ARCHER & GREINER,
A Professional Corporation
1025 Laurel Oak Road
Voorhees, New Jersey 08043
Attorneys for Plaintiffs
Julius H. Schoeps, Britt-Marie
Enhoerning and Florence von Kesselstatt
By: Kerri E. Chewning, Esquire

Byrne Goldenberg & Hamilton, PLLC
1025 Connecticut Avenue NW, Suite 1012
Washinton, D.C. 20036
John J. Byrne, Esquire (pro hac vice to be filed)
Thomas J. Hamilton, Esquire (pro hac vice to be filed)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JULIUS H. SCHOEPS, BRITT-MARIE ENHOERNING, and FLORENCE VON KESSELSTATT,<br><br>Plaintiffs,<br><br>v.<br><br>SOMPO HOLDINGS, INC., SOMPO INTERNATIONAL HOLDINGS LTD., SOMPO FINE ART FOUNDATION, SOMPO JAPAN INSURANCE INC., SOMPO HOLDINGS (UK) LTD., SOMPO AMERICA INSURANCE COMPANY, SOMPO AMERICA FIRE & MARINE INSURANCE COMPANY, ENDURANCE SPECIALTY INSURANCE LTD., ENDURANCE U.S. HOLDINGS CORP., ENDURANCE SERVICES LIMITED, ENDURANCE ASSURANCE CORPORATION, and LEXON SURETY GROUP, LLC<br><br>Defendants. | Civil No. ____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR RESTITUTION AND UNJUST ENRICHMENT**

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | INTRODUCTION AND OVERVIEW | 1 |
| | A. NATURE OF THE ACTION AND SUMMARY OF CLAIMS | 1 |
| | B. GERMAN INHERITANCE LAW | 10 |
| II. | THE PARTIES | 13 |
| | A. THE HEIRS | 13 |
| | B. DEFENDANT SOMPO ENTITIES | 15 |
| III. | THE FEDERAL COMMON LAW THAT PRECLUDES EMPLOYING THE CORPORATE FORM TO FRUSTRATE SIGNAL FEDERAL POLICIES AND TO PERPETRATE FRAUD | 37 |
| IV. | THE LAW THAT ASSERTS JURISDICTION OVER PARENT COMPANIES WHEN THEIR SUBSIDIARIES IN NEW JERSEY CONDUCT THE BUSINESS OF THEIR PARENTS RATHER THAN THEIR OWN BUSINESS OR WHEN PARENTS EMPLOY SUBSIDIARIES TO COMMIT FRAUD OR OTHERWISE PERPETRATE INJUSTICE | 39 |
| V. | THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS ASSERTED IN THIS ACTION | 73 |
| VI. | VENUE IS PROPER IN THIS DISTRICT | 75 |
| VII. | JAPAN DOES NOT PROVIDE AN AVAILABLE AND ADEQUATE ALTERNATIVE FORUM FOR PLAINTIFFS TO BRING THEIR CLAIMS | 76 |
| VIII. | STATEMENT OF FACTS COMMON TO ALL ALLEGATIONS | 77 |
| IX. | CLAIMS FOR RELIEF | 127 |

1. Now come Plaintiffs Julius H. Schoeps (hereinafter "Schoeps"), Britt-Marie Enhoerning (hereinafter "Enhoerning"), and Florence von Kesselstatt (hereinafter "Kesselstatt") (together, "Plaintiffs"), by their attorneys, Archer & Greiner, P.C., and for their Complaint against Defendants Sompo Holdings, Inc. (hereinafter "Sompo Holdings"), Sompo International Holdings Ltd. (hereinafter "Sompo International"), Sompo Fine Art Foundation (hereinafter "Foundation"), Sompo Japan Insurance Inc., (hereinafter "Sompo Japan Insurance Inc." or "Yasuda"), Sompo Holdings (UK) Ltd. (hereinafter "Sompo UK"), Sompo America Insurance Company (hereinafter "Sompo America"), Sompo America Fire & Marine Insurance Company (hereinafter "Sompo Fire"), Endurance Specialty Insurance Ltd. (hereinafter "Endurance Specialty Insurance"), Endurance U.S. Holdings Corp. (hereinafter "Endurance U.S. Holdings"), Endurance Services Limited (hereinafter "Endurance Services"), Endurance Assurance Corporation (hereinafter "Endurance Assurance"), and Lexon Surety Group, LLC (hereinafter "Lexon") (together, "Defendants"), allege as follows, based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation of counsel.

## I. INTRODUCTION AND OVERVIEW

### A. Nature of the Action and Summary of Claims

1. By this action, the heirs (hereinafter the "Mendelssohn heirs") of the late prominent Berlin Jewish banker and Nazi victim Paul von Mendelssohn-Bartholdy (hereinafter "Mendelssohn-Bartholdy" or "Paul") and the heirs (hereinafter "Elsa's heirs") of Mendelssohn-Bartholdy's widow, Elsa von Mendelssohn-Bartholdy (hereinafter "Elsa") seek to recover the iconic painting *Sunflowers* (hereinafter the "Painting") by the legendary artist Vincent van Gogh. The Mendelssohn heirs and Elsa's heirs will be referred to jointly as the "Heirs."

2. Mendelssohn-Bartholdy relinquished the Painting in Berlin in 1934 as one of many grave consequences of the racially exclusionary Nazi policies and concomitant coercion calculated to evict Jews from the economy and society of Germany. These policies violated the modern international law of human rights and led ultimately to genocide. Sompo Japan Insurance Inc. – then known as the Yasuda Fire and Marine Insurance Company – acquired *Sunflowers* at auction in 1987 in reckless disregard of the Painting's provenance (ownership history), including Mendelssohn-Bartholdy's forced sale of the Painting in Nazi Germany in 1934. In 2001, Yasuda expressed its concern on several occasions that the Painting could be in jeopardy if exhibited in Chicago, Illinois, at one point voicing alarm about the Painting that "Nazis (sic) confiscation problem may arise in America and in Holland." (*See* Yasuda email of April 26, 2001 to the Art Institute of Chicago, attached as **Exhibit 1**.) Yet despite its extensive resources, art world expertise, and deep suspicions that the Painting was a likely casualty of Nazi human rights abuses, Yasuda continued to avoid investigating the background of the Painting for fear of confirming the truth about its Nazi history. Instead – and since then – Defendants have commercially exploited as a corporate emblem what they long have all but ***known*** was a Nazi-tainted artwork. (This Complaint uses the terms "know," "knowledge" and their derivatives to mean, alternatively, knowledge in fact or reckless indifference sufficient to constitute constructive notice under relevant New Jersey and U.S. law.) Moreover, the very ability of Sompo Holdings and its wholly owned subsidiaries to commercially exploit *Sunflowers* and to reap profits drawn from their corporate identification with this work of art has depended inescapably upon their conscious wrongdoing in concealing the Painting's Nazi taint while concomitantly and proactively misrepresenting that the Painting bears no international human

rights stigma. Defendants' current and ongoing ability to commercially exploit *Sunflowers* hinges similarly upon this conscious and continuing wrongdoing.

3. Moreover, the ability of Defendants collectively to commercially exploit *Sunflowers* also has depended imperatively – and continues to depend upon – their perpetrating a ***second*** and integrally related fraud that pertains to the discrete identity of the Sompo corporate entity that actually does business in the U.S. To commercially exploit the Painting in the U.S. the Defendants necessarily must affirmatively conceal from U.S. stakeholders and prospective insurance consumers that the corporate entity through which they operate in the United States and elsewhere is not Sompo International – as they advertise – but rather their sham subsidiaries. As discussed, *infra,* the website of defendant Sompo International relates that Sompo International is the corporate vehicle through which its parent Sompo Holdings does business outside of Japan and in the U.S. The Sompo International website represents further that its insurance contracts are backed by the full financial weight of its parent, Sompo Holdings, and includes a link to the Sompo Holdings website where *Sunflowers* is prominently displayed to garner commercial and psychological traction with prospective clients. But the Defendants conceal from their U.S. stakeholders and prospective consumers that Sompo International does not do business in the U.S., but rather its corporate subsidiaries do business under the name "Sompo" or "Sompo International" throughout the United States. Accordingly, the Defendants use the Painting to perpetrate fraud upon the United States insurance market in three discrete but necessarily integrally related ways: (1) concealing the Painting's identity as a Nazi-confiscated artwork from corporate stakeholders and prospective clientele; (2) concealing also from corporate stakeholders and prospective clientele that Sompo International – whose website U.S. insurance consumers normatively consult before buying insurance from an entity doing business

in the United States as "Sompo International" or "Sompo" and which they necessarily assume is Sompo International in fact – does not do business in the United States. Rather, the corporate entities from which U.S. insurance consumers instead are buying insurance are the unidentified subsidiaries of the Defendants; and (3) prolonged and extensive fraudulent financial reporting in violation of auditing and financial accounting prescriptions of the governing International Financial Reporting Standards (IFRS) and Public Company Accounting Oversight Board (PCAOB) as well as Rule 10b-5 of the Securities and Exchange Commission (17 CFR 240.10b-5) which wrongfully and perpetually conceals both the identity of *Sunflowers* as a Nazi-tainted painting and the awareness since 2001 of Sompo and its corporate predecessors of this fact.

4. This action also seeks to recover the extensive unjust enrichment that Defendants wrongfully have reaped from capitalizing upon *Sunflowers* since recklessly acquiring the Painting in 1987, while both knowing (either in fact or by reckless indifference) that the Painting is a casualty of Nazi policies and falsely misrepresenting that it is not. Accordingly, the immense unjust enrichment that Defendants have realized from commercially exploiting *Sunflowers* since 1987 results necessarily – and inevitably – from their serious, continuing, and conscious wrongdoing. The Heirs therefore ground their equitable claims in this proceeding upon the foundational maxim prohibiting conscious wrongdoers from benefiting from their misconduct, and upon elemental principles of estoppel that preclude wrongdoers such as the Defendants from profiting by characterizing or representing facts or circumstances in a particular way, and then evading the reciprocal obligations or liabilities that later arise from these same representations. Plaintiffs' equitable claims also invoke the focal concerns of equity with redressing fraud, protecting public policies, affording appropriate remedies as necessary to rectify wrongs and avert injustice, and enjoining continuing wrongdoing. Finally, the Heir's

equitable claims assert the equitable doctrine that recognizes one corporation as the *de facto* alter ego of another, and that precludes the corporate form from being employed either to perpetrate fraud or injustice or to frustrate federal policies.

5. A U.S. District Court judge already has validated the basis for the Heirs' claims to recover *Sunflowers*, including that Mendelssohn-Bartholdy forfeited his artworks as a consequence of Nazi policies and coercion. In *Schoeps v. Museum of Modern Art*, 594 F.Supp.2d 461, 466 (S.D.N.Y. 2009), U.S. District Judge Jed S. Rakoff affirmed the *bona fides* of the Heirs' claim to recover two other artworks that Mendelssohn-Bartholdy surrendered as a consequence of Nazi persecution under nearly identical facts by denying the defendant museums' motion for summary judgment and declaring that the evidence confirmed that Mendelssohn-Bartholdy would not have transferred any of his paintings but for Nazi policies and coercion:

> Claimants have adduced competent evidence that Paul never intended to transfer any of his paintings and that he was forced to transfer them only because of threats and economic pressures by the Nazi government. Summary judgment is therefore not appropriate.

A copy of this opinion is attached as **Exhibit 2**.

6. When Christie's auction house in London offered *Sunflowers* for sale in March 1987, Yasuda resolved to buy the Painting regardless of its price because *Sunflowers* presented Yasuda with a singular and non-recurring opportunity to burnish its corporate image with the unique luster of both the iconic Painting and its legendary artist. So committed, Yasuda recklessly – if not purposefully – ignored the provenance of *Sunflowers* that Christie's published, which related that the famous Jewish Berlin banker and Nazi victim Paul von Mendelssohn-Bartholdy sold the Painting in Berlin in 1934 – at a time when notorious Nazi policies were targeting and dispossessing elite Jewish bankers and businessmen like Mendelssohn-Bartholdy

and wreaking havoc upon Germany's Jewish population. Moreover, Christie's "Conditions of Business" for prospective buyers specifically states that all statements made by Christie's in the auction catalogue – including the provenance of the Painting – are "opinion" only, and that buyers "must satisfy themselves" as to all such matters (including provenance) before the date of the auction. Accordingly, Christie's thereby disclaimed that it was transferring good title to the Painting. (*See* "Conditions of Business" prescribing terms and conditions for "The Buyer," Christie's Auction Catalogue for March 30, 1987 London auction, attached as **Exhibit 3**.) Driven to buying *Sunflowers* regardless both of its cost and conspicuously problematic provenance, Yasuda paid a record hammer price of nearly $40 million dollars for the Painting. But Yasuda immediately acknowledged to a Christie's official that based upon the unprecedented international media attention and fanfare attending the auction, Yasuda realized in public relations value an amount four times greater, or approximately $160 million dollars.

7. In 2001, Yasuda confided to the Art Institute of Chicago (AIC) and the van Gogh Museum in Amsterdam that "Nazis confiscation problem may arise in America and in Holland" with regard to a proposed exhibition of the Painting in those locations, and that it knew little more about the Painting than what the Christies' auction provenance revealed. (**Exhibit 1**.) But despite extensive resources and art world expertise, Yasuda continued to avoid investigating the Painting for fear that it would confirm that systematic Nazi policies and coercion, in violation of the international law of human rights, compelled Mendelssohn-Bartholdy to surrender *Sunflowers* in 1934 Berlin. Instead – and upon information and belief – the Art Institute of Chicago, with Yasuda's knowledge and complicity, filed with the U.S. Department of State a false application under the Immunity from Judicial Seizure Act (22 U.S.C. § 2459), which failed to disclose the Painting's Nazi taint. This deception enabled Yasuda to import the Painting into

the U.S. so that Yasuda could commercially exploit it at a major van Gogh exhibition that AIC was hosting in Chicago, with the assurance that U.S. law enforcement authorities would not seize the Painting as Nazi contraband. This misconduct violated federal statutes including the National Stolen Property Act, 18 U.S.C. § 2314 as well as the proscription against filing a false report with a federal agency, 18 U.S.C. § 1001.

8. Sompo Holdings and its defendant corporate subsidiaries (which Sompo Holdings collectively refers to as "One Sompo") have commingled the primary marketing and branding asset of Sompo Japan Insurance Inc. – the *Sunflowers* painting – and collectively have employed it fraudulently to reap billions of dollars of unjust enrichment through a sophisticated branding strategy based upon psychological images or archetypes. By knowingly exploiting a Nazi-tainted painting in the U.S. for commercial gain – while misrepresenting concomitantly that they have conducted an extensive human rights due diligence investigation of all of their constituent corporate entities that has revealed that none of their assets or activities are afflicted with human rights violations – the Defendants have, and continue, to defraud the U.S. insurance market and to consciously violate multiple U.S. laws as well as domestic and foreign policies. These policies include seeking to resolve claims for Nazi-era artworks openly, honestly, fairly, and with access to all relevant documents and evidence, and without litigation if possible, as well as policies protecting the U.S. insurance market from commercial fraud, unfair competition and unfair or deceptive acts or practices in or affecting commerce, as provided by 15 U.S.C. § 45. Moreover, Defendants' conscious wrongdoing concerning the Painting – which has enabled them to reap extensive unjust enrichment – also violates federal proscriptions such as mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) in that – upon information and belief – those companies employ both the U.S. mails and wires to operate in the U.S. and to further their

fraudulent scheme concerning the Painting which targets prospective United States insurance consumers.

9. As a casualty of Nazi policies, the Painting implicates both signal U.S. foreign policies to identify artworks lost as a consequence of Nazi crimes and to return these artworks to their rightful owners based upon equitable principles grounded in fairness and justice, as well as the related ability of the U.S. Government to address war-related crimes through international diplomacy. The Supreme Court has made clear that when the subject matter of an equitable claim – such as the claims of the Heirs to recover the Painting and for unjust enrichment – affects federal interests, courts assessing equitable relief consider relevant federal policies as well as how the conduct of the parties affects the public interest. *See, e.g., Precision Manufacturing Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945). In sustaining or denying equitable claims under these circumstances, courts protect both established federal policy as well as the public interest. *Ibid.* Moreover, when important federal legislative policies and the public interest are at stake, Article III, Section 2 of the U.S. Constitution invests the federal judiciary with the broadest range of plenary equitable authority to achieve these objectives. These include the power in appropriate circumstances to impose constructive trusts upon property, as well as to compel conscious wrongdoers such as Sompo to disgorge or forfeit the unjust enrichment that they have reaped from their conscious wrongdoing. *See*, *e.g*., *Kansas v. Nebraska*, 574 U.S. 445, 463 (2015). *See also* Owen W. Gallogly, *Equity's Constitutional Source*, 132 Yale L. J. 1213, 1312 (2023), observing that "the power exercised by federal courts in most equity cases is the inherent remedial authority conferred by Article III, so it is the extent of that power – not any authorized by statute – that delimits the permissible remedies available in federal court." (Emphasis and italics supplied.) Accordingly, the federal equitable claims of the

Heirs to recover the Painting and for unjust enrichment are grounded necessarily upon the Court's plenary equitable authority under Article III, Section 2 of the U.S. Constitution to effectuate the federal foreign policy objectives of both Congress and the President to resolve claims for the return of Nazi era artworks in a just, fair and equitable manner. And because both political branches that the Constitution entrusts with deciding and implementing U.S. foreign policy – Congress and the Executive have agreed emphatically upon these policies and their substantive content, these policies necessarily preempt, as a matter of U.S. Constitutional law, any New Jersey state law or remedy that obstructs or limits these policies in any way. So – and in the final analysis – the federal equitable remedies of the Heirs to recover the Painting and for unjust enrichment do not depend upon whether New Jersey state law affords the Heirs effective judicial relief.

10. By expressly identifying the Sompo corporate image with *Sunflowers* so that the two have become, as Sompo Japan Insurance Inc. celebrates, "synonymous" in the minds of its many stakeholders and members of the public – and by making *Sunflowers* an emblem of its collective corporate identity while proactively concealing the Painting's Nazi taint – the Defendants make clear that the Painting (and the Defendants' concomitant deceptions) necessarily play an integral role in defining their discrete brand and appealing to U.S. insurance consumers.

11. Importantly, the Defendants continue to violate U.S. foreign policy with impunity, in that fraudulently concealing the Painting's Nazi taint and concomitant conscious wrongdoing are – and always have been – essential to their ability to commercially exploit the Painting. These considerations crystalize the need for the Court to exercise its plenary equitable authority

both to vindicate overarching U.S. foreign policy and to redress the Defendants' unconscionable and continuing wrongdoing.

12. Finally, the "Sompo Group" – which includes Sompo Holdings and its subsidiaries, including the Defendants in particular – has made a mockery of its vaunted public commitments to behaving ethically, honestly, and transparently and consistent with corporate social responsibility and the protection of human rights as a basis for inviting the reliance and trust of its stakeholders, prospective customers, and the public.

**B. German Inheritance Law**

13. Paul von Mendelssohn-Bartholdy was married to Elsa von Mendelssohn-Bartholdy (hereinafter "Elsa") from 1927 until his death on May 10, 1935. At the time of his death, Mendelssohn-Bartholdy had four living sisters: Kathe Wach; Charlotte Hallin; Enole von Schwerin; and Marie Busch.

14. On February 8, 1935 – about three months before his death – Mendelssohn-Bartholdy and his non-Jewish wife, Elsa, executed a Contract of Inheritance (hereinafter the "COI"), which under German law is an alternative to a will. Under this contract, Paul gave Elsa a life estate in his property, with a reversionary interest to his four sisters or their descendants. In other words, at the time of Elsa's death, Paul's four sisters (or their descendants) would become the residuary owners of Paul's property and all rights related thereto.

15. Under German law, rights vest immediately upon the death of the decedent. Accordingly, an heir takes the place of the decedent immediately upon death. If there is more than one heir, then a "community of heirs" takes the place of the decedent jointly and severally. The heir or "community of heirs" assumes the decedent's obligations and takes over his or her assets. Under German law, there is no legal "estate," and no "administrator" or "executor" is appointed by statute since rights vest immediately upon the decedent's death.

Paul died on May 10, 1935. Elsa's rights to a "life estate" vested immediately at the time of Paul's death. Elsa died in 1986. Because all four of Paul's sisters predeceased Elsa, the descendants of Paul's four sisters immediately became the owners of the residuary rights to Paul's estate.

16. Elsa left a will providing that her inheritors were her daughter, plaintiff Kesselstatt, and her niece Edelgard von Lavergne-Peguilhen (hereinafter "Edelgard"). When Elsa died in 1986, all of Kesselstatt's and Edelgard's inheritance rights to Elsa's estate vested immediately.

17. This action is brought on behalf of all of the living heirs through descent and relevant law of Paul von Mendelssohn-Bartholdy's four sisters, that is, the Mendelssohn heirs, and all of the living heirs through descent and relevant law of Elsa, that is, Elsa's heirs, as described immediately below.

18. Under German law it is possible for a single co-heir belonging to a community of heirs to bring forward – in his or her individual capacity – claims belonging to the estate against third parties. Each rightful co-heir belonging to a community of heirs can pursue such a claim deriving from the estate without involving the other co-heirs belonging to the community of heirs – and without being appointed by the other co-heirs – as long as the individual co-heir taking such action demands performance for the benefit of all co-heirs jointly in this regard. This right derives from § 2039 German Civil Code which reads:

> § 2039. Estate Claims
> If a claim is part of the estate, the person obliged may perform only to all heirs jointly, and each co-heir may claim only performance to all heirs. Every co-heir may require that the person obliged deposit the thing to be surrendered for all heirs or, if it is not suitable for deposit, delivers it to a custodian to be appointed by the court.

Thus § 2039 German Civil Code recognizes the legal capacity of an individual co-heir to demand performance from third parties concerning claims belonging to an estate. This legal capacity is granted by law. When pursuing such a claim the individual co-heir acts in his own name and not as representative of the other co-heirs. The membership in a community of heirs entitles one to have standing to bring suit, provided that the demand is made for performance to all members of the community of heirs jointly. Accordingly, in this case under German law, plaintiffs have standing – as individual co-heirs – because they belong to the entitled community of heirs and are demanding that Defendants restitute the painting, *Sunflowers*, jointly to all those in the respective community of heirs.

19. The foregoing basic allegations regarding German inheritance law, among other evidence, has been sufficient for courts to find that the Plaintiffs have standing to bring suit for art lost by Paul von Mendelssohn-Bartholdy due to Nazi persecution. *See Schoeps v. Sompo*, 736 F.Supp.3d 582 (N.D. Ill. 2024)(court found that the same plaintiffs as in this case had standing to bring suit because property rights vest immediately upon the death of decedents in Germany; Germany lacks a procedure for appointment of an estate administrator since no such "estate" exists under German law; an individual suit on behalf of a community of heirs would fulfill the same purpose as an action brought by an appointed representative; and that the plaintiffs have standing to bring such a claim under German law); *see also Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 466-67 (S.D.N.Y. 2009)(in another related case, the court found that the Mendelssohn heirs had standing because German law has no "estate" but rather property passes immediately by operation of law to the decedent's heirs and "there is no estate as there is under American law; rather, the decedent's assets vest immediately in his or her heirs at death"; the court went on to state: "It is, indeed, difficult to imagine how the Claimants could be appointed

representatives of Paul's or Elsa's estates when, according to the Museums' witness, no such estates ever existed or would exist under German law”).

## II. THE PARTIES

### A. The Heirs

20. Plaintiff Professor Schoeps is a citizen of Germany residing in Berlin, Germany. He is the former director of the Moses Mendelssohn Center for European-Jewish Studies at the University of Potsdam in Potsdam, Germany. Schoeps is a professor *emeritus* and one of the founders of the University of Potsdam. Schoeps is Mendelssohn-Bartholdy’s great-nephew and is one of the Mendelssohn heirs. As such, Schoeps is duly qualified under New Jersey and German law to bring this action to demand restitution of the Painting to the Mendelssohn heirs, and as such is their agent and representative in this proceeding. All of the Mendelssohn heirs have agreed to plaintiff Schoeps acting as their agent and representative in this matter.

21. Plaintiff Enhoerning is a U.S. citizen as well as a citizen and resident of Sweden. She is Mendelssohn-Bartholdy’s grand-niece and is one of the Mendelssohn heirs. Plaintiff Enhoerning is duly qualified under New Jersey law to bring this action to demand restitution of the Painting to the Mendelssohn heirs, and as such is their agent and representative in this proceeding. All of the Mendelssohn heirs have agreed to plaintiff Enhoerning acting as their agent and representative in this matter.

22. Plaintiff Kesselstatt is an individual residing in Munich, Germany. She is Elsa’s daughter and is one of Elsa’s heirs. Plaintiff Kesselstatt is duly qualified under New Jersey and German law to bring this action to demand restitution of the Painting to Elsa’s heirs, and as such is their agent and representative in this proceeding. All of Elsa’s heirs have agreed to plaintiff Kesselstatt acting as their agent and representative in this matter.

23. Plaintiff Kesselstatt is a party to this action due to a historical ambiguity resulting from Nazi persecution that may – under a possible contingency – give her legal rights to reclaim the Painting. The Contract of Inheritance related that Mendelssohn-Bartholdy had given his "paintings" to Elsa at their wedding in 1927. Upon information and belief, however, Mendelssohn-Bartholdy did not give his art collection or the Painting to Elsa when they married in 1927. Rather, Mendelssohn-Bartholdy so declared in the Contract of Inheritance to protect his art collection from Nazi predation by conveying the impression that his wife Elsa – an "Aryan" – had owned his art collection since before the Nazis took power. Moreover, even if this recital created an *inter vivos* gift of Mendelssohn-Bartholdy's art collection to Elsa as of February 8, 1935, Mendelssohn-Bartholdy did not intend to transfer to her any artworks – like the Painting – that he had already sold or had consigned as of the date of the Contract of Inheritance. Therefore, recoverable artworks like the Painting that Mendelssohn-Bartholdy lost in the Nazi period would have become "choses in action" in the life estate comprising Mendelssohn-Bartholdy's property, and to which Elsa succeeded after Mendelssohn-Bartholdy died in May 1935. These choses in action – reflecting the right to recover artworks that Mendelssohn-Bartholdy forfeited during the Nazi-era – then became part of Mendelssohn-Bartholdy's residual estate to which the heirs of Mendelssohn-Bartholdy's sisters succeeded when Elsa died in 1986.

24. In the alternative, if Mendelssohn-Bartholdy's Contract of Inheritance effectively transferred his art collection to Elsa as of 1927 or as of February 8, 1935 (the date of the Contract of Inheritance), then the owners of the artworks would be Elsa's heirs.

25. The Mendelssohn heirs and Elsa's heirs are aware of their competing ownership claims to *Sunflowers*, but have decided to pursue this action jointly. To this end, they have waived any and all conflicts of interest among them to recover artworks lost as a result of Nazi

persecution, as was noted and approved in *Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 463 n. 1 (S.D.N.Y. 2009) (in a case similar to this matter brought by the Mendelssohn heirs and Elsa's heirs, the court found that "Claimants have entered into a side-agreement waiving any conflicts and agreeing to divide any recovery.") (**Exhibit 2**.)

**B. Defendant Sompo Entities**

**1. General Allegations and Corporate Structure**

26. Defendant Sompo Holdings, Inc. (hereinafter "Sompo Holdings") is the Japanese parent holding company of the Sompo group. Sompo Holdings is the parent company of multiple subsidiaries that operate primarily in the insurance industry in Japan, internationally, in New Jersey and throughout the U.S. Further, Sompo Holdings owns and controls, among other entities, the Defendants in this action. The Defendants operate in a tightly organized and cohesive manner and expressly encourage the reliance of both New Jersey and U.S. stakeholders and prospective customers that they collectively constitute a single integrated enterprise which they denominate as "One Sompo" and market under the name "Sompo" and "Sompo International." Sompo Holdings and the other Defendants collectively employ *Sunflowers* as their primary and defining marketing and branding asset while knowing both that the Painting is a casualty of Nazi confiscatory and genocidal policies and their commercial exploitations of the Painting violates the signal U. S. foreign policy to restitute Nazi-confiscated artworks to rightful owners, and defrauds New Jersey and U.S. insurance consumers. Sompo Holdings is incorporated and organized under the laws of Japan, and has its principal place of business at 26-1, Nishi-Shinjuku 1-chome Shinjuku-ku, Tokyo 160-8338 Japan.

27. Defendant Sompo Japan Insurance Inc. (hereinafter "Sompo Japan") is the principal Japanese property-and-casualty insurance subsidiary of Sompo Holdings. Sompo Japan is organized and existing under the laws of Japan, and its principal of business is at 26-1,

Nishi-Shinjuku 1-chome Shinjuku-ku, Tokyo 160-8338 Japan. Sompo Japan is a direct subsidiary of Sompo Holdings.

28. Defendant Sompo International Holdings Ltd. (hereinafter "Sompo International") is the Bermuda-based international insurance holding company within the Sompo corporate group. Sompo International is a company organized and existing under the laws of Bermuda, with its principal place of business at Waterloo House, 100 Pitts Bay Road, Pembroke HM 08 Bermuda. Sompo International is a direct subsidiary of Sompo Japan, and controls the major U.S. insurance operations of the Sompo group.

29. Endurance Specialty Insurance Ltd. (hereinafter "Endurance Specialty") is a company organized and existing under the laws of Bermuda, with its principal place of business at Waterloo House, 100 Pitts Bay Road, Pembroke HM 08 Bermuda. Endurance Specialty became part of the Sompo International organization after Sompo acquired Endurance Specialty Holdings Ltd. in 2017, and is a direct subsidiary of Sompo International.

30. Sompo Holdings (UK) Ltd. (hereinafter "Sompo UK") is a United Kingdom company within the Sompo corporate group. Sompo UK is a company incorporated under the laws of England and Wales, with its registered office at 1 Creechurch Place, London EC3A 5AF, United Kingdom. Sompo UK is a wholly owned subsidiary of Endurance Specialty.

31. Endurance U.S. Holdings Corp. (hereinafter "Endurance Holdings") is a corporation within the Sompo corporate group, and is organized and existing under the laws of the State of Delaware. It is a U.S. holding company in the Sompo International structure and is used to hold ownership interests in various U.S.-based insurance subsidiaries, including insurance carriers and related operating entities. Endurance Holdings' principal place of

business is 333 South Wabash Avenue, Chicago, Illinois 60604. Endurance Holdings is a direct subsidiary of Sompo UK.

32. Endurance Services Limited (hereinafter "Endurance Services") is a Delaware corporation formed in 2005, with its principal place of business at 4 Manhattanville Road, Purchase, New York. Endurance Services is a wholly owned direct subsidiary of Endurance Holdings. Endurance Services provides general corporate services to Sompo subsidiaries throughout the United States, including but not limited to managing office leases.

33. Endurance Assurance Corporation (hereinafter "Endurance Assurance") is a Delaware insurance corporation within the Sompo corporate group. Endurance Assurance is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 333 South Wabash Avenue, Chicago, Illinois 60604. It is a direct subsidiary of Endurance Holdings. Endurance Assurance became part of the Sompo organization through Sompo's acquisition of the Endurance group in 2017.

34. Sompo America Insurance Company (hereinafter "Sompo America") is a New York insurance corporation within the Sompo group. Sompo America is a corporation organized and existing under the laws of the State of New York with its principal business at 1221 Avenue of the Americas, New York, New York 10020. Sompo America is a direct subsidiary of Endurance Assurance.

35. Sompo America Fire & Marine Insurance Company (hereinafter "Sompo AFM") is a New York insurance corporation within the Sompo group. Sompo AFM is organized and existing under the laws of the State of New York, with its principal business address at 1221 Avenue of the Americas, New York, New York 10020. Sompo AFM is a direct subsidiary of Endurance Assurance.

36. Defendant Foundation operates the defendant Sompo Museum of Art in Tokyo, Japan. Upon information and belief, Sompo Holdings exercises dominion and exclusive control over the Foundation, and employs the Foundation to embody and promote the collective commercial image and agenda of Sompo Holdings, "One Sompo," and the "Sompo Group."

37. Defendant Lexon Surety Group, LLC (hereinafter "Lexon") is a limited liability company organized under the laws of the State of Tennessee, with its principal place of business located at 12890 Lebanon Road, Mt. Juliet, Tennessee 37122. Lexon operates through subsidiaries and registered entities in all 50 states, and itself is a direct subsidiary of Endurance U.S. Holdings Corp. Lexon operates as a specialized U.S. surety insurance division of Sompo International.

38. To summarize the foregoing, the Defendants' corporate ownership structure is as follows:

(a) Defendant Sompo Holdings directly owns all of the outstanding capital stock of Defendant Sompo Japan Insurance Inc. (Yasuda);

(b) Defendant Sompo Japan Insurance Inc. (Yasuda), in turn, directly owns all the issued and outstanding voting shares of Defendant Sompo International;

(c) Defendant Sompo International directly owns Defendant Endurance Specialty;

(d) Defendant Endurance Specialty directly owns Defendant Sompo Holdings (UK) Ltd.;

(e) Defendant Sompo Holdings (UK) Ltd. directly owns Defendant Endurance U.S. Holdings Corp.;

(f) Defendant Endurance U.S. Holdings owns Defendant Endurance Services, Defendant Endurance Assurance Corporation and Defendant Lexon;

(g) Defendant Endurance Assurance Corporation owns Defendant Sompo American Insurance Company and Defendant Sompo America Fire & Marine Insurance Company.

(*See* May 17, 2023 New York State Department of Financial Services "Report on Examination of Sompo America Insurance Company as of December 31, 2021," at 8-10, hereinafter "NY Report," excerpts of which are attached hereto as **Exhibit 4**; Defendants respective ownership interests are set forth in the diagram on page 10).

**2. "Sompo" entities act in concert to avail themselves of the U.S. Market**

39. Sompo Holdings was established on April 1, 2010 under the name "NSKJ Holdings, Inc.," as a result of a share exchange agreement between Sompo Japan Insurance Inc. and the Nipponkoa Insurance Co., Ltd. to establish a joint holding company. "Sompo has an extensive global footprint with nearly 80,000 employees in 228 cities in 30 countries and its core business encompasses one of the largest property and casualty insurance groups in the Japanese domestic market." (*See* Sompo International website, "About Us," available at https://www.sompo-intl.com/about-us/.) As noted above, Sompo Holdings' wholly owned subsidiaries include the Defendants in this action, as well as Sompo Himawari Life, Sompo Japan DC Securities, Sompo Risk Management, Fresh House, Sompo Health Support, My Insurance, Saison Insurance, Sompo Asset Management, Prime Assistance, Sompo Care, and Sompo Warranty, Inc. For marketing purposes and to maximize revenues and profits, however, Sompo Holdings has encouraged its stakeholders and prospective clientele to view each Sompo subsidiary as "One Sompo" or "Sompo," and employs *Sunflowers* as the emblem of their

collective corporate identity. Similarly, Sompo Holdings and Sompo International in particular have advanced the concept of the "Sompo Group," which includes the Sompo Holdings' subsidiaries and the Defendants in particular. In this manner, Sompo Holdings commingles its primary branding and marketing asset – the iconic *Sunflowers* painting – among its subsidiaries. And by concealing the Nazi taint of *Sunflowers* and proactively affirming to its stakeholders and prospective clientele that *Sunflowers* is not afflicted with any international human rights violations or stigma, Sompo Holdings and its subsidiaries collectively defraud the insurance market in New Jersey, the U.S. and in every country in which they operate. The Defendants also violate with impunity the signal foreign policies of the U.S. and many countries where they operate to return Nazi tainted artworks to rightful owners in a just, fair and equitable manner.

40. Sompo Holdings' declared objective is to create a global "Theme Park" for wellness by cultivating a "new level of trust" internationally. (*See* Sompo Holdings website, "Brand Story," available at https://www.sompo-hd.com/en/company/brand/.)

41. Sompo Holdings professes a close allegiance with the nation of Japan and seeks to connect the world's people with a "New Level of Trust." Sompo Holdings declares that its unique brand mark, "Global Ring," symbolizes the Sompo Group, and "serves as a core element of its brand communication." (*See* Sompo Holdings website, "The Golden Ring," available at https://www.sompo-hd.com/en/company/brand/.) Sompo Holdings further maintains that "the red sphere symbolizes perfect harmony, while simultaneously representing *our nation of Japan."* *Id.* (Emphasis supplied.) It additionally represents that "[t]he overlaid platinum ring is a leader guiding towards our future, representing Sompo Group's future in connecting with people of the world to create a 'new level of trust.'" *Id.* (Emphasis supplied.)

42. Kengo Sakurada was the CEO of Sompo Holdings until in or around March 2024, and was foremost responsible for protecting Sompo's discrete brand. Mr. Sakurada was a prominent international business leader, and was proactive in the World Economic Forum. In 2019, Mr. Sakurada became the Chair of the Japan Association of Corporate Executives (Keizai Doyukai), and is the author of the book *Corporate Bushido: The Code to Redefine Business for a Sustainable Future*. This book proposes to "recalibrate" international capitalism based upon the ancient warrior code of Japan. Mr. Sakurada resigned as CEO of Sompo Holdings in or around March 2024 because of corporate scandals relating to fraudulent automobile insurance claims and price-fixing. (*See* discussion immediately below). These scandals materially impaired the trust that Sompo enjoys among its corporate stakeholders which is essential to preserve Sompo's corporate viability as a going concern business entity in the increasingly uncertain, and permanently volatile international insurance market.

43. Mikio Okumura is now the CEO of Sompo Holdings, beginning in or around March 2024. At the Shareholders meeting on June 3, 2024, Mr. Okumura vowed that the Sompo scandals described above would not occur again:

> The Company [Sompo Holdings] and Sompo Japan Insurance Inc. (hereinafter "Sompo Japan"), a subsidiary of the Company received business improvement orders respectively from the [Japanese Government] Financial Services Agency in January 2024, with regard to our responses to fraudulent automobile insurance claims made by Big Motor. Moreover, Sompo Japan received a business improvement order from the Financial Services Agency in December 2023 for the incident concerning inappropriate insurance premium adjustments, which were seen as infringing on the Antimonopoly Act. We sincerely apologize to our shareholders, customers, and many other stakeholders for the great inconvenient and concern caused. Taking this situation very seriously, and to ensure that such incidents never happen again, I will stand at the forefront of the Group's efforts to execute business improvement plans diligently and with a sense of speed, and restore the trust of all stakeholders as soon as possible.
>
> *See* https://www.sompo-hd.com/-/media/hd/en/files/ir/stock/meeting/pdf/sompo-hd20240531_eng_1.pdf?la=en

44. Defendant Sompo Japan Insurance Inc. does business in Japan and other locations, including in the United States territory of Guam. Sompo Japan Insurance Inc. is the direct lineal successor to Yasuda, which was founded in 1888. In 1962, Yasuda established Yasuda America in New York primarily to service its Japanese clients in the U.S., and by 2001 Yasuda America had offices in several major U.S. cities – Chicago, New York, Louisville, Los Angeles, Atlanta, and Nashville.

45. In 1986, Yasuda established Yasuda Asset Management in Japan, a firm specializing in asset and risk management, and later expanded its commercial asset and risk management services. As noted above, in 1987 Yasuda purchased *Sunflowers* at an auction at Christie's in London, England, and Sompo Japan Insurance Inc. claims ownership of the Painting at this time.

46. Defendant Sompo International is a Bermuda corporation and is a wholly-owned subsidiary of Sompo Holdings, and represents on its website that it maintains well over 20 offices throughout the United States, including New Jersey offices at 340 Mount Kemble Avenue, Suite 310 N, Morristown, NJ 07960 and 499 Washington Boulevard Jersey City, NJ 07310. Sompo International's website also states that it maintains an office at 303 West Madison, Suite 1800, Chicago, Illinois 60606, where the name "Sompo International" is prominently displayed with the Sompo Group symbol. (*See* **Exhibit 5**, which is a copy of the webpage at which Sompo International states that it has two offices in New Jersey; and **Exhibit 6**, which is a copy of a webpage at which Sompo International states that it has an office in Chicago, Illinois at 303 West Madison; *see also* **Exhibit 7**, which is a photo of the outside of the 303 West Madison building, along with a photo of the Sompo International office inside the building prominently displaying the name "Sompo International" next to the Sompo Group's

"Global Ring" logo). Sompo International is a global specialty provider of property and casualty insurance and reinsurance, and was established in March 2017 as the result of the acquisition of Endurance Specialty Holdings Ltd. by Sompo Holdings. *See* Sompo International website, "About Us," available at https://www.sompo-intl.com/about-us/. Sompo International is the discrete corporate vehicle by which Sompo operates in the U.S. and internationally. The website of Sompo International states that:

> Sompo's commercial property, casualty and specialty insurance and reinsurance business outside of Japan has been unified under Sompo International's Commercial P&C platform. Sompo International's Retail platform, outside of Japan, continues to grow as a part of our on-going transformation in 2020.*Id.*

47. Defendant Sompo International operates in North America, Europe, and Asia in the following countries or territories: Bermuda, Germany, Italy, Luxembourg, Mexico, Luxembourg, Singapore, Spain, United Kingdom and the United States. Sompo International's website, available at https://www.sompo-intl.com/locastions/. As discussed, *infra,* eight of these countries or territories – Bermuda, Germany, Italy, Luxembourg, Spain, Switzerland, the United Kingdom and the United States – are signatories to, and stakeholders in, the Terezin Declaration of 2009 (the "Terezin Declaration" or "Declaration"). The Declaration commits each stakeholder government – to the extent practicable – to employ its discrete legal system in a manner that facilitates the restitution of Nazi-era artworks such as the Painting.

48. Sompo International targets the lucrative U.S. insurance market in particular, and currently represents on its website to have offices in many U.S. cities including Morristown and Jersey City in New Jersey, and Chicago, New York, Los Angeles, San Francisco, Seattle, Atlanta, Nashville, St. Louis, Dallas, Charlotte, and Louisville. As noted above, in 2001 Yasuda brought the Painting to Chicago to commercially exploit it in a prestigious van Gogh exhibition between September 2001 and January 2002 sponsored by the Art Institute of Chicago

(hereinafter "AIC") after, upon information and belief, approving a false application that AIC filed with the United States Department of State under 22 U.S.C. § 2459 (Immunity from Judicial Seizure Act) concealing the Painting's Nazi taint. The Defendants' misconduct in conjunction with AIC in this regard violated the National Stolen Property Act, 18 U.S. C. § 2314 (proscribing transporting stolen or converted property worth $5,000 or more in international or interstate commerce), as well as 18 U.S.C. § 1001 (prohibiting filing a false report with a federal agency concerning subject matter within its jurisdiction). Moreover, the display of the Painting in Chicago afforded the Defendants special notoriety as well as public relations and commercial benefits throughout the United States. In fact, Yasuda's Chicago office was actively involved in the Exhibition and the "Lender Dinner," which took place before the Exhibition. (*See* **Exhibit 8**, a September 6, 2001 facsimile from Steve Kunizuka at Yasuda's Chicago office to AIC's Barbara Mirecki). Defendants continue to augment the benefits of the Exhibition by employing their websites in the U.S. as vehicles for promoting their fraudulent marketing scheme. By bringing the Painting to display at the prestigious Van Gogh Exhibition (Exhibition) at the AIC , the Defendants targeted the United States specifically and reaped extensive reciprocal benefits and advantages that amplified its capability to commercially exploit the Painting both throughout the U.S and internationally. The three and one half (3 ½) month Exhibition afforded Sompo immense branding and marketing rewards by enabling it to associate its discrete corporate identity with this iconic Painting and the legendary artist Vincent Van Gogh through the extensive U.S. and international publicity and media coverage that the Exhibition received.

49. On its website, Sompo International assures prospective U.S. insurance consumers that the full financial power of Sompo Holdings supports its insureds: ***"Sompo International is backed by the financial strength of Sompo Holdings, Inc., which holds more***

***than $100 billion in total assets."*** *See* **Exhibit 9**. (Emphasis supplied.) The website page on which this assurance appears provides a link inviting viewers to learn more about its parent company that expressly assumes liability for its obligations. Sompo Holdings thereby induces prospective U.S. insurance consumers – through its wholly owned subsidiary and corporate vehicle for conducting business outside Japan and including the United States, Sompo International – to rely expressly upon its financial strength. Sompo Holdings has thereby represented to the public that its financial assets are available to Sompo International and thus waived the most important attribute of corporate identity – the limited liability that the corporate form offers shareholders.

50. Sompo Holdings and Sompo International have interconnected website links, so that the two entities are intertwined in multiple ways. (Sompo International provides a link to Sompo Holdings at, for example, *https://www.sompo-intl.com/about-us/*; an example of Sompo Holdings link to Sompo International is at *https://www.sompo-hd.com/en/group/group_list/#09*.)

51. In addition, Sompo Holdings and Sompo International share interlocking officers, in that many of the top-level officers at Sompo International also have important positions at Sompo. For example: (1) James Shea is the CEO and Executive Chairman of the Board of Directors of Sompo International; he also is the "Chief Executive Officer of Overseas Insurance and Reinsurance Business" of Sompo Holdings; (2) before he became CEO of Sompo Holdings in or around March 2024, Mikio Okumura was Non-Executive Director, Sompo International while – at the same time – he was Group Chief Operating Officer, President and Representative Executive Officer, of Sompo Holdings; (3) Yuji Kawauchi is a "Non-Executive Director of Sompo International"; Kawauchi also is listed as "Executive Vice President, General Manager, Global Business Planning Department" for Sompo Holdings; (4) Katsuyuki Tajiri is a Senior

Executive Vice-President for Sompo Holdings and was – at least up to March 2, 2022 – Chief Executive Officer of Sompo International Retail.

52. Defendants operate, in effect, as one company. Thus, not surprisingly, in July 2022, Sompo International opened an office in Tokyo. Kenneth Reilly was appointed to lead that office. *See* https://www.sompo-intl.com/media-center/sompo-international-announces-the-establishment-of-its-tokyo-office-ken-reilly-to-join-as-head-of-the-office/. Reilly had positions at both Sompo Holdings (Executive Vice President, General Manager, Global Business Department) and Sompo International (Executive Vice President, Head of the new Sompo International Tokyo office, effective July 1, 2022). In fact, Sompo International related that Reilly would be reporting to officials from both Sompo Holdings and Sompo International. *Id*.

53. In an April 8, 2022 Press Release, Sompo International CEO James Shea – who also is Chief Executive Officer of the Overseas Insurance and Reinsurance Business of Sompo Holdings – stated: "Establishing our new Sompo International office in Tokyo is a big step forward towards increasing collaboration and education amongst the employees of Sompo International and the Sompo Insurance companies in Japan . . . . Ken [Reilly] and his team will focus on building '***<u>One Sompo'</u>*** . . . . " (Emphasis supplied.)

54. On Monday October 31, 2022 Sompo Holdings sponsored a full-page paid advertisement in the Wall Street Journal (Page A18) with the caption "Accelerating Growth in a Time of Great Change" featuring a quotation from Mr. Mikio Okumura, Group COO/Director/President and Representative Executive Officer for Sompo Holdings, declaring that "[w]e aim to become the most unique insurance group in the world." (*See* **Exhibit 10.)** The advertisement asserts that Sompo Holdings has had special success in its overseas markets, which presumably include the U.S: "[g]rowth in our overseas insurance and reinsurance business

has been particularly remarkable." Importantly, the advertisement is for Sompo Holdings in the United States, with the intent to direct consumers to the Sompo Holdings website. On this website, a prospective U.S. insurance consumer or investor investigating Sompo Holdings as a prospect for buying insurance or for investment would find at the top of the first page a striking image of Van Gogh's *Sunflowers* with the accompanying notation "*True Feeling and an Enriched Heart for People and Society Through Art and Culture*" (emphasis supplied), necessarily conveying the message that the Painting fosters these sentiments. (**Exhibit 11**.) Sompo Holdings, however, proactively conceals from website visitors and prospective clientele that the Painting is a casualty of Nazi policies. It misrepresents to website visitors that in 2021 it conducted an extensive enterprise-wide human rights due diligence investigation to ensure that none of its assets or corporate activities were afflicted with human rights violations or human rights taint. (**Exhibit 12**.) Sompo thereby both violates the signal U.S. foreign policy to identify Nazi-tainted artworks and to resolve claims for these materials equitably, and defrauds New Jersey and U.S. consumers thereby violating both state and federal policies to protect consumers from unfair business and deceptive trade practices.

55. The Sompo Holdings website informs prospective New Jersey and U.S. insurance consumers that Sompo Holdings operates internationally through Sompo International. Accordingly, Sompo Holdings guides New Jersey insurance consumers and prospective clientele to the New Jersey office of Sompo International or its subsidiaries to encourage and enable them to purchase insurance.

56. In light of the foregoing, it is clear that Sompo Holdings operates internationally through Sompo International, and that the two corporations have a unity of purpose, intertwined personnel, and act in concert on many levels as "One Sompo."

57. As noted, Defendant Foundation operates the Sompo Museum of Art in Tokyo, Japan. Upon information and belief, Sompo Holdings exercises dominion and exclusive control over the Foundation, and employs the Foundation to embody and promote the collective commercial image and agenda of Sompo Holdings, "One Sompo," and the "Sompo Group." Sompo Japan Insurance Inc. claims ownership of the Painting. Upon information and belief, the Foundation collaborates with Sompo Japan Insurance Inc., Sompo Holdings, Sompo International, Endurance Services, Endurance Specialty Insurance, Endurance U.S. Holdings, and all other Defendants in commercially exploiting the Painting in the U.S. and internationally. Accordingly, and for all purposes associated with this litigation, the Defendants are reciprocal corporate alter egos that collectively and tortiously commercially exploit *Sunflowers* in the U.S. in violation of signal U.S. foreign policy to return Nazi-confiscated artworks to rightful owners, and in a manner that deceives and defrauds insurance consumers throughout the U.S.

58. Defendant Endurance Specialty is a Bermuda corporation owned by Sompo International. Endurance Specialty, in turn, owns Defendant Sompo Holdings (UK), which owns Defendant Endurance U.S. Holdings. Endurance U.S. Holdings owns Defendant Endurance Services and Endurance Assurance Corporation. Defendant Endurance Assurance Corporation owns Sompo America Insurance Company and Sompo America Fire and Marine Insurance Company.

59. Defendant Endurance Services does business throughout the United States as "Sompo International. (*See* April 17, 2024 declaration of Defendant Sompo International Senior Vice President Greg Garside ["Garside Declaration"] ¶ 9-10; D. E. 72-1, attached hereto as **Exhibit 13**.) For example, Defendant Endurance Services rents an office at 303 West Madison Street in Chicago, Illinois. (*Id.* at 10). Defendant Endurance Services purposely conceals its identity, and

intentionally creates the false impression that it is, in fact, "Sompo International" of Bermuda or "Sompo." Indeed, this deception is facilitated by Sompo International's website where Sompo International (Bermuda) states that it maintains an office at 303 West Madison Street in Chicago. (**Exhibit 6**).

60. As another example of the manner in which Defendant Endurance Services operates in the United States, it announced the rental of new and expanded Chicago office space at 155 North Wacker Drive, Chicago, Illinois, in February 2024 under the name "Sompo International." Upon information and belief, Defendant Endurance Services facilitated media coverage of its expanding business with the intent to make consumers and the public believe that Sompo International of Bermuda or Sompo Holdings was the lessee. Indeed, the media coverage featured a photo of Kengo Sakaruda, then CEO of Sompo Holdings. *See* https://therealdeal.com/chicago/2024/02/09/sompo-more-than-doubles-chicago-office-footprint/. Moreover, Endurance Services recruited employees to its Chicago office by using the name "Sompo International" and the Sompo logo. (*See* **Exhibit 13**, Garside Declaration ¶ 11; 14(e)-14(f)).

61. Defendant Endurance Services has no website of its own. Since it does business as "Sompo International" and uses the Sompo logo, Defendant Endurance Services purposely drives consumers and the public to the websites of Defendant Sompo International and Sompo Holdings, where the Painting is commercially exploited as discussed herein. So Defendant Endurance Services has no real independent corporate identity in the U.S., and operates as "Sompo International" merely to conduct the insurance business of the Sompo Defendants by collecting insurance payments from consumers, *i.e.*, the "unjust enrichment" deriving from the commercial exploitation of the Painting – thereby advancing the goals of the Sompo Defendants.

62. Notwithstanding the allegations immediately above, the certified records from the Illinois Secretary of State's office show that Endurance Services had its license to transact business in the State of Illinois revoked over two years ago, that is, on February 11, 2022. (*See* April 25, 2024 Illinois Secretary of State Certified Document, attached hereto as **Exhibit 14**.)

63. In addition, the certified records from the Illinois Secretary of States show that no entity with the name "Sompo International" or "Sompo International Holdings, Ltd." had ever been incorporated or licensed to transact business in Illinois. (*See* April 25, 2024 Illinois Secretary of State Certified documents, attached hereto as **Exhibits 15 and 16**). Illinois law precludes corporations from operating under an assumed name unless they are duly qualified to transact business in Illinois. *See* Illinois Secretary of State website at https://www.ilsos.gov/departments/business_services/assumed_name_adoptions/corpinstructions .html. Further, Endurance Services has never registered with the Secretary of State that it is operating under the "assumed name" of Sompo International.

64. In addition, Defendant Endurance Services is not licensed by the Illinois Department of Insurance to transact insurance business in Illinois. (*See* June 14, 2024, email from Ms. Marcy Savage, Deputy Director, Corporate Regulatory Section, Illinois Department of Insurance, a copy of which is attached as **Exhibit 17**, stating that none of the Sompo entities or Endurance entities were licensed to transact insurance business in Illinois: "The companies that you have listed below [Sompo entities and Endurance entities] are not insurance companies licensed to transact the business of insurance in Illinois.") Further, as to Endurance Services Limited in particular, Ms. Savage wrote that she "[c]annot locate any record of this entity."

65. Defendant Endurance Specialty Insurance is a Bermuda corporation that is a wholly owned indirect subsidiary of Defendant Sompo Holdings and Defendant Sompo Japan Insurance

Inc., and a direct wholly owned subsidiary of Defendant Sompo International. In addition, Endurance Specialty is the direct parent of Endurance U.S. Holdings, and an indirect parent of Endurance Services.

66. Defendant Endurance Specialty Insurance utilizes a multi-beneficiary reinsurance trust ("MBRT") and a reduced collateral trust ("RCT," together with the MBRT, the "Trusts") to provide collateral for Sompo ceding companies in the United States. The Delaware Department of Insurance is the domiciliary regulator of the Trusts.

67. Defendant Endurance Specialty Insurance is approved to use the Trusts for reinsurance collateral in the United States.

68. Upon information and belief, Defendant Endurance Specialty works with Defendant Endurance Services in order to renew its status as a certified reinsurer in, among other places, Illinois. Specifically, on January 6, 2023, the Illinois Department of Insurance wrote a letter to Endurance Services stating, among other things, that in Illinois Endurance Specialty was "renewed as a Certified Reinsurer eligible for collateral reduction effective January 1, 2023 to December 31, 2023 with a reading as a Secure-3 Reinsurer."

69. Defendant Endurance U.S. Holdings is an indirect wholly owned subsidiary of Sompo Holdings, Sompo Japan Insurance Inc. and Sompo International. In addition, Endurance U.S. Holdings is a direct wholly owned subsidiary of Endurance Specialty. Endurance U.S. Holdings, in turn, is the direct parent company of Endurance Services.

70. In 2018, Endurance U.S. Holdings acquired Lexon Surety Group, LLC (hereinafter "Lexon"). (*See* Sompo Holdings webpage at https://www.sompo-hd.com/-/media/hd/en/files/news/2018/e_20180104_1.pdf?la=ja-JP, a copy of which is attached as **Exhibit 18** at p. 1, ¶2, "Outline of the Deal," noting that Endurance U.S. Holdings is the "acquiring entity").

Lexon does business in all 50 U.S. states, including New Jersey. (*See* Sompo International webpage, located at https://www.sompo-intl.com/insurance/us-surety/, a copy of which is attached as **Exhibit 19).**

71. Sompo International financed the purchase of Lexon for Endurance U.S. Holdings by using its "cash on hand." (*See* **Exhibit 18,** p. 1, ¶ 2, under "Source of Funds," stating that "This acquisition is to be financed using cash on hand at Sompo International").

72. Although Lexon is a direct subsidiary of Endurance U.S. Holdings, it does business in the United States using the name "Sompo International" and the Sompo Logo. (*See, e.g.*, **Exhibit 20** hereto, a copy of a March 30, 2023 Notice of Bond Reinstatement from Lexon regarding a bond for which "The People of the State of Illinois" are the obligees and Lexon is the surety; the documents is stamped "Official File Illinois Commerce Commission," the document has "Sompo International" and the Sompo logo printed at the top left-hand corner of the page; *see* Illinois Commerce Commission website at https://www.icc.illinois.gov/downloads/public/filing/2/18/22/345559.pdf).

73. Defendants aggressively commercially exploit *Sunflowers* online in New Jersey and throughout the United States to drive business to Defendants operating in New Jersey and throughout the United States, including but not limited to Defendants Endurance Services, Endurance Specialty and Endurance U.S. Holdings. In particular – and as discussed *infra* – Defendant Sompo Holdings, Sompo Japan Insurance Inc., and Sompo International promote *Sunflowers* on their websites and elsewhere, thereby commingling their most salient and important branding and marketing asset to reap billions of dollars of unjust enrichment through, and among other means, employing archetypal branding.

74. Defendant Endurance Services in particular participates integrally in the aforementioned fraudulent marketing scheme that employs *Sunflowers* to induce U.S. consumers to obtain insurance from Defendants by, among other things: (a) conducting business and selling insurance, among other locations, at its offices in New Jersey under the name "Sompo" or "Sompo International"; (b) recruiting employees to its offices under the name "Sompo International"; (c) renting office space in the U.S. under the name "Sompo International"; and (d) seeking publicity to advance their insurance sales in the U.S. using the "Sompo" or "Sompo International" name.

75. Indeed, Defendants Endurance Services, Endurance Specialty and Endurance U.S. Holdings use the "Sompo International" name in the United States without maintaining their own websites, thereby directing consumers to the websites of Sompo International and Sompo Holdings – featuring and marketing *Sunflowers* – in furtherance of their scheme to deceive U.S. consumers into believing that they are dealing directly with Sompo International and Sompo Holdings.

76. Moreover, Defendants Endurance Services, Endurance Specialty and Endurance U.S. Holdings currently violate multiple state laws in that they do not properly register to transact business and fail to register that they are operating under the assumed name such as Sompo or Sompo International.

**Sompo Holdings Proclaims an Overarching Commitment to Human Rights and to Human Rights Due Diligence**

77. Sompo Holdings professes to be committed to protecting human rights: "[w]e will respect the basic human rights of all stakeholders." Sompo Holdings website, "Human Rights." Sompo Holdings website, available at https://www.sompo-japan.co.jp/english/csr/humanrights/.

78. Moreover, Sompo Holdings emphasizes that respect for human rights ostensibly represents an essential cornerstone of its business in the 21st century:

**Respect of Human Rights**

> In the 21st century, often referred to as the "century of human rights," it is of vital importance to actively raise awareness of human rights at every opportunity in order to create a society in which civil liberties are universally respected. The Sompo Holdings Group advocates respect for human rights in the Groups CSR vision and provides CSR training (including human rights) to all of its employees. *Id.*

Sompo website, available at https://www.sompo-hd.com/~/media/hd/en/files/csr/communications/pdf/2013/e_report2013_8.pdf.

79. Sompo Holdings further maintains that "[i]n the core business, Sompo Holdings Group develops and offers products and services that are instrumental in safeguarding human rights." *Id.*

80. Sompo Holdings declared that in 2019 it amended its human rights policy to include human rights due diligence: "[i]n June 2019 we amended the policy to clearly commit our human rights expectations/demands for all suppliers and business partners and ***human rights due diligence***." (Emphasis supplied.) Sompo Holdings website, "Respect for Human Dignity and Rights" available at https://www.sompo-hd.com/en/csr/action/employee/content4/.

81. Sompo Holdings asserts that it has established a *Human Rights Risk Identification and Mitigation* protocol, as well as *Human Rights Risk Identification and Evaluation* procedures. Sompo Holdings relates further that "[w]e identify potential impacts and risks related to human rights for all businesses …and business processes through the entire value chain." *Id.* Sompo Holdings claims that in identifying human rights risks it employs standard international guidelines.

82. Sompo Holdings also reports that in fiscal year 2021, it investigated potential human rights issues affecting its business activities: "[i]n FY 2021 we carried out a risk evaluation on human rights" based upon two axes: "Human rights impact (severity, number affected, and likelihood of remediation)" and "Connection to company." *Id.* (**Exhibit 12**.)

83. Sompo Holdings further states that it has established the "Human Rights Promotion Headquarters." *Id.* In addition, Sompo Holdings declares that it is committed to "Corporate Social Responsibility" in several areas, including the Environment, Social Contribution, Art & Culture, Diversity & Inclusion and Human Rights. Sompo Holdings proclaims an intention "To Become a CSR Leading Company," and has established a "Group CSR promotion framework" to help it achieve this goal. Sompo Holdings website, "Group Corporate Social Responsibility," formerly available at https://www.sompo-japan.co.jp/english/csr/management/.

84. Sompo Holdings says further that it "take(s) a leading role in a wide variety of international and domestic issues." Sompo Holdings website, "Declarations to Society and Participation in CSR Initiatives," available at https://www.sompo-hd.com/en/csr/engagements/declaration/.

**Sompo International Purports to Place "Promise. Trust. Protect" at the Center of All that It Does and to Operate With the Highest Ethical Standards**

85. Sompo International explains that it is the corporate vehicle by which Sompo Holdings' "commercial property, casualty and specialty insurance and reinsurance business outside of Japan" have been unified. Sompo International website, "About Us" available at https://www.sompo-intl.com/about-us/. Sompo International was established in March 2017 as a result of Sompo Holdings acquisition of Endurance Specialty Holdings Ltd.

86. Under its name "Sompo International" on its website, Sompo International includes the notation "**Promise. Trust. Protect. At the center of everything that we do."** (Emphasis in original.) Sompo International website, available at https://www.sompo-intl.com/.

87. Sompo International proclaims that its brand is founded upon ethics and integrity, as well as a promise in this regard. Its brand statement boasts:

> **OUR BRAND**
>
> **In Today's World, What Do We Stand For?**
>
> Ethics and integrity are the foundation of delivering our commitment to you. We believe that core values drive success, and when relationships are held in the highest regard, there is nothing that cannot be accomplished.
>
> At Sompo International, our ring is more than a logo, it is a symbol of our ***promise.*** (Emphasis supplied.) Sompo International website, "Our Brand," available at https://www.sompo-intl.com/media-center/our-brand/.

**In 2020, Sompo Holdings Opened a New Museum in Tokyo that Prominently Connected through *Architecture* Its Corporate Identity and Discrete Brand with *Sunflowers* and van Gogh**

88. In 2020, Sompo Holdings completed a new six story museum adjacent to its skyscraper office building in downtown Tokyo to underscore its public identity as congruent with *Sunflowers* and fine art and to display *Sunflowers* more prominently. That the Museum is nearly adjacent to Sompo Holdings' office building reinforces through architecture Sompo Holdings' close association with *Sunflowers* and to the fine arts.

89. The Defendant Foundation operates the Sompo Museum of Art and cultivates Sompo Holdings' association with art in Japan. The Foundation purports to collect and preserve paintings, sculptures, and other artworks, and makes them available

to the general public. The seminal predecessor of the Foundation – the Yasuda Fire & Marine Insurance Art Foundation – was established in June 1976.

**Sompo Holdings Invokes Social Media Extensively to Promote *Sunflowers* and to Convey Its Corporate Message**

90. Sompo Holdings and its subsidiaries employ social media and the internet extensively to celebrate *Sunflowers* and to promote Sompo Holdings' discrete brand. Sompo Holdings' subsidiaries have an extensive presence on **Facebook**, **Instagram**, **Twitter, YouTube** as well as other internet "open" sources.

## III. THE FEDERAL COMMON LAW THAT PRECLUDES EMPLOYING THE CORPORATE FORM TO FRUSTRATE SIGNAL FEDERAL POLICIES AND TO PERPETRATE FRAUD

91. The Supreme Court long has instructed that the corporate form will not be recognized in several instances, including: (1) when one corporation so controls or dominates the other that the subordinate entity is the mere "alter ego" of the parent; (2) to perpetrate fraud or injustice; and (3) when the corporate form – either purposefully or inadvertently – impairs or defeats federal legislative policies or governmental interests. As the Court counseled in *First National City Bank v. Banco Para Comercio Exterior de Cuba* 462 U.S. 611, 628 (1983):

> [A]n incorporated entity …is not to be regarded as legally separate from its owners in all circumstances…. Thus, where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created we have held that one may be held liable for the actions of the other...In addition, our cases have long recognized 'the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice'….***In particular, the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies…*** ( Emphasis and italics supplied).

92. The Supreme Court, the U.S. Court of Appeals for the Seventh Circuit, as well as this Court long have precluded the corporate form from being employed – either purposefully or inadvertently – to undermine or frustrate a federal statute. *See, e.g., Anderson v. Abbot,* 321 U.S.

348, 362-363 (1944), observing that "[i]t has often been held that interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim *or only the result of the arrangement."* (Italics supplied). Moreover, "'courts will deal with the substance of the transaction involved as if the corporate agency did not exist and the justice of the case may require.'" (citation omitted); *Bangor Punta Operations v. Bangor & Aroostook Railroad Company et al.*, 417 U.S. 703, 713 (1974), instructing that "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy…In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."

93. Third Circuit authority is consistent with the foregoing in declaring that the tool of equity known as piercing the corporate veil is appropriately utilized when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or a federal statute, or shield someone from liability for a crime. *See, e.g., Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979)(same); *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967)(corporate entity can be disregarded when created with specific intent to escape liability for a specific tort or class of torts); *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. 2002)(piercing corporate veil when corporate structure used to circumvent the law); *N.L.R.B. v. Al Bryant, Inc.*, 711 F.2d 543, 550 (3d Cir. 1983)(court disregarded separateness of corporations when structure used to circumvent federal law).

94. The foregoing precludes the Defendants from employing or interposing U.S. subsidiaries – or any other intermediary entity – to negate or mitigate the legal wrongdoing or

culpability of any of the other Sompo Defendants including Sompo Holdings, Inc., Sompo International Holdings, Ltd., Sompo Fine Art Foundation, Inc. or Sompo Japan Insurance Inc. in commercially exploiting the Painting through a fraudulent scheme to defraud the New Jersey and U.S. insurance markets.

## IV. THE LAW THAT ASSERTS JURISDICTION OVER PARENT COMPANIES WHEN THEIR SUBSIDIARIES IN NEW JERSEY CONDUCT THE BUSINESS OF THEIR PARENTS RATHER THAN THEIR OWN BUSINESS OR WHEN PARENTS EMPLOY SUBSIDIARIES TO COMMIT FRAUD OR OTHERWISE PERPETRATE INJUSTICE

95. At all times relevant hereto, the common law of New Jersey has prescribed that parent companies will be deemed to be doing business in New Jersey – and thereby subject to specific jurisdiction in New Jersey – when the subsidiaries conduct the business of their parents rather than their own discrete business. By expressly and proactively doing business as "Sompo International" in New Jersey, the Sompo subsidiaries conduct the business of their parents in this context and in a manner that subjects Sompo International and Sompo Holdings to specific jurisdiction regarding the claims asserted herein.

96. Moreover – and at all times relevant hereto – the common law of both New Jersey and the U.S. has precluded parent companies from employing their subsidiaries to commit fraud, torts, or crimes or otherwise to perpetrate injustice or inequity, as Sompo Holdings and Sompo International have done with their subsidiaries in this proceeding. In such instances, the law will "pierce the corporate veil" of the subsidiary, and will both assert specific jurisdiction over the parent for the misconduct of the subsidiary as well as make the parent liable for the legal wrongs that the subsidiary has committed.

97. As related, the parent companies Sompo Holdings, Sompo International and Sompo Japan Insurance Inc. have wrongfully employed U.S. subsidiaries in a scheme to reap unjust enrichment by commercially exploiting *Sunflowers* in a tortious manner and deceiving and defrauding the New Jersey and U.S. insurance markets. Based upon the foregoing, specific jurisdiction properly attaches over Sompo Holdings, Sompo International and Sompo Japan Insurance Inc.

## ALLEGATIONS SUSTAINING SPECIFIC JURISDICTION

### Exuberant with the Prospect of Commercially Exploiting the Iconic van Gogh *Sunflowers* Painting, Sompo Holdings' Corporate Predecessor Yasuda Acquires *Sunflowers* at Christie's Auction in London in 1987 in Reckless Disregard of the Glaringly Suspicious Nazi-Era Provenance

98. A *Los Angeles Times* article dated April 10, 1987 entitled *What's Behind that 40-Million Bouquet?* by Sam Jameson relates that Sompo Holdings' corporate predecessor – Yasuda – bought *Sunflowers* at Christie's auction house in London for an unprecedented price of nearly $40 million to avail itself of a unique opportunity that would never recur and that would give it a painting with iconic status in Japan. (A copy of this article is attached as **Exhibit 14**.)

99. "To the Yasuda Fire & Marine Insurance Co., the auction of Vincent van Gogh's painting '*Sunflowers*' was 'a never-again' opportunity. That's why the company paid a record $39.85 million for it, a spokesman said here Thursday." A Yasuda representative stated that "[e]very Japanese in the country, even school children, knows the painting." The article reported that "students in both elementary and junior high school study it in their art classes as one of the world's great art works." Accordingly, "[r]ealizing the meaning of *Sunflowers* to the Japanese public at large, Yasuda determined to buy it when it heard the painting would be on the market," the spokesperson said.

100. British art journalist Martin Bailey reports in *The Sunflowers Are Mine - The Story of Van Gogh's Masterpiece* (2013), that the Yasuda CEO responsible for the purchase of *Sunflowers* in 1987 – Yasuo Goto – acknowledges to Christie's specialist James Roundell that in buying *Sunflowers* amid such intense international publicity and press coverage Yasuda would have been required to spend "L 100 million, or ***four times the price of the painting***" in advertising to receive equivalent notoriety. (Emphasis supplied.)

101. Resolved to acquiring *Sunflowers* at any price, Yasuda ignores the provenance of this painting that Christie's published for the auction, which identified elite Jewish German banker, premier private art collector, and prominent Nazi victim Paul von Mendelssohn-Bartholdy as owning *Sunflowers* in Berlin as late as 1934. This provenance related:

- Paul von Mendelssohn-Bartholdy, Berlin, by 1910, probably bought from Galerie Druet.
- Galerie Paul Rosenberg, Paris (from whom bought by Edith Beatty in 1934).

102. This information all but confirmed that Mendelsohn-Bartholdy had owned *Sunflowers* in Berlin when the Nazi era began in early 1933, and consigned the Painting to the Galerie Paul Rosenberg in 1934 because of Nazi predation. Yasuda's failure to investigate this likelihood was reckless if not purposeful, in that by 1987 Yasuda was a sophisticated corporate art collector – having established a corporate museum in 1976 and having acquired two Renoir paintings in the international art market in 1986. So by 1987 Yasuda was aware – or reasonably should have been aware – that stolen art and Nazi-era contraband appear frequently on the international art market and that collectors must take affirmative precautions against acquiring such materials. Accordingly, Mendelssohn-Bartholdy's ownership of *Sunflowers* in Berlin as late as 1934 was a "red flag" that demanded further inquiry. But Yasuda's resolve to acquire the

*Sunflowers* at ***any price*** – and concomitant aspirations for commercially exploiting it – foreclosed any such investigation.

**In 1999 Yasuda Chairman *Emeritus* Yasuo Goto Celebrates *Sunflowers* Has Benefitted Yasuda Immensely and Altered It's Corporate "Destiny"**

103. On June 23, 1999 the by now "Chairman *Emeritus*" of Yasuda Yasuo Goto – who conceived acquiring *Sunflowers* in 1987 – gives a speech at the van Gogh Museum in Amsterdam commemorating the completion of a new wing which Yasuda had helped fund with an approximately $30 million contribution in 1990, and declaring that *Sunflowers* had changed Yasuda's corporate destiny. (A copy of this speech is appended as **Exhibit 15**.)

104. This speech underscores how *Sunflowers* informed the corporate identity of Yasuda and its corporate successors, and relates the driving goal of Yasuda to equate its identity with both the Painting as well as its legendary artist, Vincent van Gogh.

105. Mr. Goto relates a close identity between *Sunflowers* and van Gogh, and how through *Sunflowers* Yasuda has become integral to the international van Gogh cultural community, and a proactive partner with the van Gogh museum. Mr. Goto expressly equates *Sunflowers* with van Gogh, and tacitly equated Yasuda with both *Sunflowers* and van Gogh. Mr. Goto affirms that Yasuda had received both "tangible and intangible benefits" from *Sunflowers*.

106. Mr. Goto accentuates the close relationship and amity that van Gogh enjoyed with Japan, and van Gogh's intrigue with Japanese artistic technique that inspired *Sunflowers*. Mr. Goto notes that *Sunflowers* is adored by many Japanese. He observes that "As a result of the ties commenced through *Sunflowers*, I feel that it was the destiny of Yasuda" as well as other Japanese contributors to "cooperate in the construction of the new exhibition wing of the Van Gogh Museum."

107. Mr. Goto underscores "the ***destiny*** associated with *Sunflowers"* (emphasis supplied), as *Sunflowers* enhanced Yasuda's credibility and provides a springboard for opportunities in other spheres of corporate social responsibility which inevitably would enhance Yasuda's corporate image.

**Beginning in 1998 the U.S. and Other Countries Affected by Nazi Art Dispossessions Encourage the Restitution of Confiscated Materials**

108. Beginning in 1998 – and amid much public fanfare – the U.S. as well as many other nations affected by wrongful Nazi art dispossessions commences an international campaign to encourage Holocaust victims and their heirs to come forward with claims for the restitution of Nazi-confiscated artworks like *Sunflowers*. Through repeated international as well as national declarations and pronouncements over the past 28 years, the U.S. has reasserted foundational policies that claims for the restitution of Nazi-era artworks like the Painting should be resolved honestly, fairly, with reference to all available documents and evidence and without litigation, if possible.

109. The international commitment of the U. S in this regard begins on December 3, 1998 at a meeting in Washington D.C. of some 44 governments affected by Nazi art looting entitled *The Washington Conference on Holocaust Era Assets* (the "*Washington Conference*"). The *Washington Conference* concludes by promulgating the *Washington Conference Principles on Nazi-Confiscated Art* (the "*Washington Principles*") which sets forth ten prescriptions by which claims to recover Nazi-era artworks will be encouraged and resolved. While the *Washington Principles* are "non-binding" in that they have no independent legal effect, they expressly: (1) encouraged Holocaust victims and their heirs to come forward with claims for the recovery of Nazi-confiscated artworks; (2) declared "that steps should be taken expeditiously to

achieve a ***just and fair solution***" to such claims (emphasis supplied); and; (3) encouraged the signatory nations to "develop national processes to implement these principles, particularly as they relate to alternative dispute resolution mechanisms for resolving ownership issues." The *Washington Principles* became the foundation for the renewed international initiative to return Nazi-confiscated artworks such as *Sunflowers* to rightful owners.

110. In 1998, Congress enacts the Holocaust Victims Redress Act (the "Redress Act") Public Law. No 105-158), 112 Stat. 15, which further declares U.S. policy favoring the return to rightful owners of Holocaust era artworks such as *Sunflowers*. The Redress Act expresses the sense of Congress that "all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner."

111. On June 30, 2009 – and following the conclusion of *The Holocaust Assets Conference* in Prague and Terezin – the U.S. and 45 other governments issue the *Terezin Declaration* (the "*Declaration*"). The *Declaration* reaffirms the commitment of the parties to the *Washington Principles*, to ensure that their respective legal systems or alternative processes resolved claims to recover Nazi-confiscated artworks fairly and on their merits: "we urge all stakeholders to ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all of the relevant documents submitted by the parties."

112. In 2016 the U.S. enacts the HEAR Act, suspending otherwise applicable statutes of limitations for claims to recover Nazi-tainted artworks. The HEAR Act prescribes that a Holocaust victim or heir may commence a judicial action to recover any artwork or other property that was lost "because of" Nazi persecution during the "covered period" of January 1, 1933 through December 31, 1945 (HEAR Act § 4(3), 5(a)), and affords claimants a six-year limitation period commencing when the claimants or their agents actually discover the identity, location and their interest in the lost artwork. In cases where, as here, the Plaintiffs were aware of pertinent elements of their claim before the HEAR Act became law but were barred by a statute of limitations, the actual discovery date of their claim or cause of action is considered the date the HEAR Act was enacted, that is, December 16, 2016 (HEAR Act § 5(c)(1).

113. The HEAR Act reaffirms long-standing U.S. polices seeking to identify Nazi-tainted artworks and to return these materials to rightful owners. The stated purposes of the HEAR Act are to ensure that laws governing claims for the recovery of "Nazi-confiscated" artworks further United States policies as set forth in the Washington Principles, the Redress Act, and the Terezin Declaration, and that otherwise applicable statutes of limitations do not bar claims for the recovery of Nazi-confiscated artworks and other misappropriated property, so that such claims are resolved justly and fairly. Pub.L. 114-308, 130 Stat. 1526, § 3.

114. In 2018, Congress enacts the Justice for Uncompensated Survivors Today (JUST) Act of 2017 (the "Just Act"), Public Law No 115-171 (05/09/2018). The Just Act requires the U.S. Department of State to report to Congress concerning the progress countries affected by Nazi property confiscations and seizures have made in returning materials to rightful owners, and so underscores the importance to U.S. foreign policy of the restitution of Nazi era artworks. The Just Act also tacitly reaffirms established U.S. policy in this area.

115. Moreover, because both Congress and the President expressly have endorsed this policy it preempts – as a matter of federal Constitutional law – any New Jersey or other state statute, judicial decision or other law that obstructs or impairs this objective. *See, e.g*., Anagha Sundarajan, *Foreign Affairs Federalism: The Doctrine of Foreign Affairs Preemption and State Regulation in Light of the Paris Agreement*, 55 U.S.F.L. 363, 397 (2021), observing that "[t]he doctrine of foreign affairs preemption is founded on a presumption built into our constitutional structure that the federal government has plenary authority to define and conduct foreign policy." Accordingly, [w]hen the President and Congress act in concert, any state law that touches the arena of foreign relations is preempted." *Id.*

**In 2001, Yasuda Exhibits *Sunflowers* at the Art Institute of Chicago Notwithstanding that Displaying the Painting Publicly May Lead to What it Admits Are "Nazi-Confiscation Problems"**

116. In 2000, the Art Institute of Chicago (AIC) invites Yasuda to display *Sunflowers* at an international van Gogh exhibition in Chicago offering – correspondingly – a chance to capitalize upon the Painting by aligning its corporate identity with *Sunflowers* throughout the U.S., where it already had offices in several major cities, including Chicago.

117. On April 26, 2001, Yasuda representative Masura Igarashi – who noted that he was writing on behalf of Yasuda and the Yasuda Museum – states that Yasuda was honored to collaborate in the "van Gogh and Gauguin: Studio of the South exhibition" in Chicago and Amsterdam by exhibiting *Sunflowers,* but cautions that "***Nazis [sic] confiscation problem may arise in American and in Holland***. We would like to include the clear terms in the loan agreement to protect our paintings against this problem." (**Exhibit 1**.) (Emphasis supplied.)

118. On May 8, 2001, Yasuda representative Masaru Igarashi sends the AIC and Van Gogh Museum another email relating that several years earlier, Yasuda had helped MoMA organize an exhibition of Egon Schiele artworks in New York and Tokyo. Igarashi expresses awareness that at the New York exhibition the Manhattan District Attorney had confiscated the painting *Portrait of Wally* as Nazi contraband. Igarashi is concerned that *Sunflowers* similarly might be a casualty of Nazi policies and might suffer a similar fate. Igarashi confesses that "[w]e are ***deeply concerned*** about our [sic] Goh' and [sic] Gauguin' provenance. We think our two works have nothing to do with Nazi-looted art, but are not 100% sure." **Exhibit 16**. (Emphasis supplied.)

119. On May 9, 2001, Igarashi writes another email to AIC and the Van Gogh Museum admitting that Yasuda had not investigated the provenance of the Painting since acquiring it in 1987, and claimed to know nothing more about it than what Christie's had published for the sale. (A copy of this email is attached as **Exhibit 17**.) This email confirms that Yasuda did not investigate the provenance of *Sunflowers* when it bought the Painting at Christie's in 1987, and did not investigate the background of *Sunflowers* during the years 1987-2001 despite its stated suspicions, extensive resources, art world expertise, and putative commitments to international human rights due diligence and corporate social responsibility. Moreover, the above-referenced concerns that Yasuda registered in 2001 about exhibiting the Painting in light of "Nazi confiscation problems" – based on the same information that it possessed when it purchased the work in 1987 – intimates strongly that it consciously entertained the same concerns about Nazi confiscation of the Painting in 1987 when it bought *Sunflowers.*

120. Upon information and belief, AIC – with Yasuda's knowledge – files a false application with the U.S. Department of State (State Department) under the Immunity from

Judicial Seizure Act, 22 U.S.C. § 2459, concealing the Nazi taint of *Sunflowers*. This application induces the State Department to assure AIC and Yasuda that law enforcement authorities would not seize *Sunflowers* were Yasuda to bring the Painting to the U.S. for the Exhibition. (*See* **Exhibit 22**).

121. The application requires AIC to attest that it had investigated the provenance of *Sunflowers* in a professional, conscientious manner employing "independent, multi-source research."

122. Only after receiving this assurance did Yasuda permit *Sunflowers* to be displayed at the Exhibition. Although a putative public trustee, the AIC has refused to share with the Heirs a copy of this report.

123. Yasuda registers no concern with what all but certainly were the superior legal and moral rights of the Heirs in the Painting, or with investigating the background of the Painting further to address this possibility. Rather, Yasuda's sole express concern was that U.S. law enforcement authorities might seize the Painting as Nazi contraband. But this threat was averted when the State Department granted immunity from judicial seizure pursuant to 22 U.S.C. § 2459, based on an application that, upon information and belief, concealed the provenance of the Painting. Yasuda then commercially exploits the Painting at the van Gogh exhibition in Chicago, burnishing its corporate image with the Painting throughout the U.S. where Yasuda had offices in several major cities, including Chicago, New York, Los Angeles, Louisville and Nashville.

124. Most conspicuously – and consonant with their goal to conceal what they knew to be the Painting's Nazi taint – the provenance that AIC and Yasuda composed for *Sunflowers*

when they displayed the Painting at the Exhibition omits any reference to Paul von Mendelssohn Bartholdy or that the Painting was sold in Berlin in 1934. (**Exhibit 12.**)

125. Finally, there can be no doubt that Sompo Holdings is responsible for the foregoing, since the August 27, 2001 Loan Agreement by which *Sunflowers* was lent to AIC for the exhibition (attached as **Exhibit 18**) makes clear that Yasuda would be changing its name to Sompo Japan Inc. "as of April 1, 2002," during the course of the loan, and that "the loans will automatically be transferred to the company under the new name."

**In 2017, Sompo Japan Insurance Inc. Proclaims that Many Customers View *Sunflowers* and Sompo as the Same**

126. On July 18, 2017, Sompo Japan Insurance Inc. issued a statement "Celebrating 30 Years of Van Gogh's *Sunflowers*." Sompo Japan Insurance Inc. exclaimed that *Sunflowers* had been on display at its museum for 30 years, and observed: ***"To many customers, Sompo Japan Nipponkoa has become synonymous with Sunflowers.***" (**Exhibit 19**; emphasis supplied.)

**Notwithstanding Their Long Awareness that *Sunflowers* Is Nazi-Tainted, Yasuda and Sompo Holdings Have Commercially Capitalized Upon and Exploited the Painting with a Sophisticated Branding Strategy Based Upon Psychological Archetypes**

127. Even though Sompo Holdings long has known that *Sunflowers* is a casualty of Nazi policies – and that Mendelssohn-Bartholdy forfeited the Painting as a consequence of Nazi wrongs that violate paradigmatically the modern international law of human rights – Sompo Holdings nonetheless has proactively conjoined its corporate identity with the Painting to such an extent that Sompo Holdings now proclaims that its customers view *Sunflowers* as "synonymous" with Sompo Holdings. Sompo Holdings thereby has made its discrete brand coterminous with *Sunflowers*.

128. Moreover – and through a well-established psychological marketing strategy known as "archetypal branding" – Sompo Holdings has borrowed or "leveraged" discrete characteristics and qualities commonly associated with *Sunflowers* and its iconic, creative artist Vincent van Gogh and invested these traits or "archetypes" in Sompo Holdings. Sompo thereby has employed the Painting to enhance its discrete corporate image as creative and socially caring, and to foster subliminal psychological traction with prospective insurance consumers in New Jersey, throughout the U.S., and internationally.

129. These subliminal traits or archetypes that Sompo Holdings derives from the Painting enable it to perform efficiently and effectively many necessary brand roles, and so add immense value to its corporate operations. These include the following:

a. helping Sompo Holdings create positive associations for the brand in the minds of consumers and stakeholders;

b. enabling Sompo Holdings to invoke the rich potential of art to forge emotional attachments and to differentiate its brand identity;

c. injecting Sompo Holdings' brand with content and meaning borrowed from the paradigmatically creative van Gogh;

d. performing an umbrella function for Sompo Holdings by integrating, cohering, and aligning all of its corporate functions;

e. evoking consumer and stakeholder emotion;

f. enabling Sompo Holdings to appear authentic and to promise consumers a better life;

g. allowing Sompo Holdings to offer consumers a "short-cut" for buying decisions;

h. helping Sompo Holdings both to develop and sustain a positive brand image which is essential to attract and retain valuable employees;

i. enhancing Sompo Holdings' brand value in a market where brands play an increasingly pivotal role;

j. attracting perpetual publicity to Sompo Holdings, the value of which vastly exceeds advertising.

130. The archetypes that Sompo Holdings has derived from *Sunflowers* both to ***create*** its corporate identity and persona and to ***differentiate*** itself from its competitors has helped it to reap immense unjust enrichment since it misappropriated the Painting in 1987, in an amount approximating ten percent (10%) of its net profits.

131. Because Sompo Holdings is a "conscious wrongdoer" within the meaning of the applicable law in that it acquired *Sunflowers* and has commercially exploited it in reckless disregard of the fact that the Painting was a casualty of Nazi policies, and in derogation of the superior ownership and possessory interests of the Heirs, the law allows the Heirs to recover the consequential gains that Sompo Holdings has realized from misappropriating and commercially exploiting the Painting. The law defines "conscious wrongdoer" as one who is enriched by misconduct and who either acts with knowledge of the underlying wrong, or despite a known risk that the conduct in question violates another's rights. Sompo Holdings is a "conscious wrongdoer" because its predecessor (Yasuda) bought *Sunflowers* in reckless disregard of the high probability that Nazi policies deprived Mendelssohn Bartholdy of the Painting, and that the Heirs therefore were its rightful owners. Sompo Holdings also is a "conscious wrongdoer" because after Yasuda expressing its "deep concern" that *Sunflowers* was afflicted with a Nazi taint, Yasuda and Sompo Holdings continued to neglect to research the Painting's suspicious

provenance, and instead commercially exploited it, employing a sophisticated archetypal branding strategy to "leverage" the attributes of *Sunflowers* and van Gogh and to transfer and invest these qualities in Sompo Holdings.

132. Sompo Holdings additionally is a "conscious wrongdoer" because Sompo Holdings consistently has maintained that it is committed to international human rights, follows a human rights due diligence investigative protocol, and that in 2021 it surveyed its corporate operations extensively to ensure that none of its assets or activities exploit human rights violations. Knowingly commercially exploiting a Nazi-tainted painting and proactively concealing this misconduct makes Sompo Holdings – at a minimum – a "conscious wrongdoer."

133. Moreover – and because quantifying unjust enrichment in this context is speculative – the law requires only that the Heirs establish a reasonable basis for computing Sompo Holdings' wrongful gains. The law additionally allocates to Sompo Holdings both the burden of disproving the amount of unjust enrichment that the Heirs demand, as well as the residual risk that Sompo Holdings' unlawful profits cannot be computed with certainty.

134. Because these leveraged traits – the warmth and reassurance of *Sunflowers* and the visionary, creative genius of van Gogh – ***define*** Sompo Holdings' core identity and brand, they necessarily play a commensurate role in enabling Sompo Holdings to generate profits and net income. There can be no doubt, then, that *Sunflowers* has contributed immensely to Sompo Holdings' earnings, and Sompo Holdings so has admitted.

135. Many judicial decisions confirm that courts consistently have awarded far greater than ten percent (10%) of a company's net profits when that company realized less benefit from converted or misappropriated property than Sompo Holdings has reaped from misappropriating

and exploiting *Sunflowers*. *See, e.g., Blackman v. Hustler Magazine*[1] (affirming an award of 60% and 35% of the profits that a magazine earned from separate issues that published certain photographs in violation plaintiff's copyright privileges); *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*[2] (awarding plaintiff one third (1/3) of the profits that a bar review course earned from pirating copyrighted bar exam questions); *Sigma Photo News v. High Society Magazine*[3] (awarding plaintiff fifty percent (50%) of the profits earned on a particular magazine from publishing a copyrighted photo of the famous celebrity Raquel Welch); *Williams v. Gaye*[4] (awarding song writer Marvin Gaye 50% of the publishing revenues for a particular song); *Aerospace Services International v. The LPA Group, Inc.*[5] (characterizing an award of approximately 28 percent (28 %) of profits earned from exploiting copyrighted material as "only a small percentage"); *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*[6] (awarding a lawn service company that infringed the trademark of a competitor 25 percent (25%) of the competitor's profits for a particular period notwithstanding apparent questions about whether the infringed trademark induced those profits); *Universal Pictures v. Harold Lloyd Corporation*[7] (awarding plaintiff 20 percent (20%) of the profits that a movie earned from using a copyrighted photoplay when the copyrighted material played "an integral and essential part in carrying along the role of the star in the story").[8] The *Universal Pictures* court reaffirmed that "uncertainty as to the amount and extent of damage will not deprive" a plaintiff of recovery, and "it will be

[1] 800 F.2d 1160, 1164-65 (D.C. Cir. 1986)
[2] 484 F. Supp. 2d 252, 261 (E.D. Pa. 2006).
[3] 778 F.2d 89 (2d Cir. 1985)
[4] 885 F.3d 1150,
[5] 57 F.3d 1002, 1004 (11th Cir. 1995).
[6] 959 F.3d 903, 914 (8th Cir. 2020).
[7] 162 F.2d 354 (9th Cir. 1947).
[8] *Id.* at 360.

enough if the evidence shows the extent of the damage as a matter of just and reasonable inference, although the result be only approximate."[9]

136. Courts also have not hesitated to award large compensatory recoveries when necessary to deprive wrongdoers of illicit profits. *See, e.g., Motorola Solutions, Inc. v. Hytera Communications Corp, Ltd.*[10] (sustaining a verdict in the amount of $764,561,156 for copyright infringement and trade secrets misappropriation). Sompo has wrested far more commercial benefit and value from exploiting *Sunflowers.*

137. Moreover, the signal role that the archetypes described above have played both in defining Sompo Holdings' unique brand and enabling it to discharge multiple brand functions preclude any possibility that Sompo Holdings can demonstrate that these archetypes have contributed ***less*** than ten percent (10%) to its net earnings.

**Because Sompo Holdings' Commercial Exploitation of What it Knows to Be a Nazi-Tainted Painting Is Contrary to Signal Federal Policies and Impairs the Public Interest in Many Ways, the Federal Unclean Hands Doctrine Precludes Sompo Holdings from Equitable Relief**

138. The Supreme Court has reaffirmed that whenever the misconduct of a party impairs a federal interest, the federal equitable doctrine of Unclean Hands precludes that party from invoking equitable relief. The Court also has made clear that artworks lost as a consequence of Nazi policies and coercion – such as *Sunflowers* – implicate uniquely federal interests and affect the foreign policy of the U.S. Because the Heirs' claim to recover *Sunflowers* invokes uniquely federal interests, the federal equitable doctrine of Unclean Hands governs Sompo Holdings' misconduct concerning the Painting.

---

[9] *Id*. at 369.
[10] 495 F. Supp. 3d 687 (N.D. Ill. 2020)

139. By commercially exploiting *Sunflowers* while knowing that the Painting is a casualty of Nazi policies and affirmatively misrepresenting that the Painting bears no human rights stigma, Sompo Holdings has violated multiple signal U.S. public policies and impaired the public interest in several ways. Moreover, the central, paramount roles that *Sunflowers* plays both in informing Sompo Holdings' corporate identity as well as in its archetypal branding strategy amplify the magnitude of Sompo Holdings' wrongdoing and exacerbate the injury to public policies and interests that taint it with Unclean Hands.

140. First, Sompo Holdings' wrongful commercial exploitation of *Sunflowers:*

a. undermines signal U.S. foreign policies prescribing how claims to recover Nazi era artworks such as *Sunflowers* properly should be handled. As related, these policies seek initially to identify Nazi- era artworks and to resolve claims for these materials openly, honestly, transparently, fairly, with access to all relevant documents and other evidence, and without litigation, if possible. Sompo Holdings' refusal to entertain the Heirs' claim repudiates these policies;

b. perpetrates commercial fraud upon the entire U.S. and international insurance markets;

c. violates the federal law of unfair competition and unfair or deceptive acts or practices in or affecting commerce, as proscribed by 15 U.S.C. § 45;

d. violates the federal statutes proscribing mail fraud, 18 U.S.C. § 1341. This provision prohibits generally employing the U.S. mail to obtain money "by means of false or fraudulent pretenses, representations, or promises." Upon information and belief, Sompo Holdings' uses the mail for its integral

utilization of *Sunflowers* in its U.S. and international marketing – both overtly as well as covertly through its archetypal branding strategy – while affirmatively misrepresenting that the Painting is not afflicted with any violations of the international law of human rights violates this proscription;

e. violates the federal statute proscribing wire fraud, 18 U.S.C. § 1343. This provision prohibits generally using the U.S. wires to obtain money "by means of false or fraudulent pretenses, representations, or promises." Sompo Holdings' integral use of *Sunflowers* in its U.S. and international marketing – both overtly on its website as well as covertly through its archetypal branding strategy – while affirmatively misrepresenting that the Painting is not tainted with any violations of the international law of human rights, breaches this proscription.[11]

**Defendants' Fraudulent and Willful Misconduct Concerning the Painting Entitles the Heirs to an Award of Punitive Damages**

141. At all times relevant hereto, the law of New Jersey has permitted plaintiffs to recover punitive damages whenever the tortious conduct of a defendant "evinces a high degree of moral culpability," such as whenever the "tort is committed with fraud, actual malice…or when the defendants acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." Moreover, to determine whether punitive damages are appropriate the trier of fact properly may consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that defendant has caused, as well as the wealth of the defendant.

[11] Even where plaintiffs do not seek to bring a claim for mail fraud, wire fraud, or similar violations, such misconduct reflects a defendant's state of mind and the gravity of the misconduct, warranting equitable relief such as that sought here.

142. The Heirs are entitled to an award of punitive damages against Defendants because Defendants – with extreme recklessness bordering upon affirmative knowledge – misappropriated *Sunflowers* in derogation of the superior ownership and possessory rights of the Heirs. Defendants since have commercially exploited the Painting while knowing that it is casualty of Nazi policies. Moreover, Defendants have capitalized upon the Painting while affirmatively misrepresenting that the Painting is not affected with human rights violations or bears any human rights stigma. These misrepresentations – which are essential to the capability of Defendants to exploit *Sunflowers* commercially – are both fraudulent and morally unconscionable. Defendants' misconduct regarding *Sunflowers* therefore satisfies the legal standard that New Jersey courts have established for awarding punitive damages. In addition, by fraudulently exploiting *Sunflowers* in this manner Defendants and their predecessor have wrongfully reaped many billions of dollars of unjust enrichment while flouting signal U.S. policies seeking to identify Nazi tainted artworks and resolve claims for these materials fairly.

143. Based upon these considerations and Defendants' great wealth – as well as the extensive unjust enrichment that Defendants have reaped from fraudulently commercially exploiting a Nazi-tainted artwork for many years – the Heirs are entitled to an award of punitive damages in the amount of seven hundred and fifty million dollars ($750 Million), representing three times the current fair value of *Sunflowers*.

**The Mendelssohn Heirs 2022-2025 Litigation for the Restitution of *Sunflowers***

144. On December 13, 2022, Plaintiffs filed a Complaint for Restitution and Unjust Enrichment against Sompo Holdings, Inc., Sompo International Holdings Ltd., Sompo Fine Art Foundation, and the Sompo Museum of Art in the United States District Court for the Northern District of Illinois, case no. 22 CV 7013 (Hon. Jeremy C. Daniel, U.S.D.J.).

145. On May 31, 2023, Plaintiffs filed a First Amended Complaint for Restitution and Unjust Enrichment against the same defendants, except that Plaintiffs added Sompo Japan Insurance Inc. as a defendant, and changed the name of Sompo Museum of Art to the Sompo Fine Art Foundation.

146. On June 3, 2024, the District Court filed a Memorandum and Order dismissing the action. *Schoeps v. Sompo Holdings, Inc.*, 736 F. Supp. 3d 582 (N.D. Ill. 2024). Among other reasons, the District Court dismissed the action based upon its determination that it did not have specific personal jurisdiction over the defendants under the Illinois Long-Arm Statute. Ill. Comp. Stat. 5/2-209 (2016).

147. On June 10, 2024 an Amended Judgment of Dismissal was entered.

148. On July 1, 2024, Plaintiffs filed a Motion to File an Amended Complaint under Fed. R. Civ. P. 15(a)(2), 15(c)(1) and 21, based on evidence and information they acquired, among other sources, through Defendants' disclosures in the course of the pending litigation. The proposed Second Amended Complaint (SAC) named the following defendants: Sompo Holdings, Inc.; Sompo International Holdings Ltd.; Sompo Fine Art Foundation; Sompo Japan Insurance Inc.; Endurance Specialty Insurance Ltd.; Endurance U.S. Holdings Corp.; and Endurance Services Limited.

149. Also on July 1, 2024, Plaintiffs filed a Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e).

150. On February 10, 2025, the Court entered an Order denying Plaintiffs' Motion to File an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2), 15(c)(1) and 21, and Plaintiffs' Motion to Alter or Amend the Judgment under Fed. R. Civ. P. 59(e).

151. On March 10, 2025, Plaintiffs filed a timely Notice of Appeal to the United States Court of Appeals for the Seventh Circuit.

152. After briefing and a September 18, 2025 oral argument, on November 21, 2025 the United States Court of Appeals for the Seventh Circuit affirmed the District Court's dismissal. *See Schoeps v. Sompo Holdings, Inc.*, 160 F.4th 815 (7th Cir. 2025).

153. On December 18, 2025, Plaintiffs filed a Petition for Rehearing or Petition for Rehearing En Banc.

154. On January 22, 2026, the Seventh Circuit denied the Heirs' Petition for Rehearing or Rehearing En Banc. *See Schoeps v. Sompo Holdings*, No. 25-1405, 2026 WL 181614, at *1 (7th Cir. Jan. 22, 2026).

155. On April 22, 2026, Plaintiffs filed with the U.S. Supreme Court a timely Petition for a Writ of Certiorari, and the case was docketed on April 29, 2026.

156. On June 8, 2026, the U.S. Supreme Court denied Plaintiffs' Petition for a Writ of Certiorari.

**In 2024 the Japanese Financial Administration (FSA) – an Analogue to the U.S. Securities and Exchange Commission (S.E.C.) – Settles an Enforcement Action Against Sompo in Which Sompo Admits that it Perpetrated Material Fraud in the Japanese Insurance Market and Now Seeks to Regain the Trust of its Stakeholders**

144. On January 25, 2024 Sompo received notice from the Financial Services Agency of Japan (FSA) of an administrative penalty and business improvement order (Order) for its response to fraudulent insurance claims by the automobile repair company Big Motor. According to an article in *Kyodo News* , "Bigmotor was found to have been charging excessive repair fees by intentionally damaging customers' cars and padding insurance claims." A Sompo document entitled **Mid-Term Management Plan (FY2024-2026)** and dated May 28, 2024

relates that the FSA had issued a business improvement order both to Sompo Holdings and to its subsidiary Sompo Japan Insurance "for fraudulent auto insurance claims" and to Sompo Japan for price fixing. This document stated that both companies "will work as one to prevent recurrence…and… ***regain the trust of stakeholders".*** (Emphasis and italics supplied.)

145. The Order found multiple corporate operational deficiencies, including a corporate culture that valued company profits over customer interests, ineffective internal and audit control due to inadequate risk management, lack of risk awareness, and lack of independence among executives and employees. The Order identified prospective preventative measures including establishing effective agency management, establishing a system to ensure thorough legal compliance and customer protection, fostering a healthy organizational culture prioritizing compliance and customer protection over sales and "[d]rastically strengthening governance."

146. The scandal compelled Sompo CEO Kengo Sakurada to step down as Sompo's CEO. Sakurada stated that ***"[i]t is extremely regrettable that we lost everyone's trust.*** We apologize for causing tremendous trouble to our customers." (Emphasis and italics supplied).

147. Sompo Holdings, Inc. Inc. Integrated Annual Report 2024 (Report) acknowledged the Order and its necessary implications for reforming Sompo's corporate culture, and preventing the recurrence of fraud, observing that "[i]n response to the serious misconducts, the Board of Directors expressed the opinion that it should reaffirm the possibility of prevention and issue in governance."

**The Holocaust Appropriated Art Recovery Act of 2025 (Act) – Public Law No 119-82 (04/13/2026) - Deprives Defendants in Judicial Actions Seeking to Recover Nazi-Confiscated Artworks of All Affirmative Defenses and Prescribes National Contacts Jurisdiction for Judicial Claims Seeking to Recover Nazi-Confiscated Artworks**

148. Section 2(f) of the Act entitled "Defenses Based on Passage of Time and Other Non-Merits Defenses" abrogates all defenses or substantive doctrines based upon the passage of time, as well as all non-merits discretionary defenses.

149. Section 2(g) of the Act prescribes nationwide service of process for judicial claims brought under the Act, providing that "process may be served in the judicial district where the case is brought or any other judicial district of the United States where the defendant may be found, resides , has an agent or transacts business."

**Since 2024 the Global Insurance Consultancy of the "Big Four" International Accounting Firm E/Y Has Emphasized to its Current and Prospective Clientele that Gaining and Retaining Stakeholder *Trust* is Imperative to Compete Successfully in Today's Increasingly Volatile, Unstable, and Hypercompetitive International Insurance Market**

150. E/Y 2024 documents entitled "2024 GLOBAL INSURANCE OUTLOOK – Strengthening trust to unlock innovation and growth" (Outlook) and "How increased trust and transparency can unlock growth" emphasize the importance that insurance companies cultivate trust with their stakeholders. Page 6 of E/Y's Global Insurance Outlook (Outlook) affirms "[t]he value of trust in a time of turbulence", and asserts that "high degrees of trust are a hallmark of the world's top insurance brands", and that firms with low trust "will be vulnerable to rising competition from outside the industry" and "will struggle to build strong customer relationships or grow its market share." The article stresses that corporate transparency and building stakeholder trust are keys to competing successfully in today's turbulent, unstable and volatile international insurance market. These materials also assert that "declining levels of trust

in the industry have become a competitive liability", and that "trust is a competitive consideration as traditional boundaries between sectors dissolve", and that "[c]onsumers will turn to providers they trust…those that consistently do the right thing." A subsequent E/Y publication summarizes the Outlook as instructing that "trust and transparency have never been more important to the industry's present performance or future prospects."

151. E/Y's 2026 Global Insurance Outlook reports that the competitive landscape in the international insurance industry is changing profoundly, with uncertainty, instability and volatility as permanent, and with non-traditional players entering the industry and challenging traditional insurers for market share.

**Since 2001 Sompo and its Predecessor Corporate Entities Have Filed Fraudulent Financial Statements – with Multiple Related Errors, Omissions, and Misstatements - with the SEC Wrongfully Concealing that *Sunflowers* Is a Casualty of Nazi Persecution While Assuring Stakeholders that They Comply with All Pertinent Social Corporate Responsibilities Thereby Enabling Sompo to Continue to Tortiously and Fraudulently Commercially Exploit *Sunflowers* in New Jersey and Throughout the U.S. and to Reap Concomitant Unjust Enrichment**

152. Upon information and belief, since 2001 Sompo and its corporate predecessors have filed false and misleading as well as fraudulent financial statements (financial statements) with the SEC in violation of the financial reporting standards that both the relevant International Financial Reporting Standards (IFRS) as well as by applicable reporting standards issued by the Public Company Accounting Oversight Board (PCAOB). These financial statements have fraudulently concealed that *Sunflowers* – which is emblematic of and represents Sompo's corporate brand – is a casualty of Nazi coercion and duress and its genocidal policies in violation of the international law of human rights. Sompo's purposeful concealment of the Nazi taint to *Sunflowers* violates multiple relevant financial accounting and reporting strictures including the following:

a. Failing to present fairly the financial position of Sompo at the conclusion of each reporting period and to constitute a faithful representation of its financial position;

b. Failing to make relevant disclosures necessary for a faithful representation of Sompo's financial statements including that *Sunflowers* is casualty of Nazi confiscatory policies;

c. Omitting, misstating, and obscuring material information that reasonably would influence the financial decisions of the users of Sompo's financial statements including that (1): *Sunflowers* is a Nazi -tainted Painting in contravention of Sompo's many misrepresentations that it conducts comprehensive human rights due diligence investigations to ensure that none of its assets or activities are afflicted with human rights violations, and; (2) the Heirs enjoy a meritorious judicial claim to recover the Painting – to which Sompo has no meritorious defense - if they can obtain specific jurisdiction over Sompo and its subsidiaries based upon their collective contacts with the U.S.

d. Failing to identify and to discuss appropriately in footnotes to financial statement contingent liabilities resulting from federal, state, and international enforcement agencies invoking viable remedies against Sompo for wrongfully employing a Nazi-tainted artworks over the internet to garner commercial traction with local consumers in violation of relevant proscriptions against deceptive and unfair business practices and commercial fraud, and that federal, state, and international law enforcement agencies might assert viable criminal claims against Sompo for; (a) mail fraud, 18 U.S.C. § 1341; (b) wire fraud 18 U.S. C. § 1343; (c) the Racketeer Influence and Corrupt Organizations Act , 18U.S.C. § 1961 *et. seq.*

e. Failing to address the pervasive and integral fraud that Sompo perpetually commits by employing the Nazi-tainted *Sunflowers* its discreet corporate brand to garner commercial traction with its stakeholders and insurance consumers throughout the U.S.;

f. Misrepresenting that Sompo's financial statements comply with IFRS;

g. Failing to correct past errors in past financial statements and to restate Sompo and Yasuda's past financial statements to correct those errors retrospectively to 2001;

h. Failing to appropriately disclose the Heirs' judicial claim to recover *Sunflowers* as a contingent liability in the notes of Sompo's financial statements;

i. Failing to disclose that Sompo's pervasive fraud and misconduct with *Sunflowers* belies its misrepresentations that it comports with relevant Environmental, Social and Governance (ESG) prescriptions;

j. Failing to discuss as a material uncertainty that threatens the "going concern" future of Sompo the loss of all residual trust necessary for its continuing commercial viability that would result from an appropriate accounting disclosure that Sompo has ***continued to perpetrate fraud*** upon its stakeholders by concealing the Nazi taint to *Sunflowers* after admitting that it must regain stakeholder trust in the aftermath of the Big Motors and price fixing scandals discussed, *supra*.

**For Many Years E/Y Has Served as the Public Auditor for Sompo and Has Wrongfully - and Either Knowingly or with Extreme Recklessness - Validated Sompo's Fraudulent Financial Reporting in Violation of Multiple Legally Mandated Ethical, Auditing, and Attestation Standards as Well as SEC Rule 10-B-5**

152. E/Y has enabled Sompo to conceal the Nazi taint to Sompo's corporate brand emblem *Sunflowers* – and concomitantly to continue to fraudulently and tortiously commercially exploit the New Jersey and U.S. insurance markets – by violating a raft of applicable IFRS and PCAOB ethical, auditing, and attestation prescriptions. These include:

a. Failing to exercise due professional care including cultivating the requisite ***professional skepticism*** in its auditing Sompo's financial statements;

b. Failing to understand the current turbulent, unstable, and uncertain environment in the international insurance industry in which Sompo competes, and how the necessary and legally mandated disclosure that Sompo long has concealed that *Sunflowers* is a Nazi-tainted artwork would negate the precarious and minimal residual trust that Sompo currently enjoys and needs to compete in this environment, in light of Sompo's admitted fraud in in the recent Big Motors and price fixing scandals, discussed, *supra.*

c. Failing to understand and account for relevant applicable laws and potential liabilities as discussed, *supra*;

d. Failing to gather appropriate audit documentation, including extensive and readily accessible documentation that *Sunflowers* is casualty of Nazi persecutorial policies which is readily available in the judicial proceeding that the Heirs brought against Sompo in the Northern District of Illinois.

e. Failing to assess relevant potential judicial claims as discussed, *supra*;

f. Failing to detect and report upon the long-term and extensive financial fraud that Sompo has perpetrated in concealing the Nazi-taint to *Sunflowers*;

g. Failing to detect and report upon potential ESG fraud associated with Sompo and its corporate predecessors knowingly concealing from their stakeholders since 2001 that *Sunflowers* is a Nazi-tainted painting;

h. Failing to report that by long concealing the Nazi taint to *Sunflowers* Sompo has materially jeopardized its future as a commercially viable ***going concern*** business entity based upon the loss of all residual trust among Sompo stakeholders that would result were Sompo's financial statements to report appropriately the financial accounting consequences of Sompo's malfeasance with the Painting, including failing to restate those financial statements retrospectively to 2001 to reflect the extensive evidence of Sompo's perpetual wrongdoing available in the Heirs' First Amended Complaint in *Schoeps v. Sompo*, Case: 1:22-cv-07013, Docket Entry # 39, filed May 31, 2023.

i. Failing to base its opinion on all available evidence;

j. Failing to restate earlier Sompo financial statements since 2001 for material errors associated with Sompo's purposeful, fraudulent concealment of the Nazi taint to *Sunflowers*;

k. Failing to report potential prospective legal enforcement actions by multiple affected governmental agencies regarding Sompo's omnibus fraudulent wrongdoing with *Sunflowers*;

l. Failing to require that Sompo file SEC Form 8-K Item 402 regarding Notice of Non-Reliance on Past Financial Statements;

m. Failing to evaluate multiple misstatements in Sompo's financial statements;

n. Failing to identify relevant risks to Sompo based upon its long-term and perpetual malfeasance in knowingly employing a Nazi-tainted painting as its corporate brand to garner unjust enrichment in the New Jersey and U.S. insurance markets.

**The International Reputation of E/Y for Reliability , Integrity, and Trust Essential to the Commercial Viability of Independent Public Auditors to Attest Credibly to the B*ona Fides* of Financial Statements Has Been Tarnished by Recent Ethical Scandals and Allegations that E/Y Repeatedly Has Failed to Identify Material and Conspicuous Fraud in Financial Statements**

153. On June 28, 2022 the SEC issued a cease and desist order (Order) against E/Y which – *inter alia* – imposed a fine of $100 million for cheating on the ethics portion of the Certified Public Accountant (CPA) examination "as well as a variety of other examinations required to maintain their CPA licenses." The Order asserted that "E/Y audit professionals' repeated cheating on exams and the firm's misrepresentations to the SEC violated ethics standards and discredited the accounting profession." The Order related that "[i]nvestors rely on independent audit firms to serve critical gatekeeping roles with respect to financial reporting. The gatekeeping role depends on the integrity not only of independent audit firms' audit personnel, but of its management and its attorneys."

154. This scandal received extensive publicity including an SEC release dated June 28, 2022 entitled "Ernst & Young to Pay $100 Million Penalty for Employees cheating on CPA Ethics Exam and Misleading Investigation". A *New York Times* article dated June 28, 2002 related that "*Ernst & Young to Pay 100 Million Fine After Auditors Cheated on Ethics Exam*".

Other business journals contained articles reporting "E& Y in Murky Waters After the SEC Fined It $100 Million Over A Cheating Scandal" and "PR pros on how Ernst & Young can rebound after cheating scandal results in $100M SEC fine."

155. E/Y has sustained further damage to its professional reputation as an independent auditor from multiple recent lawsuits and media reports alleging that it repeatedly has ***failed to detect and report material fraud*** in the financial statements of its audit clients. These include: an article dated May 20, 2025 in the publication *Accountancy Age* entitled "**EY faces L2bn lawsuit over 'extremely serious' audit failings at NBC Health"** reporting that "[t]he administrators allege EY missed a series of red flags and failed in its duties to maintain professional skepticism and audit rigour" in neglecting to scrutinize a company's general ledger a "foundational financial record" "which the claimants argue would have uncovered evidence of fraud."; an article dated July 9, 2025 in the *International Accounting Bulletin* entitled **"Ernst & Young faces 1.4 bn Bridging finance lawsuit** alleging that E/Y failed to detect fraudulent activities and misstatements leading to the downfall of Toronto-based private lender Bridging Finance, reported *Bloomberg*." ; an article in the *Financial Times* published September 12, 2025 entitled "**EY insider: Big Four firm failed investors by watering down fraud-hunting plans**" alleging that "EY failed to follow through on the fraud- hunting measures it promised in the wake of the Wirecard scandal, according to a former partner (Joe Howie) involved in the clean-up effort ." The article reported that Howie "has taken his campaign public with a lawsuit" alleging that "EY is failing investors who rely on it to endorse corporate accounts."; an article dated March 14, 2025 in *Tax & Accounting* titled **PCAOB Criticizes EY for Quality Control Issues Third Time in a Row: Finds Deficiencies at 4 Small Firms;** an article in "*theacci.net*" dated October 25, 2025 entitled **EY Faces Scrutiny Over Alleged Misleading Conduct- What It**

**Could Mean for Global Audit Integrity** relating that if proven true these allegations "would raise serious questions about the quality, independence, and ethical effectiveness of EY's audit processes", observing that "[t]he international audit ecosystem depends on trust, transparency, and robust internal governance."; an article dated August 23, 2024 in *Stocks* entitled **Big Four Shakeup: EY Sheds Clients, Faces Audit Scrutiny** relating that E/Y was facing "increasing scrutiny from regulators."

## V. JURISDICTION AND VENUE

### A. The Heirs Properly Assert Specific Jurisdiction Over the Defendant Sompo Entities on Multiple Discrete Grounds Based Upon the Holocaust Expropriated Art Recovery Act of 2025 - Public Law No-119-82 (04/13/2026) (Hear Act Amendments) – Prescribing Nationwide Service of Process for National Contacts

152. The HEAR Act Amendments (Amendments) prescribe national contacts jurisdiction enabling plaintiffs to bring suit - *inter alia* - in any judicial district in which Sompo does business and to aggregate Sompo's contacts nationally to satisfy requisite due process. Section 2(g) of the Amendments provide as follows:

> (g) NATIONWIDE SERVICE OF PROCESS:.-For a civil action brought under subsection (a) in any State or Federal court, process may be served in the judicial district where the case is brought or any other judicial district of the United States where the defendant may be found, resides, has an agent or transacts business.

**B. Specific Jurisdiction Complies with Constitutional Due Process Requirements When Defendants Benefit from Their Discrete Forum Contacts or Claims Arise from the Defendant Doing Business in that Forum or Relate to Torts and Crimes that Defendants Commit Therein and the Exercise of Specific Jurisdiction Otherwise is Reasonable**

153. Beginning with the seminal *International Shoe Co. V. Washington*[12] – and continuing through its latest guidance in *Ford Motor Company v. Montana Eighth Judicial District* [13] – the Court consistently has reaffirmed that specific jurisdiction is premised upon a tacit bargain or *quid pro quo*: in exchange for enjoying the privileges, benefits, and advantages of a forum state a defendant submits to the jurisdiction of that sate regarding claims that arise from or relate to those discrete contacts. The Court consistently has equated due process in this context with *reasonable foreseeability*: if the defendant availing itself of the advantages, benefits, and privileges of a forum state reasonably should *foresee* that its conduct in the state might occasion liability for a claim arising from or connected to those activities, due process is satisfied. Due Process for specific jurisdiction also is satisfied when Defendants commit a tort or crime in the forum state. Finally, to comport with Due Process the exercise of personal jurisdiction must be reasonable.

**C. Exercising Specific Jurisdiction Over Sompo Defendants Satisfies the Requirements of Due Process on Multiple Discrete Grounds**

154. First, asserting specific jurisdiction over each of the Defendants represents a *paradigm* of the foundational tacit bargain – *quid pro quo* metric that the Supreme Court employs for ascertaining whether a discrete exercise of specific jurisdiction satisfies due process. The Sompo defendants' extensive, perpetual, and wrongful commercial exploitation of

[12] 326 U.S. 310, 326 (1945).
[13] 141 S. Ct. 1017 (2021).

*Sunflowers* over the internet throughout the U.S. to drive business to their corporate offices in 17 U.S. cities and thereby to reap concomitant unjust enrichment from their knowing misuse of *Sunflowers* satisfies independently the requirements for specific jurisdiction.

155. Second, the extensive branding and marketing benefits that the Sompo defendants realized in New Jersey and *throughout the U.S.* from displaying what they k*new* to be a Nazi-tainted artwork at the Art Institute of Chicago Exhibition in 2001-2002 and resulting from copious U.S. media attention and publicity *alone* satisfies independently the requisite tacit bargain-*quid pro quo* metric for establishing specific jurisdiction for the Heirs' judicial claims to recover the Painting and for unjust enrichment.

156. Third, Sompo's prolonged, deliberate and pervasive fraudulent concealment of the Nazi taint to *Sunflowers* in its mandatory U.S. financial reporting with the S.E.C. since 2001 – and its many related and concomitant accounting errors, omissions, and misstatements upon which Sompo's ability to commercially exploit *Sunflowers* necessarily depends – constitute another discrete basis for asserting specific jurisdiction over the Sompo defendants. The ability of Sompo to reap unjust enrichment from commercially exploiting what it knows to be a Nazi-tainted painting depends integrally upon concealing the Nazi taint to *Sunflowers* from Sompo's many U.S. stakeholders, and from violating its legal obligations to file financial statements that comport with the auditing and accounting strictures of IFRS and the PCAOB. These strictures entail that the Nazi taint to *Sunflowers* and Sompo's extensive wrongdoing in commercially exploiting what it long has ***known*** to be Nazi-tainted artwork be disclosed. Moreover, these strictures also require that the ramifications to Sompo's future as a viable "going concern" business entity from fraudulently concealing from its stakeholders since 2001 the Nazi taint to *Sunflowers* be discussed – especially since Sompo now admittedly is struggling to ***regain the***

***trust*** of its stakeholders in the aftermath of two high profile fraud scandals, and E/Y has placed ***trust*** as the foundation for gauging the competitive viability of insurance companies in the current and permanently unstable, uncertain, and hyper-competitive international insurance market. Sompo's materially false and fraudulent financial statements – which omit these facts and their attendant material consequences for Sompo's business operations and future as a viable going concern business entity - breach these obligations and violate SEC Rule 10b-5.

157. Fourth, Sompo has committed many torts and crimes in fraudulently concealing the Nazi taint to *Sunflowers* while wrongfully reaping extensive branding and marketing benefits at the expense of U.S. taxpayers, as discussed *supra.* Moreover, Sompo has continued to commit these same torts and crimes in perpetually commercially exploiting a Nazi-confiscated painting in the U.S. insurance market while concealing its identity as such. These torts and crimes provide an additional discrete basis for asserting specific jurisdiction over the Sompo defendants that satisfies the requisite due process, as they are integral to Sompo's ability to reap unjust enrichment by commercially exploiting *Sunflowers* at the expense of the Heirs.

158. Finally, that the many Sompo subsidiaries active in the U.S. are merely doing the business of their parent companies subjects the parent companies to specific jurisdiction in New Jersey.

## V. THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS ASSERTED IN THIS ACTION

159. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based upon the decisions of the Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S.308 (2005) and *Gunn v. Minton*, 568 U.S. 251 (2013). Under these decisions, federal jurisdiction will lie over state law claims if a federal issue is: (1)

necessarily raised; (2) actually disputed; (3) substantial, and; (4) capable of being resolved in federal court without disrupting relevant federalism concerns as envisioned by Congress. Each of these factors supports federal jurisdiction in this proceeding in that the Heir's claims affect uniquely federal foreign policies that a federal court can resolve without inappropriately impairing federalism.

160. The claims of the Heirs to recover *Sunflowers* and for unjust enrichment, as well as their other claims, satisfy these criteria on two distinct bases. First, because the Heirs' claims to recover the Painting and for unjust enrichment are equitable, relevant federal policies necessarily must inform them. The Supreme Court has made clear that when equitable claims implicate federal policies, these policies necessarily will determine both whether equitable relief will be granted, as well as the character and extent of such relief. The Court has instructed that "'[ t]here is inherent in the Courts of Equity a jurisdiction . . . to give effect to the policy of the legislature,'" and that when federal law is at issue and the public interest is involved a federal court's "'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake . . . .'" *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 291 (1960). "Courts of equity may, and frequently do, go much further to give relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015).

161. That courts necessarily consider federal law and policy in granting equitable relief when a controversy implicates federal interests assures that the Heirs satisfy the *Grable* factors for asserting federal question jurisdiction over their claims against Sompo Holdings. The Heirs' claims necessarily raise federal issues because the Heirs seek the recovery of a Nazi-confiscated artwork, which both courts and Congress have confirmed implicates uniquely federal interests.

*See Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954 (9th Cir. 2010); HEAR Act, Findings, §2(7); *Holtzman as Trustees of Elizabeth McManus Holtzman Irrevocable Tr. v. Philadelphia Museum of Art*, No. 22-CV-0122-JMY, 2022 WL 2651851, at *4 (E.D. Pa. July 7, 2022).

162. Second, the relevant federal issues necessarily are substantial and significant. In 2016, the U.S. enacted the Holocaust Expropriated Art Recovery Act of 2016 (the "HEAR Act"), Pub.L. 114-308, 22 U.S.C. § 1621 (2016), suspending otherwise applicable statutes of limitations for claims to recover Nazi-tainted artworks until December 15, 2022. The HEAR has underscored the importance of enabling Holocaust victims and their heirs to recover Nazi-confiscated artworks, and that this issue implicates signal and exclusive federal foreign policy concerns.

163. Moreover, that the Heirs are asserting their claims under the HEAR Act supplies a second, independent basis for federal question jurisdiction based upon the *Grable* doctrine. *See Holtzman v. Philadelphia Museum of Art*, No. 22-CV-0122-JMY, 2022 WL 2651851, at *3 (E.D. Pa. July 7, 2022), asserting federal question jurisdiction under the *Grable* doctrine over a claim to recover a Nazi era painting based solely upon how a claim brought under the HEAR Act satisfied the prescribed criteria. The court ruled that the HEAR Act fulfilled all four criteria that *Grable* prescribed for asserting federal question jurisdiction over a state law claim. *Id*. at 8.

164. Finally, adjudicating the Heirs' claim will not disturb the balance of state-federal responsibilities that Congress has established. As discussed, the restitution of Nazi- era artworks is a federal concern, and the few such claims brought will not threaten to overwhelm the federal courts.

165. In light of the Court's federal question jurisdiction, the Court possesses supplemental jurisdiction over the state law claims of plaintiffs based upon 28 U.S.C. § 1367.

## VI. VENUE IS PROPER IN THIS DISTRICT

166. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claim of the Heirs occurred in New Jersey. Sompo Holdings has an extensive commercial presence in New Jersey with its wholly owned subsidiaries conducting the business of Sompo Holdings through offices located in New Jersey. In addition, Sompo Holdings through its website and the website of Sompo International solicits business in New Jersey by employing the Painting in the manner related and alleged above. Sompo Holdings represents that the Painting has become "synonymous" with its corporate identity, and invokes the Painting prominently on its website to invite trust and reliance from its stakeholders, prospective clientele, and the public. But in capitalizing upon the Painting in this manner, Sompo Holdings affirmatively conceals that the Painting was a casualty of Nazi policies, and misrepresents that it is not tainted with any violations of the international law of human rights.

167. Alternatively, venue is proper in this district under 28 U.S.C. 1391 (b)(3) in that all Defendants are subject to personal jurisdiction in this district regarding the Heir's action.

168. Finally, this is the most convenient forum for this dispute.

169. As noted, in 2016, the U.S. enacted the HEAR Act, suspending otherwise applicable statutes of limitations for claims to recover Nazi-tainted artworks until December 15, 2022. Accordingly, this action is timely under the HEAR Act.

## VII. JAPAN DOES NOT PROVIDE AN AVAILABLE AND ADEQUATE ALTERNATIVE FORUM FOR PLAINTIFFS TO BRING THEIR CLAIMS

170. Japanese courts do not provide an available and adequate alternative forum for Plaintiffs to bring their claims. Plaintiffs would have no viable claim under Japanese law for the restitution of Vincent van Gogh's *Sunflowers,* since – among other provisions of Japanese law – even a bad faith possessor of an article acquires ownership after twenty years of possessing it "peacefully and openly with the intention to own it." *See* Japanese Civil Code, Article 162(A)(1) (Article 162 (A)(1). Since Defendant Sompo Japan Insurance, Inc. (formerly Yasuda) took possession of *Sunflowers* in 1987 and has possessed it continuously since that time – well over 20 years – the Plaintiffs would have no viable action for relief in a Japanese court.

171. Moreover, applying Article 162 (A)(1) to the Heirs' claims would repudiate U.S. policy as set forth in the HEAR Act, §5(a), that no claim will be untimely based upon "any defense at law relating to the passage of time."

172. In sum, Japan does not provide an available and adequate alternative forum for Plaintiffs to bring their claims for the restitution of *Sunflowers*. Rather, Japanese law would deprive Plaintiffs of any viable remedy and accordingly would defeat U.S. policy upon which the HEAR Act is based – to ensure that claims for the recovery of Nazi-tainted artworks are resolved on their substantive merits, in a just and fair way, and not extinguished by legal defenses such as Article 162 (A)(1) which are based merely upon the passage of time.

173. The foregoing paragraphs are confirmed by the Declaration of the Hon. Hiroyuki Kanno, which was submitted by Defendants as Exhibit E to their April 27, 2023 Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) & 12(b)(2) and Doctrine of *Forum Non Conveniens.* Mr. Kanno confirms at page 19 of his Declaration, that acquisitive prescription "means that a person that possess the

property of another for 10 years if the person was acting in good faith and without negligence at the time when possession started, or for 20 years *otherwise*, peacefully and openly with an intention to own the property, acquires ownership thereof." (Emphasis supplied.) Exhibit 16 of Mr. Kanno's Declaration contains the actual language of Article 162(1) of the Civil Code: "A person that possesses the property of another for 20 years peacefully and openly with the intention to own it acquires ownership thereof." In addition, Exhibit 20 to Mr. Kanno's Declaration contains the text of Article 724 of the Civil Code (Extinctive Prescription of Claim for Compensation for Loss or Damage Caused by Tort, which extinguishes claims if "the right is not exercised within 20 years from the time of the tortious act"). Accordingly, the Defendants' own expert has confirmed that Plaintiffs would have no viable claim for the restitution of the Painting in Japan under Japanese law.

## VIII. STATEMENT OF FACTS COMMON TO ALL ALLEGATIONS

### Overview and Summary

174. Paul von Mendelssohn-Bartholdy (hereafter "Mendelssohn-Bartholdy" or "Paul") was descended from a famous German Jewish family and was of purely Jewish extraction. He was a co-owner and director of the international bank of Mendelssohn & Co., which was one of the five largest German private banks. In addition, Mendelssohn-Bartholdy was on the board of the prominent Berlin Stock Exchange. He was married to an "Aryan" woman more than 20 years his junior, and collected what the Nazis termed "degenerate" modern art. Together, these attributes framed Mendelssohn-Bartholdy as a paradigmatic exemplar of what the Nazi party long had denounced about Jews, and made him an early and conspicuous target for Nazi antagonism. Purposeful and unrelenting Nazi policies to exclude Jews from the economy of Germany – and especially to eradicate Jewish banks – crippled Mendelssohn-Bartholdy

financially and forced him in or around 1934 to consign *Sunflowers* to Parisian art dealer Paul Rosenberg in a paradigmatic forced transfer.

175. Mendelssohn-Bartholdy released *Sunflowers* into a depressed market saturated with many similar modern artworks that intensifying Nazi persecution had wrested from other suffering Jewish collectors. Mendelssohn-Bartholdy's loss of *Sunflowers* occurred well along a course that Nazi authorities purposefully engineered to marginalize Jews, deprive them of their property, and exclude them from the economy of Germany – leading ultimately to massive genocide.

**The Nazi Goal to Exclude Jews from the Economy of Germany**

176. In 1920, Adolf Hitler announced the program of the National Socialist German Workers party (NSDAP) – from which the abbreviation "Nazi" derived – to rehabilitate Germany with its "Twenty-Five Points" or "Twenty-Five thesis." Points 4 through 8 and 24 targeted Jews as the root cause of Germany's many misfortunes, and decreed that Germany must remove Jews from public life, revoke their citizenship, and if necessary, expel them from the country.

177. In 1924, Hitler wrote his notorious autobiography *Mein Kampf* explicating his rabid, racially propelled anti-Semitism. Historians have regarded *Mein Kampf* as a "blueprint" for the Nazi agenda against Jews. Hitler blamed Jews for undermining the economic, political and cultural life of Germany. Hitler warned that Jews active in banking and in the stock exchange – such as Mendelssohn-Bartholdy – posed an especially insidious threat to Germany.

178. Accordingly, then, for Adolf Hitler, wrote historian Saul Friedlander in *Nazi Germany and the Jews* (1997), p. 102, "the struggle against the Jews was the immutable and obsessional core of his understanding of history, politics and political action." And as historian

Karl A. Schleunes observed in *The Twisted Road to Auschwitz-Nazi Policy Toward German Jews 1933-1939* 5 (1970), Hitler's speeches and *Mein Kampf* foreshadowed a desolate future for Jews in Germany if the Nazi party ever obtained the political means to implement its transparent agenda: "[i]t is often noted that anyone who listened seriously to Hitler or read *Mein Kampf* carefully might have expected something approaching a Final Solution."

**Nazi Policies Against Jews Based Upon Race and Not Religion**

179. Nazi antagonism towards Jews was premised upon their perception of Jews as a distinct race seeking to dominate the German people and to control the German economy. As Hitler had insisted in *Mein Kamp*, "the Jews are members of a *people* and not a *religion*." (Emphasis in original) Hitler, *supra*, p. 306.

**Special Nazi Antipathy for "High-Finance Jews" Like Mendelssohn-Bartholdy**

180. As a prominent Berlin banker of Jewish descent and Board Member of the Berlin Stock Exchange, Mendelssohn-Bartholdy attracted instant Nazi attention and antipathy. From the early-1920s, the Nazis proclaimed that "high finance Jews," and particularly "Jewish bankers" and "Stock Exchange Jews," were enslaving non-Jews in Germany and throughout the world. In a speech in 1923, Hitler stated that a "few dozen" Jewish bankers – which without question included Mendelssohn-Bartholdy as co-owner and co-manager of Mendelssohn & Co., one of the five largest private banks in Germany – controlled German destiny: "We in Germany have come to this: that sixty million people sees its destiny to lie at the will of a few dozen Jewish bankers." (Adolf Hitler speech in Munich, April 13, 1923.)

181. In this same speech, Hitler declared that the Jews active in the stock exchanges – such as Mendelssohn-Bartholdy in the Berlin Stock Exchange – had been responsible for

Germany's defeat in World War I, and now controlled the world though the World Stock Exchange.

**Prominent Banker and Stock Exchange Director Mendelssohn-Bartholdy as Early Nazi Target**

182. As early as 1920, Nazi propaganda and publications began targeting Mendelssohn-Bartholdy. These publications included Julius Streicher, *Deutscher Sozialist,* (June 4, 1920), and an anti-Semitic "Encyclopedia" entitled *Sigilla Veri.* As a worldly and sophisticated banker and art collector, Mendelssohn-Bartholdy would have been aware of these publications.

**January 30, 1933 – Persecution of Jews Becomes Official State Policy**

183. On January 30, 1933, Adolf Hitler became Chancellor of Germany, and the Nazi era began. The Nazis exalted their determination to exclude Jews from the German economy and expel them from Germany.

184. The Nazis commenced their multi-pronged campaign against Jews immediately after taking power, and pursued it inexorably. Within months after Hitler became Chancellor, the Nazi government promulgated more than 400 discriminatory laws and decrees against its Jewish citizens. Private industries and businesses – seeking to curry favor with the new regime – adopted Nazi exclusionary policies. Nazi leaders continued to denounce Jews with increasing vehemence. And violence against Jews throughout Germany exploded during the early months of the Nazi regime, as gangs of the Nazi-affiliated S.A. thugs randomly assaulted and terrorized Jews

185. Within months after Hitler became Chancellor, Goebbels had cleared the Berlin city administration of all contracts with Jewish businesses, attorneys and physicians.

186. An Emergency Decree of February 28, 1933 deputized the S.A. – over 1.5 million Nazi Storm troopers – as official agents of the Nazi government and also suspended the writ of habeas corpus. Now the S.A. could arrest Jews arbitrarily, without having to justify the detention to a judge.

187. Only three days later – on March 3, 1933 – the Reichstag divested itself of its legislative functions by passing the Enabling Act, which gave full legislative and executive powers to the Chancellor, Adolf Hitler. The Enabling Act allowed the Nazi government to rule by decree for the next four years. According to historian Schleunes, this legislation provided "the Nazis with a cloak of legality with which to cover their official actions." Schleunes, *supra*, p. 96. The Enabling Act then established the legal basis for later discriminatory legislation against Jews. As historian Friedlander commented, "[t]he rapidity of change was stunning." Friedlander, *supra* p. 17.

188. Violence against Jews escalated throughout Germany in 1933. On April 1, 1933, the Nazis orchestrated the infamous boycott of Jewish businesses. Initially, Nazi authorities intended that the April 1, 1933 boycott would continue until the Jews had been eliminated from the German economy, but abandoned this goal in favor of expunging Jews more judiciously to mitigate stress on the precarious German economy.

189. On April 7, 1933, the Nazis government introduced the infamous "Law for the Restoration of the Civil Service" (the "Civil Service Law") which prescribed that only "Aryans" could hold civil service positions. This legislation designated a "Jew" as anyone being one quarter (1/4) Jewish. It dismissed or forced into retirement virtually all Jews working for the German government. Many private companies – anxious to accommodate the new government and to mirror official Nazi policy – began firing Jews from their positions in the private sector.

190. In the wake of the Civil Service Law, local governments and municipalities began excluding Jewish firms from public contracts.

191. Nazi laws and decrees continued to exclude Jews from an ever-widening range of economic activities. On April 22, 1933, non-Aryans were subjected to the "Decree Regarding Physicians Services with National Health Service." The "Law Against Overcrowding of German Schools" was announced on April 25, 1933. In May 1933, Germany revoked the licenses of non-Aryans as tax consultants, judges, professors, instructors and lecturers in universities and colleges.

192. On September 29, 1933, a "Hereditary Farm Law" precluded Jews from owning farmland or engaging in agriculture. And Jews soon were barred from belonging to the Journalist Association or from being newspaper editors.

193. The Nazi campaign against Jews struck with especial force in Berlin – where Mendelssohn-Bartholdy resided and the Mendelssohn & Co. bank was situated. Jews there suffered not only the anti-Jewish campaign of the Reich government, but also the independent, aggressively anti-Jewish policies of the Berlin city administration.

194. Nazi exclusionary policies soon struck Jewish banks. Some cities and districts refused to do business with such banks in the first several months after Hitler's rise to power, which resulted in these banks losing the municipal bond business – a crucial source of revenue for the survival of many banks in Germany. Further, Jewish private bankers observed with trepidation how the major corporate banks, Deutsche Bank AG, Dresdner Bank AG, and Commerzbank AG, hastily dismissed all but a few Jewish directors and board members in order to impress Nazi authorities. Indeed, throughout Germany "Aryanization" was rampant and permeated all businesses and industries.

195. Nazi authorities monitored in detail their progress in eliminating Jews from the economy of Germany. In the mass distribution pamphlet entitled *Why the Aryan Law? A Contribution to the Jewish Question,* the Nazis analyzed the contemporaneous impact of the "racial laws," and compiled statistics confirming that during 1933 and early 1934, the number of Jews in each profession had declined. The report states that the Nazi "racial legislation has reduced the influence of Jewry in all professions." The report underscored that the elimination of the Jews from the professions and economy was an ongoing project: "[O]ne cannot ignore the fact that we have not yet fully eliminated the influence of the Jewish foreign body in German national life." (*See Warum Arierparagraph? Ein Beitrag zur Judenfrage,* by Dr. E. H. Schulz and Dr. R. Frercks (Berlin: Verlag Neues Volk, 1934.)

**Nazi Pressure Against Mendelssohn-Bartholdy Escalates Throughout 1933**

196. Mendelssohn-Bartholdy was an immediate target and casualty of Nazi policies.

197. In 1933, Nazi hate literature continued to identify Mendelssohn-Bartholdy specifically and the Mendelssohn family generally. These include *The International Relationships of Jewish High Finance* (Heinrich Pudor, *Die Internationalen verwandschaftlichen Beziehungen der juedischen Hochfinanz,* Leipzig 1933-1937); *Handbook of the Jewish Question* (Theodor Fritsch, (*Handbuch der Judenfrage*, 3rd Edition, Leipzig: Hammer Verlag, 1933), p. 294; and "*Jews, Look at You*" (Johann von Leers, *Juden sehen dich an,* Berlin: NS.-Druck und Verlag, 1933), p. 82-84.

198. On March 20, 1933, newly deputized Nazi Storm troopers marched into the Berlin Stock Exchange – where Mendelssohn- Bartholdy sat on the board of directors – and began physically threatening and assaulting members. Mendelssohn-Bartholdy likely suffered personal threats and physical intimidation during this incident.

199. In or around the summer or fall of 1933, fear of potentially imminent physical assault drove Mendelssohn-Bartholdy from his conspicuous mansion residence at Alsenstrasse into a small rental garden house in a more secluded, wooded area of Berlin called *Schlosspark Bellvue*. Mendelssohn-Bartholdy had spent years designing and building his palatial mansion residence at Alsenstrasse with the help of famed architect Bruno Paul. Mendelssohn-Bartholdy had lived at Alsenstrasse since 1918, and it had become the center of his gracious social world, as well as the primary venue for displaying his modern art collection. The decision of Mendelssohn-Bartholdy to abandon Alsenstrasse so precipitously after the Nazis came to power reveals how imperiled and precarious he viewed his future in Berlin. Mendelssohn-Bartholdy had good reason to fear for his safety at this point: Storm Troopers randomly attacked people that they perceived as Jewish on the street, and might well invade his residence.

200. Mendelssohn-Bartholdy's forced departure from Alsenstrasse registered a concrete and quantifiable economic injury that resulted directly from Nazi policies. By denying Mendelssohn-Bartholdy the reasonable use and enjoyment of his primary residence, the Nazi authorities effectively expropriated this residence from him at this time. In addition, Mendelssohn-Bartholdy was forced to pay rent at his alternative residence *Schlosspark Bellvue*.

201. On or before November 17, 1933 – and as an additional precaution – Mendelssohn-Bartholdy also moved the Danish consulate from Alsenstrasse to the buildings which housed the Mendelssohn & Co. bank. Mendelssohn-Bartholdy held the prestigious position of Danish Consul, and had located the consulate in his spacious residence until November 1933.

202. Perhaps most ominously for Mendelssohn-Bartholdy, however, in late 1933 the Nazis began speaking openly of terminating all Jewish owned banks. The Nazis publicly

expressed the view that Jews were incompatible with the appropriate ethos for banking. The Nazi campaign against "Jewish bankers" was panoramic, and extended to Jews who worked for privately owned banks that were not Jewish-owned.

203. Strategic Nazi-orchestrated boycotts and public relations campaigns against Jewish banks throughout 1933 had registered their effect by the end of that year. Nazi policies had reduced the net earnings of Mendelssohn & Co. from RM 2.3 million in 1932 to only RM 1.3 million in 1933. Correspondingly, Mendelssohn-Bartholdy's income from Mendelssohn & Co. decreased from RM 436,357 in 1932 to RM 239,009 in 1933 – or a loss of about forty five percent (45%) from the previous year. This decline – coupled with an intensifying Nazi commitment to eradicate Jewish-owned banks – intimated that Mendelssohn-Bartholdy's earning would plummet even further in 1934. Having been evicted from Alsenstrasse and his primary forum for displaying his paintings – and with his personal income diminishing at an alarming rate with little hope ever of rebounding to his traditional earning level – towards the end of 1933, Mendelssohn-Bartholdy began dismantling his private art collection by consigning three paintings by the artist Georges Braque to Flechtheim galleries.

**The Nazis Government Legislates to "Reorganize" the German Economy to Exclude Jews as Mendelssohn-Bartholdy Forfeits Invaluable Leadership Positions in Industries Essential to the Survival of Mendelssohn & Co.**

204. On February 27, 1934, the Nazi government implemented the "Statute on the Preparation of the Organic Constitution of the German Economy" (hereafter the "Statute" or "reorganization laws") which brought associations of business leaders in all industries – including banking, insurance, and securities – within the broader national scheme to reorganize the German economy and exclude Jews from it. The Statute formalized *de facto* Nazi policies that the Nazi party had pursued throughout 1933, and hastened the exclusion of Jews like Mendelssohn-Bartholdy from leadership positions in German business and industry.

**Nazi Policies Deprive Mendelssohn-Bartholdy of Membership on the Board of the Reich Insurance Corporation**

205. The Statute and its underlying policy injured Mendelssohn-Bartholdy immediately. In February 1934, Mendelssohn-Bartholdy stopped attending Board meetings and lost his position as a member of the Board of the Reich Insurance Corporation. This loss devastated Mendelssohn-Bartholdy, since the Reich Insurance Corporation was a government-related insurance corporation that handled important tasks such as unemployment insurance, pension insurance, and investing corporate funds.

**Nazi Policies Strip Mendelssohn-Bartholdy of His Powerful Position on the Berlin Stock Exchange**

206. The Statute and Nazi policies effectively divested Mendelssohn-Bartholdy of his position as a member of the powerful and prominent Berlin Stock Exchange, as Nazi reorganization laws deprived the Board of which Mendelssohn-Bartholdy was a member of further power.

**Mendelssohn-Bartholdy's Well-Founded Fear in Early 1934 that the Nazi Government Would "Aryanize" and Destroy Mendelssohn & Co. Imminently**

207. In early 1934, the Nazi government began taking special aim at Jewish-owned banks and Jewish bankers. In 1934, Reichsbank president and Hitler's Ministry of the Economy, Hjalmar Schact, began insisting that all German bank boards dismiss their Jewish directors. Also in early 1934, several prominent national Aryan banking leaders declared that Jewish banks and Jewish bankers would have no future in the newly reorganized banking industry.

208. On March 2, 1934, a representative of Mendelssohn & Co. visited a Nazi official at the Office of the State Commissioner for Banking to determine whether Jewish-owned banks would be allowed to exist in the re-organized Germany economy. The Mendelssohn & Co. representative suggested that if the Nazi government intended to eradicate Jewish-owned banks

summarily, the interests both of the government and the targeted banks would best be served by providing the banks with sufficient notice to allow them to dismantle their operations in an orderly fashion. The Nazi official eventually responded that the Jewish-owned banks like Mendelssohn & Co. would not be eliminated at that time, but that the Nazi government would no longer allow Jews in leadership positions in banking associations. As one commentator observed, "[t]hat this declaration of intent was only a temporary decision was already presumably clear at his time both to [the Nazi official] and to the representative of [Mendelssohn & Co.]." Ingo Köhler, *Die "Arisierung" der Privatbanken im Dritten Reich* (*The "Aryanization of Private Banks in the Third Reich*) (2005), p. 83. Indeed, the internal Nazi government memos relating to the meeting also reflect this understanding.

**Nazi Policies Caused Mendelssohn-Bartholdy to Lose his Position on the Board of the Central Union of German Banking and Bankers**

209. Consistent with the Statute and the statements of the Bank Commissioner noted above, in the Spring of 1934 Mendelssohn-Bartholdy lost his powerful position at the influential Central Union of German Banking and Bankers (the "Central Union") – along with all of the other Jewish board members – when the Nazis "re-organized" the banking union and incorporated this body into an umbrella Nazi organization. The exclusion of Mendelssohn-Bartholdy from leadership positions in the banking, insurance, and securities industries coincided with the Nazi removal of Jews from managerial positions in all segments of the economy.

210. The loss of positions of leadership and influence in the banking, securities and finance industries of elite Jewish bankers like Mendelssohn-Bartholdy undermined the basis of their success and prosperity. As historian Martin Dean explained, much Jewish prosperity in Germany was "based upon intangibles, such as education, expectations, motivation, professional standing, and experience, as much as it was on the ownership of capital. *The effects of Nazi*

*economic discrimination devastated these key foundations* ….” (Emphasis supplied.) Dean, *supra*, p. 49.

**Nazi Authorities Deprive Mendelssohn & Co. of Its Interest in Akzeptbank**

211. In March 1934, the Reich began the “Aryanization” of Akzeptbank, a bank in which Mendelssohn & Co. had invested heavily. This venture had been set up under the supervision of the Deutsche Gold-diskontbank and Reichsbank in order to give failing banks the opportunity to take additional bills on discount, and Mendelssohn & Co. had invested heavily in this enterprise. Nazi authorities compelled Mendelssohn & Co. and all other Jewish owned banks and members of the supervisory board to resign.

212. In July 1934, Mendelssohn & Co. objected strenuously to the “re-organization” of Akzeptbank, but to no avail. Mendelssohn & Co. received only the nominal value of its participation and a small amount of compensation. Mendelssohn & Co protested and denounced this action as "a contravention of justice and all mercantile practice."

213. As a 22% owner of Mendelssohn & Co., the Aryanization of Akzeptbank wrongfully denied Mendelssohn-Bartholdy of an invaluable financial opportunity.

**Nazi-inspired Boycotts Force Mendelssohn & Co. to “Aryanize” the German Goods Trust Company and Compel Mendelssohn-Bartholdy to Resign from Its Board**

214. The German Goods Trust Company (the “GGTC”) was a joint subsidiary of Mendelssohn & Co. and M.M. Warburg & Co. In 1934, the Nazis orchestrated a boycott of this business because it was Jewish-owned. The boycott precluded the continued operation of this firm as a Jewish-owned enterprise. In September 1934, the owners decided to “Aryanize” the business to save it. Mendelssohn-Bartholdy and Fritz Warburg resigned from the company's supervisory board, although they had been members since 1920. Mendelssohn & Co. and M.M. Warburg transferred ownership of the GGTC to “Aryans,” and the boycott ended.

215. After the war, a former senior employee of the Warburg Bank who had participated in "Aryanization" negotiations on behalf of Warburg remembered that the sale of the company had taken place solely due to the anti-Semitic boycott and the impossibility of continuing the GGTC as a Jewish-owned company.

216. As a 22% owner of Mendelssohn & Co., the “friendly Aryanization” of the GGTC effectively confiscated the equity interest of Mendelssohn-Bartholdy in a profitable going concern business.

**Nazi Policies Destroy the Financial Future of Mendelssohn & Co. and Thereby Effectively Rob Mendelssohn-Bartholdy of His 22% Equity Interest**

217. Beginning in 1933 and throughout 1934, the Nazi government pursued in several ways its policy to exclude Jewish banks incrementally from the German economy. In the first months of the Nazi regime some cities and districts refused to do business with Jewish banks, and foreclosed them from the municipal bond business – a crucial source of revenue for many banks in Germany. As the Nazi campaign intensified, more cities and districts boycotted Jewish-owned banks. Moreover, in response to Nazi policies and pressure, Aryan clients of Jewish banks – both individual and corporate – did less and less business with them. In addition, the mounting emigration of the Jewish clientele of Jewish-owned banks further eroded their sources of business. As historian Avrham Barkai explained, “the dwindling deposits both by ‘Aryan’ customers – and with mounting emigration and deepening pauperization of Jews – undermined the basis of the continued survival of Jewish banks.” Avrham Barkai, *From Boycott to Annihilation – The Economic Struggle of German Jews 1933-1938* (1989), p. 76. Furthermore, foreign business clients – aware that even the largest private Jewish banks such as Mendelssohn & Co. had no long-term future in Nazi Germany – began transferring their accounts to more secure Aryan bank alternatives.

218. The Nazi government – through the Economic and Statistical Department of the Reichsbank (the "Department") – monitored methodically the success of its policies and the corresponding financial decline of Jewish banks. A 1936 Department Report for the period "from the end of 1932 until the end of June 1935" verifies these trends. The Report related, among other things, that the incremental losses that Jewish banks sustained during this period frequently corresponded with the gains of Aryan banks. This Report also stated that over the first two and one-half years of the Nazi era – almost precisely the time that Mendelssohn-Bartholdy struggled in Nazi Germany – "the average balance sheet totals" of the five largest Jewish-owned banks (which specifically included Mendelssohn & Co.) declined by a dramatic ***thirty six percent (36%).*** The Report noted that "[t]he average balance sheet total of the non-Aryan firms decreased in all groups, while that of the Aryan ones increased." (Emphasis original.) The Report stated further that among the largest 5 Jewish-owned banks (including specifically Mendelssohn & Co.), the erosion of foreign business accounted for most of their losses: "for the 5 largest firms…its decline is based mostly on the shrinkage of the foreign monies." The Report also noted a "decline in the credit capacity of the majority of the non-Aryan firms," which "pointed to a migration of customers from non-Aryans to Aryan firms." The Report observed also that Aryan banks were far outstripping their Jewish-owned competitors in cash deposits: "paper [money] funds for the Aryan firms in all size categories increased far more when compared to the non-Aryan ones."

219. By late 1934, Nazi persecution and policies had all but negated the future of Mendelssohn & Co. as a viable going concern business entity in Nazi Germany. Correspondingly, these policies had obliterated the value of Mendelssohn-Bartholdy's 22% equity interest in the Bank, and the future income that he reasonably could expect to earn from it.

220. In 1931, two years before the Nazis took power, Mendelssohn & Co. had earned RM 2,804,000. In 1932 – the year before the Nazis took power – Mendelssohn & Co. had earned about the same, that is, RM 2,305,000. But in 1934, intensifying Nazi policies to eliminate Jewish-owned banks had reduced its earnings to only RM 514,000 – ***a decline in profits of approximately seventy eight percent (78%) in only two years.*** And the personal income that Mendelssohn-Bartholdy earned from his 22 % equity interest in Mendelssohn& Co. dropped even more precipitously. In 1931 and 1932 Mendelssohn-Bartholdy had earned income respectively of RM 430,270 and RM 436, 357. But in 1934 his income was only RM 59, 374 – or ***less than fourteen percent (14%)*** of what it had been based upon an average of his income in 1931 and 1932.

221. By late 1934, the aggressive Nazi policies to eradicate Jewish banks and bankers from the economy of Germany had dramatically diminished the fair value of Mendelssohn-Bartholdy's 22% equity interest in Mendelssohn & Co. In essence, by denying Mendelssohn & Co. a future as a going concern business entity, Nazi policies correspondingly deprived Mendelssohn-Bartholdy of the present value of the income that he reasonably could expect to earn from his equity interest in this enterprise over a potentially unlimited number of years going forward. By sabotaging his primary asset – his equity interest in Mendelssohn & Co. – Nazi policies starkly redefined Mendelssohn-Bartholdy's financial portfolio and ***compelled*** him to seek liquidity from alternative sources.

**Nazi Confiscatory Policies Against Mendelssohn-Bartholdy Accelerate After Hitler Murders His Political Opponents, Consolidates Power, and Becomes Absolute Dictator of Germany**

222. Since assuming power in January 1933, the SA – a powerful grass roots paramilitary faction within the Nazi Party with a distinctive ethos – had advocated an agenda that did not cohere with Hitler's. On the night of June 30, 1934, Hitler ordered the SA leadership

imprisoned or murdered, thereby extinguishing any possible internal party threat to his leadership. The killings, however, extended beyond the SA leadership and included the recent former Chancellor of Germany, Kurt von Schleicher. The U.S. consul in Berlin placed the number of deaths at 284, and at least 5 Jews had been murdered for no ostensible reason. The incident came to be known as the "Night of the Long Knives".

223. Hitler's cabinet promptly enacted a law that legally justified all of the killings as actions taken in "emergency defense of the state."

224. The significance of this incident was not lost upon sophisticated observers like Mendelssohn-Bartholdy. For rather than reflecting merely an internal settling of political scores, this event instead revealed the Nazi Party as criminal thugs devoid of any moral conscience. The killings sent chills through the Jewish community in Germany, for it made apparent that the Nazi Party – which long had proclaimed Jews as national enemies and had sworn to expel them from the Germany economy – would commit mass murder to accomplish its objectives.

225. On August 2, 1934 the President of Germany, Paul von Hindenberg, died. According to historians Matthaus and Roseman, Hindenberg's death "removed from the political scene the last figure with enough prestige to rival the Nazi leader." But rather than appoint a new President, Hitler instead consolidated the two offices and assumed the title of "Führer," or undisputed leader of Germany. The German army immediately swore an oath of ***personal*** loyalty to Adolf Hitler as their supreme commander. With the death of Hindenberg, Hitler and the Nazi Party now had completed their consolidation of power.

**A Popular Nazi Publication Threatens the Mendelssohn Family**

226. In September 1934, a lead article in a Nazi monthly founded by Nazi Party ideologist Alfred Rosenberg, called "*Der Weltkampf*," attempted to legitimize the murder of

former Reich Chancellor von Schleicher during the "Night of the Long Knives" in June 1934 based upon his association with the Mendelssohn family. The article declared that von Schleicher was a traitor to Germany who deserved to die because he had been a "tool of the Jews" and "visited the house of the Jewish banker Franz von Mendelssohn nearly every evening." Franz von Mendelssohn was the co-director of Mendelssohn & Co. with Mendelssohn-Bartholdy. Accordingly, this article – which justified the murder of von Schleicher merely because he had socialized with the Jewish Mendelssohn family – cast the Mendelssohn family as presumed mortal enemies of Germany and reasonably intimated threats against the Mendelssohn family, Mendelssohn & Co., and Mendelssohn-Bartholdy in particular.

**The Nazi Government Makes German Tax Laws an Official Instrument to Dispossess Jews**

227. In October 1934 the Nazi Government enacted a law prescribing that henceforth the federal tax laws of Germany were to be interpreted "in accordance with National Socialist ideology," that is, against the interests of Jewish taxpayers. This enactment formally acknowledged the tax laws of the Nazi government as a mechanism for displacing Jews from the economy of Germany and for confiscating their property.

**Nazi Authorities Coerce Mendelssohn Bartholdy to "Donate" Land at Boernicke**

228. In the fall of 1934, the Nazi Kulturamt (Cultural Office) began pressuring Mendelssohn-Bartholdy to give up some of his land at his country estate, Boernicke, to the Nazi government.

229. At approximately this same time, Mendelssohn-Bartholdy took out a RM 900,000 loan on Boernicke with a four and one half percent (4 1/2%) interest rate. Concurrently, he filed a Grundschuld (encumbrance) on this land to protect it from Nazi predation. Mendelssohn-

Bartholdy also took out a similar Grundschuld on Alsenstrasse in the amount of RM 600,000. These encumbrances made it more difficult for the Nazis to seize either property.

230. On or about November 30, 1934, only about one month after Mendelssohn-Bartholdy had encumbered these properties, he assigned the two "Grundschulden" to Mendelssohn & Co. Mendelssohn-Bartholdy thereby clearly intended to protect his real estate from confiscation. Mendelssohn & Co. then negotiated with the Nazi authorities to allow the Kulturamt to acquire discrete parcels of Boernicke over the next months.

**To Protect His Residual Assets from Escalating Nazi Encroachment, Mendelssohn-Bartholdy Formulates a Defensive Strategy that Compels Him to Begin Consigning and Liquidating Substantial Portions of His Private Art Collection**

231. Mendelssohn-Bartholdy's consignment of his art collection late in 1934 Nazi Germany must be seen in the broader context of a necessary and integrally related defensive strategy that he devised to safeguard his residual assets from intensifying Nazi predation and to enhance his physical safety. Nazi exclusionary policies already had inflicted massive economic and financial damage upon Mendelssohn-Bartholdy by all but negating the value of his primary asset – his 22% equity interest in the historically successful Mendelssohn & Co. By the Fall of 1934, Mendelssohn-Bartholdy could reasonably expect little future income from this source. Mendelssohn-Bartholdy knew that the future of Mendelssohn & Co. was bleak, and that Nazi authorities were tolerating the continued operation of all Jewish-owned banks only as a short-term expedient. So now, in an attempt to protect his residual assets and estate from a similar fate, Mendelssohn-Bartholdy was forced to formulate an integrated defensive plan (the "Plan") to safeguard his two primary remaining assets, Alsenstrasse and Boernicke, and to place as much of his remaining estate as possible into the hands of his "Aryan" wife Elsa. The Plan, however, would exacerbate his already severe negative cash flow, and would require him to begin

dismantling *en masse* his prized private art collection in order to supply the liquidity necessary to meet amplified periodic expenses. The Plan included the following specific objectives:

232. *Protecting Boernicke*: As noted above, the Nazi Kulturamt began pressuring Mendelssohn-Bartholdy to give up land at Boernicke in the early fall of 1934. Mendelssohn-Bartholdy's defensive strategy was to place a "grundschuld," or encumbrance on Boernicke, borrow money against the value of the property to encumber it further, and then assign the encumbrance to Mendelssohn & Co. Mendelssohn & Co. then negotiated with the Kulturamt and eventually ceded land to it. Thus, in order to protect Boernicke, Mendelssohn-Bartholdy had borrowed RM 900,000 against its value, and had incurred an annual mortgage expense of RM 40,500 (RM 900,000 x 4 ½%), as well as ceded acreage to the Nazi authorities.

233. *Protecting Alsenstrasse*: Because he reasonably feared that Nazi thugs might assault him at Alsenstrasse since it was so close to the Reichstag in central Berlin, Mendelssohn-Bartholdy had vacated this mansion in 1933 and rented a smaller and more secluded home at *Schlosspark Bellvue.* So when Mendelssohn-Bartholdy realized that the Nazis were pressuring him to cede acreage at Boernicke in 1934, he placed a similar encumbrance on Alsenstrasse. Mendelssohn-Bartholdy no doubt believed that Alsenstrasse was especially vulnerable to Nazi predation, since it was now largely vacant and in close proximity to the Reichstag. Clearly, the Nazis would find this property inviting. Thus, in seeking to preserve Alsenstrasse, like Boernicke, Mendelssohn-Bartholdy incurred additional expenses because to retain it he had to defray essential carrying costs, including heating, repairs and maintenance, and to retain a skeletal staff at the premises. In addition he had to pay rent at his alternative residence, *Schlosspark Bellvue.*

234. *Preserving the residual commercial viability of Mendelssohn & Co*: Mendelssohn-Bartholdy declined to seek a judicial order to have his annual alimony expense of RM 120,000 to his first wife reduced on the ground of changed financial circumstances because, in order to do so, he would have had to reveal publicly his precipitous financial decline. Mendelssohn-Bartholdy and his partners concluded that the public disclosure of his diminished personal finances would undermine the public image of Mendelssohn & Co. Accordingly, Mendelssohn-Bartholdy forfeited an opportunity to have the financial burden of a RM 120,000 annual alimony expense reduced in an attempt to preserve Mendelssohn & Co. as a viable going concern bank, and to salvage whatever negligible future income that he might hope to realize from it.

235. *Putatively transferring his private art collection to his "Aryan" wife, Elsa*: Mendelssohn-Bartholdy maintained (fictively) in the February 8, 1935 Contract of Inheritance that he had conveyed his "paintings" to Elsa as a "wedding gift" in 1927. By crediting Elsa with ownership of the art collection since their wedding, Mendelssohn-Bartholdy sought to protect his collection from Nazi predation, since he could now profess that an "Aryan" had owned it since before the Nazis took power. In maintaining that he had given his art collection to Elsa as a wedding gift, Mendelssohn-Bartholdy also positioned himself to argue that the value of his collection should be excluded from the contemporaneous inheritance tax, which the Nazi government had recently legitimized as an official instrument to dispossess Jews. For the same reasons, Mendelssohn-Bartholdy's sisters accepted this fictive "wedding gift" in the Boernicke Protocol entered shortly after Mendelssohn-Bartholdy's death in May 1935. In fact, there was no "wedding gift" in 1927. Mendelssohn-Bartholdy as well as every dealer with whom he dealt

referred exclusively to Mendelssohn-Bartholdy as the owner of the artworks up until the time of his death in May 1935.

236. *Transferring value from Boernicke – which was subject to imminent Nazi predation – to property that his "Aryan" wife Elsa owned exclusively*: Consistent with his goal of transferring his property and estate to his "Aryan" wife Elsa to protect it from Nazi predation, in October 1934 Mendelssohn-Bartholdy purchased a farm house in Bavaria for 96,000 goldmark that he placed exclusively in her name. The purchase required Mendelssohn-Bartholdy to assume an existing mortgage on the property in the amount of RM 17,000, and to incur an additional mortgage of RM 22,000. These mortgages further diminished the attractiveness of the farmhouse as a target for Nazi predation. Mendelssohn-Bartholdy almost certainly acquired this property with the help of Mendelssohn & Co., and likely as part of an integrated financial plan that included the attending loan of RM 900,000 on the mortgage of Boernicke.

237. The purchase of the farm house permitted Mendelssohn-Bartholdy to transfer to Elsa more of his residual net worth and estate – just as he had attempted to convey his art collection to her by maintaining that it was a 1927 "wedding gift." The farm house additionally afforded Mendelssohn-Bartholdy a sanctuary remote from downtown Berlin where he would be a less conspicuous target for perpetual Nazi surveillance and possible physical assault. However, the two mortgages that he assumed on the purchase of the farm house increased his already prohibitive negative periodic cash flow.

238. While Mendelssohn-Bartholdy's defensive strategy improved his personal safety – and made his property and estate less susceptible to Nazi seizure – the Plan also substantially amplified his negative cash flow. The RM 900,000 mortgage at 4 ½% on Boernicke entailed an additional annual expense of RM 40,500. And the two mortgages on the farmhouse added an

annual expense of RM 1,755. With his alimony obligation of RM 120,000, Mendelssohn-Bartholdy now confronted total annual costs exceeding RM 160,000 – which created a more than a RM 100,000 deficit when measured against his comparatively meager and greatly diminished income in 1934 of only RM 59,374. Mendelssohn-Bartholdy's RM 100,000 financial shortfall does not even take into account that he had the following additional costs and expenses: real estate taxes on the three discrete properties (Boernicke, Alsenstrasse and the Bavarian farm house); expenses such as repairs and maintenance on these properties; salaries for his support staff; rent for his actual residence at *Schlosspark Bellvue;* and essential miscellaneous living expenses including food, clothing, and medical expenses, etc.

239. Nazi exclusionary policies had devastated Mendelssohn-Bartholdy financially. By October 1934, the Nazi government – pursuant to its official policies to persecute and economically marginalize Jews such as Mendelssohn-Bartholdy – had purposefully created a colossal financial crisis for Mendelssohn-Bartholdy that compelled him to begin liquidating his modern art collection to survive financially.

**Mendelssohn-Bartholdy Is Forced to Consign or Liquidate Wholesale His Modern Art Collection to Implement the Plan to Protect His Residual Assets**

240. In or around October 1934, Mendelssohn-Bartholdy consigned six van Gogh paintings, including *Sunflowers*, and a Renoir with Parisian art dealer Paul Rosenberg of Galerie Rosenberg. The decision of Mendelssohn-Bartholdy to begin liquidating his modern art collection was momentous on a personal level. It signaled his intention to dismantle one of the great private art collections of Europe to try to preserve his residual estate from Nazi predation, and to forsake a passion that both had given him much personal fulfillment and had enhanced his social and cultural status. Indeed, Mendelssohn-Bartholdy had invested much of his adult life – from the early 1900s until 1933 – building one of the great private art collections in Europe.

Moreover, these artworks comprised a substantial portion of his net worth. (Mendelssohn-Bartholdy's estate, not including his artworks, was finalized at RM 847,201; according to Elsa, Mendelssohn-Bartholdy's residual paintings were worth RM 424,900 shortly after his death).

241. Mendelssohn-Bartholdy ***had never sold or attempted to sell any significant artwork*** until the Nazis came to power in 1933. Then, in a period of less than 1.5 years during Nazi rule, that is – between September 1933 and February 1934 – Mendelssohn-Bartholdy ***consigned 16 of his most valuable paintings***, including *Sunflowers.* These artworks represented integral elements of an incomparable private art collection that he had spent more than 25 years developing.

242. Mendelssohn-Bartholdy consigned the following sixteen artworks from September 1933 to February 1934:

***1) Vincent van Gogh, Sunflowers (1889)***
2) Vincent van Gogh, *The Town Hall at Auvers* (1890)
3) Vincent van Gogh, *Young Man with Cornflower* (1890)
4) Vincent van Gogh, *Trunk of an Old Yew Tree* (1888)
*5)* Vincent van Gogh, *St. Paul's Hospital (Hospital at St. Remy)* (1889)
6) Vincent van Gogh, *The Public Park* (1888)
7) Vincent van Gogh, *Self-Portrait* (later challenged as a fake van Gogh)
8) Pierre-Auguste Renoir, *Les Pecheuses de moules a Berneval* (1896)
9) Pablo Picasso, *Madame Soler* (1903)
10) Pablo Picasso, *Le Moulin de la Galette* (1900)
11) Pablo Picasso, *Boy Leading a Horse* (1905)
12) Pablo Picasso, *Blue Head of a Woman* (1903)
13) Pablo Picasso, *The Absinthe Drinker (Angel Fernandez de Soto)* (1903)
14) Georges Braque, *The Harbor* (1909)
15) Georges Braque, *Guitar Study* (1913)
16) Georges Braque, *The Lemon* (1920)

243. Two additional considerations corroborate that Mendelssohn-Bartholdy relinquished *Sunflowers* under duress and in an attempt to preserve his residual estate from Nazi predation. First, that Mendelssohn-Bartholdy consigned 13 of these paintings in the seven-month period between July 1934 and February 1935 (all but the 3 Braque paintings) confirms his acute

economic distress at this time, and that Nazi policies had crippled him financially and forced him to begin liquidating his collection.

244. Second, the collective value of the 16 paintings that Mendelssohn Bartholdy had consigned when he died in May 1935 approximates the amplified annual negative cash flow that Mendelssohn-Bartholdy incurred in implementing the Plan. As noted, Mendelssohn-Bartholdy's residual art collection after he died – which comprised about 48 artworks – was appraised at RM 424,900. On a *pro rata* basis, 16 of these works would have a collective value of RM 141,633 – an amount that parallels the total annual shortfall that Mendelssohn-Bartholdy assumed in implementing the Plan. Accordingly, the surrounding circumstances strongly intimate that Mendelssohn-Bartholdy – an experienced and sophisticated banker and financial expert – was liquidating his art collection judiciously (and forcibly), to anticipate future cash flow demands. In May of 1935, he was reserving the other approximate 48 artworks that comprised his residual collection to meet future financial exigencies. Had Mendelssohn-Bartholdy survived another two years, these artworks all but certainly also would have been casualties of the Nazi policy to expunge Jews from the German economy and to confiscate their property.

245. Mendelssohn-Bartholdy released *Sunflowers* and fifteen other masterpieces into a depressed art market that was glutted with paintings that other persecuted Jewish art collectors contemporaneously were being compelled to relinquish. Indeed, it was common that methodically persecuted Jewish art collectors who had begun to suffer sudden severe economic hardship began liquidating their collections. Notorious "Jew auctions" of such artworks had become common in Berlin and other cities by this time.

246. Sometime before Mendelssohn-Bartholdy died on May 10-11, 1935, Rosenberg bought the paintings from Mendelssohn Bartholdy in a prototypical "forced sale."

**The Nazi Campaign to Deprive Jews of Property Propels Forward as Jews Forfeit Citizenship Rights and the Nazi Government Officially Confiscates All Remaining Jewish Property**

247. On September 15, 1935 the Nazi government promulgated a set of three laws that facilitated their campaign to marginalize Germany's Jews, confiscate their property, and expel them from the German economy. These laws –collectively known as the "Nuremberg Laws" – deprived Jews of their citizenship as German nationals and also made illegal marriages between Jews and German citizens.

248. By the end of 1936 Nazi policies and corresponding pressure had crippled the Jewish population of Germany.

249. In 1938, the Nazis completed their long-declared mission of excluding Jews from the economy of Germany. In February, new tax regulations denied Jews many previous benefits. In April, Jews were required to declare property valued at over RM 5,000 – an administrative prelude to the formal confiscation of all residual owned Jewish property which occurred later that year. In July, Jews were banished from the few occupations that they at least formally had been allowed to pursue. In September, the Reichsbank reduced to only four percent (4%) the amount that it would pay in foreign currency from blocked accounts to emigrating Jews. This measure effectively required Jews who wanted to flee Nazi Germany to forfeit nearly all of their property. By late 1938, according to historian Martin Dean, much Jewish wealth between 1933 and 1938 had been "simply wiped out by the effects of boycotts, forced sales, and confiscations."

250. On November 12, 1938, the Nazi government officially confiscated all remaining Jewish property with the First Ordinance on the Exclusion of Jews from German Economic Life (the "Ordinance"). The Ordinance precluded Jews from most remaining employment options, ordered the dismissal of employees without right to pensions or compensation, and triggered the formal confiscation of residual Jewish-owned property.

251. Late in 1938 the Nazi government also forced Mendelssohn & Co. to transfer its assets and liabilities to Deutsche Bank. The shareholders of Mendelssohn & Co. received no compensation or remuneration for this transfer. Jewish members of the board of directors of Mendelssohn & Co. resigned on December 5, 1938 – as did Paul's widow Elsa – and all Jewish employees were fired. Mendelssohn & Co. retained a few residual assets then liquidated on December 1, 1939. "The majority of the estimated 345 Jewish private banks in existence at the end of 1935" had been liquidated by the beginning of 1939. Gerald Feldman & Wolfgang Seibel, *Networks of Nazi Persecution- Bureaucracy, Business and the Organization of the Holocaust* (2005), p. 52.

252. In the summer of 1941, the Nazi government developed plans of the 'final solution' – the genocide of the Jewish people. Adolf Eichmann – whom Hitler had placed in charge of this program – estimated that by the end of the War the Nazis had murdered 6,000,000 Jews, of which 4,000,000 were killed in concentration camps.

253. In 1944, Nazi authorities deported Mendelssohn-Bartholdy's sister, Katarina to a concentration camp. Government documents confirm that Katarina was sent there because she was a Jew.

254. Banking historian Harold Dean relates that historians and political scientists have come to appreciate that the "seizure of property acts as an important catalyst in the accelerating downward spiral across /the threshold to genocide." Dean, *supra,* p. 15. Accordingly the Nazi policies during the years 1933-1938 seeking to deprive Jews of property – and that caused Mendelssohn-Bartholdy to forfeit *Sunflowers* – marked a signal milestone well along the pathway to mass murder.

**Both Persons Who Subsequently Paid Value for *Sunflowers* Were Aware that Nazi Policies and Coercion Compelled Mendelssohn-Bartholdy to Relinquish the Painting**

255. Both individuals who paid value for *Sunflowers* after Mendelssohn-Bartholdy transferred it Rosenberg Galerie – art dealer Paul Rosenberg and wealthy and prolific British-American art collector Lady Edith Dunn Stone Chester Beatty ("Beatty") – were aware that Nazi persecution forced Mendelssohn-Bartholdy to surrender the Painting.

256. For many reasons Paul Rosenberg was aware that Nazi policies and persecution compelled Mendelssohn-Bartholdy to sacrifice *Sunflowers*.

257. First, Rosenberg himself was Jewish, and operating out of Paris he necessarily must have been aware that the Nazi Party in neighboring Germany was openly persecuting Jews with a declared objective of excluding them from the economy and society of Germany. The Nazi Party had announced this policy in 1920 when it was formed, and was implementing its long-declared objectives with ruthless efficiency since coming to power in January 1933.

258. Second, as an art dealer located in Paris, Rosenberg could not help but observe the unprecedented volumes of artworks of exceptional quality that were appearing on the international market and emanating from Germany, which should have informed him that Nazi exclusionary policies against Jews accounted for this influx.

259. Third, Rosenberg's professional relationship as an art dealer with Mendelssohn-Bartholdy going back to 1913 should have alerted Rosenberg that Mendelssohn-Bartholdy's sudden consignment of *Sunflowers* along with ***six other van Gogh paintings*** as well as a Renoir painting signaled that Mendelssohn Bartholdy was suffering extreme financial distress. Upon information and belief, Mendelssohn-Bartholdy uniformly had purchased artworks from Rosenberg. The abrupt transition from consistently buying artworks to selling eight invaluable

paintings in tandem unquestionably should have alerted Rosenberg about Mendelssohn-Bartholdy's dire circumstances.

260. Fourth, the world attention that contemporaneously was being focused upon Nazi Germany's persecution of Jews also reasonably informed Rosenberg that Mendelssohn-Bartholdy was selling *Sunflowers* and the other van Gogh paintings under duress. James McDonald, United Nations' High Commissioner for Refugees (High Commissioner), brought the attention of the world to this issue during his tenure from October 1933- December 1935. And McDonald's international notoriety as High Commissioner necessarily gave this subject a high profile in the international community.

261. Fifth, that Paris was a magnate for Jews fleeing Nazi persecution in neighboring Germany during the years 1933 and 1934 would have alerted Rosenberg to the political circumstances in Germany that were causing these migrations.

262. Finally, the Letter of Resignation of James McDonald as High Commissioner in December 1935 punctuated that Nazi policies were inducing an imminent international humanitarian crisis, and already had compelled 80,000 victims of Nazi persecution to emigrate. And while McDonald submitted the Letter after Mendelssohn-Bartholdy sold the Painting to Rosenberg, the Letter recounted conditions that were prevailing when Mendelssohn-Bartholdy relinquished the Painting.

263. Rosenberg's client Beatty also was reasonably aware that Nazi policies and concomitant coercion compelled Mendelssohn-Bartholdy to transfer the Painting to Rosenberg.

264. First, Beatty was the wife of the prominent industrialist Arthur Chester Beatty and an experienced, worldly and sophisticated international art collector who travelled frequently from her residence in London to Europe to buy art. Accordingly, she was exposed perpetually to

media stories about the policies of the Nazi government to exclude Jews from the German economy.

265. Second, the contemporaneous British media and press covered the Nazi campaign against Jews extensively, and so reasonably informed Beatty that persecuted Jews were selling massive quantities of art under Nazi-induced duress, and that these materials were appearing on the international market.

266. Third, the contemporaneous British media also reported upon the challenges that the burgeoning influx of immigrants fleeing Nazi persecution posed for England and English society. These conditions fostered a prominent political debate about how best to respond to the challenge. Accordingly, the magnitude of the refugee problem and the prominence of the political dialogue about how best to redress this issue reasonably should have informed Beatty about contemporaneous conditions in Nazi Germany that deprived Mendelssohn-Bartholdy of the Painting.

267. Moreover, Rosenthal most likely informed Beatty about Mendelssohn-Bartholdy immediate past ownership of *Sunflowers* for two independent reasons. First, Mendelssohn-Bartholdy was highly esteemed, and his past ownership of the Painting added prestige and luster to its provenance. In addition, Mendelssohn-Bartholdy's ownership of the Painting for more than the past 20 years would have assured Beatty that *Sunflowers* was not a fraudulent fabrication, or connected with a contemporaneous scandal that sent German art dealer Otto Wacker to prison for 19 months for fraudulently creating paintings that he misattributed to van Gogh.

**After the War the U.S. and the Allies Presume that any Transfer of Property by a Jew in Germany after January 30, 1933 was an "Act of Confiscation" by the Nazi Government, Entitling the Claimant to Recover the Property**

268. The remedial principles that the U.S. and Allied governments promulgated to return to rightful owners property items such as the Painting that were surrendered as a

consequence of Nazi persecution emphasized the encompassing and pervasive character of coercion that Nazi authorities contrived to dispossess Mendelssohn-Bartholdy of *Sunflowers*. After World War II, the U.S. and Allied governments (the "Allies") recognized that purported sales and other conveyances of property by Jews in Germany after Hitler took power in 1933 – such as Mendelssohn-Bartholdy's forced transfer of *Sunflowers* – occurred in a purposefully and extraordinarily coercive environment and so were presumptively invalid. The U.S. and Allied governments accordingly fashioned appropriate principles of restitution to redress the wrongful pressure inherent in these conveyances.

269. The Allies laid the cornerstone for the post –War restitution policy in Europe on January 5, 1943 with the *Inter-Allied Declaration Against Acts of Dispossession Committed in Territories Under Enemy Occupation or Control*, 8 State Dep't Bull. 211 (1943), known also as the *Declaration of London* (the "Declaration"). The Declaration underscored that the Nazi government had employed both subtle and flagrant forms of coercion to deprive Jews in Germany and elsewhere of their property and cautioned "all concerned" that the Allied governments reserved the right "to declare invalid any transfers of, or dealing with, property rights and interest of any description whatsoever in Nazi occupied countries," regardless whether such transfers appeared volitional.

270. The principles of the London Declaration became the foundation of post-War allied restitution policy for property wrongfully taken as a result of Nazi persecution, such as *Sunflowers.*

271. U.S. policy in this regard became crystallized in 1947 with Military Government Law No. 59 (MGL No. 59), 12 Fed. Reg. 7983 (November 29, 1947). MGL No. 59 announced as its purpose "to effect to the largest extent possible the speedy restitution of identifiable property

…to persons who were wrongfully deprived of such property within the period from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." MGL No. 59, § 3.75(a)(1).

272. MGL No. 59 achieved its objectives for restitution through the recurring, operative terms "confiscated property" and "act of confiscation," which the statute defined broadly. § 376(a). Moreover, MGL No. 59 established a ***presumption*** that any sale or transfer of personal property that a Jewish resident of Germany made after Hitler became Chancellor of Germany on January 30, 1933 – such as Mendelssohn-Bartholdy's transfer of *Sunflowers* to Rosenberg – was an "act of confiscation." *See* MGL No. 59, § 375(b) entitled *Article 3: presumption of confiscation.*

273. MGL No. 59 became the model for similar post-War legislation, including the Berlin Restitution Law enacted in 1949. Like MGL No. 59, the Berlin Restitution Law established a presumption that any sale or other transfer of personal property that a Jew in Germany made after Hitler became Chancellor on January 30, 1933 was an "unjust deprivation" (*See* Article 3, No. 1, "Presumption of Unjust Deprivation.")

274. Accordingly – and based upon the purposefully coercive environment that Nazi authorities strategically engineered to deprive persecuted Jews of their personal property during the years 1933–1945 and in which Mendelssohn-Bartholdy surrendered *Sunflowers* – the "presumption of unjust deprivation" (also called the "presumption of confiscation") for any transfer of property by a Jew in Nazi Germany has remained a polestar of restitution schemes and law in all those states particularly affected by Nazi art plundering and aggression, including Germany, Austria, the United Kingdom, France and Holland.

**Beginning in 1998 the U.S. and Other Countries Affected by Nazi Art Dispossessions Encourage the Restitution of Confiscated Materials**

275. Beginning in 1998 – and amid much public fanfare – the U.S. as well as many other nations affected by wrongful Nazi art dispossessions commenced an international campaign to encourage Holocaust victims and their heirs to come forward with claims for the restitution of Nazi-confiscated artworks like *Sunflowers*. Through repeated international as well as national declarations and pronouncements over the past 24 years, the U.S. has reasserted foundational policies that claims for the restitution of Nazi-era artworks like the Painting should be resolved honestly, fairly, with reference to all available documents and evidence and without litigation, if possible.

276. The international commitment of the U. S in this regard began on December 3, 1998 at a meeting in Washington D.C. of some 44 governments affected by Nazi art looting entitled *The Washington Conference on Holocaust Era Assets* (the "*Washington Conference*"). The *Washington Conference* concluded by promulgating the *Washington Conference Principles on Nazi-Confiscated Art* (the "*Washington Principles*") which set forth ten prescriptions by which claims to recover Nazi-era artworks would be encouraged and resolved. While the *Washington Principles* were "non-binding" in that they had no independent legal effect, they expressly: (1) encouraged Holocaust victims and their heirs to come forward with claims for the recovery of Nazi-confiscated artworks; (2) declared "that steps should be taken expeditiously to achieve a ***just and fair solution***" to such claims (emphasis supplied); and; (3) encouraged the signatory nations to "develop national processes to implement these principles, particularly as they relate to alternative dispute resolution mechanisms for resolving ownership issues." The *Washington Principles* became the foundation for the renewed international initiative to return Nazi-confiscated artworks such as *Sunflowers* to rightful owners.

277. In 1998, Congress enacted the Holocaust Victims Redress Act (the "Redress Act") Public Law. No 105-158), 112 Stat. 15, which further declared U.S. policy favoring the return to rightful owners of Holocaust era artworks such as *Sunflowers*. The Redress Act expressed the sense of Congress that "all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner."

278. On June 30, 2009 – and following the conclusion of *The Holocaust Assets Conference* in Prague and Terezin – the U.S. and 45 other governments issued the *Terezin Declaration* (the "*Declaration*"). The *Declaration* reaffirmed the commitment of the parties to the *Washington Principles*, to ensure that their respective legal systems or alternative processes resolved claims to recover Nazi-confiscated artworks fairly and on their merits: "we urge all stakeholders to ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all of the relevant documents submitted by the parties."

279. As noted above, in 2016 the U.S. enacted the HEAR Act, suspending otherwise applicable statutes of limitations for claims to recover Nazi-tainted artworks. The HEAR Act prescribes that a Holocaust victim or heir may commence a judicial action to recover any artwork or other property that was lost "because of" Nazi persecution during the "covered period" of January 1, 1933 through December 31, 1945 (HEAR Act § 4(3), 5(a)), and affords claimants a six-year limitation period commencing when the claimants or their agents actually

discover the identity, location and their interest in the lost artwork. In cases where, as here, the Plaintiffs were aware of pertinent elements of their claim before the HEAR Act became law but were barred by a statute of limitations, the actual discovery date of their claim or cause of action is considered the date the HEAR Act was enacted, that is, December 16, 2016 (HEAR Act § 5(c)(1).

280. The HEAR Act reaffirmed long-standing U.S. polices seeking to identify Nazi-tainted artworks and to return these materials to rightful owners. The stated purposes of the HEAR Act are to ensure that laws governing claims for the recovery of "Nazi-confiscated" artworks further United States policies as set forth in the Washington Principles, the Redress Act, and the Terezin Declaration, and that otherwise applicable statutes of limitations do not bar claims for the recovery of Nazi-confiscated artworks and other misappropriated property, so that such claims are resolved justly and fairly. Pub.L. 114-308, 130 Stat. 1526, § 3.

281. In 2018, Congress enacted the Justice for Uncompensated Survivors Today (JUST) Act of 2017 (the "Just Act"), Public Law No 115-171 (05/09/2018). The Just Act requires the U.S. Department of State to report to Congress concerning the progress countries affected by Nazi property confiscations and seizures have made in returning materials to rightful owners, and so underscores the importance to U.S. foreign policy of the restitution of Nazi era artworks. The Just Act also tacitly reaffirms established U.S. policy in this area.

282. Moreover, because both Congress and the President expressly have endorsed this policy it preempts – as a matter of federal Constitutional law – any New Jersey statute, judicial decision or other law that obstructs or impairs this objective. *See, e.g.*, Anagha Sundarajan, *Foreign Affairs Federalism: The Doctrine of Foreign Affairs Preemption and State Regulation in Light of the Paris Agreement*, 55 U.S.F.L. 363, 397 (2021), observing that "[t]he doctrine of

foreign affairs preemption is founded on a presumption built into our constitutional structure that the federal government has plenary authority to define and conduct foreign policy." Accordingly, [w]hen the President and Congress act in concert, any state law that touches the arena of foreign relations is preempted." *Id.*

**Exuberant with the Prospect of Commercially Exploiting the Iconic van Gogh *Sunflowers* Painting, Sompo Holdings' Corporate Predecessor Yasuda Acquired *Sunflowers* at Christie's Auction in London in 1987 in Reckless Disregard of the Glaringly Suspicious Nazi-Era Provenance**

283. A *Los Angeles Times* article dated April 10, 1987 entitled *What's Behind that 40-Million Bouquet?* by Sam Jameson relates that Sompo Holdings' corporate predecessor – Yasuda – bought *Sunflowers* at Christie's auction house in London for an unprecedented price of nearly $40 million to avail itself of a unique opportunity that would never recur and that would give it a painting with iconic status in Japan. (A copy of this article is attached as **Exhibit 23**).

284. "To the Yasuda Fire & Marine Insurance Co., the auction of Vincent van Gogh's painting '*Sunflowers*' was 'a never-again' opportunity. That's why the company paid a record $39.85 million for it, a spokesman said here Thursday." A Yasuda representative stated that "[e]very Japanese in the country, even school children, knows the painting." The article reported that "students in both elementary and junior high school study it in their art classes as one of the world's great art works." Accordingly, "[r]ealizing the meaning of *Sunflowers* to the Japanese public at large, Yasuda determined to buy it when it heard the painting would be on the market," the spokesperson said.

285. British art journalist Martin Bailey reports in *The Sunflowers Are Mine - The Story of Van Gogh's Masterpiece* (2013), that the Yasuda CEO responsible for the purchase of *Sunflowers* in 1987 – Yasuo Goto – acknowledged to Christie's specialist James Roundell that in buying *Sunflowers* amid such intense international publicity and press coverage Yasuda would

have been required to spend "L 100 million, or ***four times the price of the painting***" in advertising to receive equivalent notoriety. (Emphasis supplied.)

286. Resolved to acquiring *Sunflowers* at any price, Yasuda ignored the provenance of this painting that Christie's published for the auction, which identified elite Jewish German banker, premier private art collector, and prominent Nazi victim Paul von Mendelssohn-Bartholdy as owning *Sunflowers* in Berlin as late as 1934. This provenance related:

- Paul von Mendelssohn-Bartholdy, Berlin, by 1910, probably bought from Galerie Druet.
- Galerie Paul Rosenberg, Paris (from whom bought by Edith Beatty in 1934).

287. This information all but confirmed that Mendelsohn-Bartholdy had owned *Sunflowers* in Berlin when the Nazi era began in early 1933, and consigned the Painting to the Galerie Paul Rosenberg in 1934 because of Nazi predation. Yasuda's failure to investigate this likelihood was reckless if not purposeful, in that by 1987 Yasuda was a sophisticated corporate art collector – having established a corporate museum in 1976 and having acquired two Renoir paintings in the international art market in 1986. So by 1987 Yasuda was aware – or reasonably should have been aware – that stolen art and Nazi-era contraband appear frequently on the international art market and that collectors must take affirmative precautions against acquiring such materials. Accordingly, Mendelssohn-Bartholdy's ownership of *Sunflowers* in Berlin as late as 1934 was a "red flag" that demanded further inquiry. But Yasuda's resolve to acquire the *Sunflowers* at ***any price*** – and concomitant aspirations for commercially exploiting it – foreclosed any such investigation.

**In 1999 Yasuda Chairman *Emeritus* Yasuo Goto Celebrates *Sunflowers* Has Benefitted Yasuda Immensely and Altered It's Corporate "Destiny"**

288. On June 23, 1999 the by now "Chairman *Emeritus*" of Yasuda Yasuo Goto – who conceived acquiring *Sunflowers* in 1987 – gave a speech at the van Gogh Museum in Amsterdam commemorating the completion of a new wing which Yasuda had helped fund with an

approximately $30 million contribution in 1990, and declaring that *Sunflowers* had changed Yasuda's corporate destiny. (A copy of this speech is appended as **Exhibit 24.**)

289. This speech underscores how *Sunflowers* informed the corporate identity of Yasuda and its corporate successors, and relates the driving goal of Yasuda to equate its identity with both the Painting as well as its legendary artist, Vincent van Gogh.

290. Mr. Goto related a close identity between *Sunflowers* and van Gogh, and how through *Sunflowers* Yasuda had become integral to the international van Gogh cultural community, and a proactive partner with the van Gogh museum. Mr. Goto expressly equated *Sunflowers* with van Gogh, and tacitly equated Yasuda with both *Sunflowers* and van Gogh. Mr. Goto affirmed that Yasuda had received both "tangible and intangible benefits" from *Sunflowers*.

291. Mr. Goto accentuated the close relationship and amity that van Gogh enjoyed with Japan, and van Gogh's intrigue with Japanese artistic technique that inspired *Sunflowers*. Mr. Goto noted that *Sunflowers* is adored by many Japanese. He observed that "As a result of the ties commenced through *Sunflowers*, I feel that it was the destiny of Yasuda" as well as other Japanese contributors to "cooperate in the construction of the new exhibition wing of the Van Gogh Museum."

292. Mr. Goto underscored "the ***destiny*** associated with *Sunflowers"* (emphasis supplied), as *Sunflowers* enhanced Yasuda's credibility and provided a springboard for opportunities in other spheres of corporate social responsibility which inevitably would enhance Yasuda's corporate image.

**In 2001, Yasuda Exhibits *Sunflowers* at the Art Institute of Chicago Notwithstanding that Displaying the Painting Publicly May Lead to "Nazi-Confiscation Problems"**

293. In 2000, the Art Institute of Chicago (AIC) invited Yasuda to display *Sunflowers* at an international van Gogh exhibition in Chicago offering – correspondingly – a chance to capitalize upon the Painting by aligning its corporate identity with *Sunflowers* throughout the U.S., where it already had offices in several major cities, including Chicago.

294. On April 26, 2001, Yasuda representative Masura Igarashi – who noted that he was writing on behalf of Yasuda and the Yasuda Museum – stated that Yasuda was honored to collaborate in the "van Gogh and Gauguin: Studio of the South exhibition" in Chicago and Amsterdam by exhibiting *Sunflowers,* but cautioned that "***Nazis [sic] confiscation problem may arise in American and in Holland***. We would like to include the clear terms in the loan agreement to protect our paintings against this problem." (**Exhibit 1**.) (Emphasis supplied.)

295. On May 8, 2001, Yasuda representative Masaru Igarashi sent the AIC and Van Gogh Museum another email relating that several years earlier, Yasuda had helped MoMA organize an exhibition of Egon Schiele artworks in New York and Tokyo. Igarashi expressed awareness that at the New York exhibition the Manhattan District Attorney had confiscated the painting *Portrait of Wally* as Nazi contraband. Igarashi was concerned that *Sunflowers* similarly might be a casualty of Nazi policies and might suffer a similar fate. Igarashi confessed that "[w]e are ***deeply concerned*** about our [sic] Goh' and [sic] Gauguin' provenance. We think our two works have nothing to do with Nazi-looted art, but are not 100% sure." *See* May 8, 2001 email., a copy of which is attached as **Exhibit 25**. (Emphasis supplied.)

296. On May 9, 2001, Igarashi wrote another email to AIC and the Van Gogh Museum admitting that Yasuda had not investigated the provenance of the Painting since acquiring it in

1987, and claimed to know nothing more about it than what Christie's had published for the sale. (A copy of this email is attached as **Exhibit 26**.) This email confirms that Yasuda did not investigate the provenance of *Sunflowers* when it bought the Painting at Christie's in 1987, and did not investigate the background of *Sunflowers* during the years 1987-2001 despite its stated suspicions, extensive resources, art world expertise, and putative commitments to international human rights due diligence and corporate social responsibility. Moreover, the above-referenced concerns that Yasuda registered in 2001 about exhibiting the Painting in light of "Nazi confiscation problems" – based on the same information that it possessed when it purchased the work in 1987 – intimates strongly that it consciously entertained the same concerns about Nazi confiscation of the Painting in 1987 when it bought *Sunflowers.*

297. Upon information and belief, AIC – with Yasuda's knowledge and help – filed a false application with the U.S. Department of State (State Department) under the Immunity from Judicial Seizure Act, 22 U.S.C. § 2459, concealing the Nazi taint of *Sunflowers*. This application induced the State Department to assure AIC and Yasuda that law enforcement authorities would not seize *Sunflowers* were Yasuda to bring the Painting to the U.S. for the Exhibition.

298. The application required AIC to attest that it had investigated the provenance of *Sunflowers* in a professional, conscientious manner employing "independent, multi-source research."

299. Only after receiving this assurance did Yasuda permit *Sunflowers* to be displayed at the Exhibition. Although a putative public trustee, the AIC has refused to share with the Heirs a copy of this report.

300. Yasuda registered no concern with what all but certainly were the superior legal and moral rights of the Heirs in the Painting, or with investigating the background of the Painting

further to address this possibility. Rather, Yasuda's sole express concern was that U.S. law enforcement authorities might seize the Painting as Nazi contraband. But this threat was averted when the State Department granted immunity from judicial seizure pursuant to 22 U.S.C. § 2459, based on an application that, upon information and belief, concealed the provenance of the Painting. (**Exhibit 22**). Yasuda then commercially exploited the Painting at the van Gogh exhibition in Chicago, burnishing its corporate image with the Painting throughout the U.S. where Yasuda had offices in several major cities, including Chicago, New York, Los Angeles, Louisville and Nashville.

301. Most conspicuously – and consonant with their goal to conceal what they knew to be the Painting's Nazi taint – the provenance that AIC and Yasuda composed for *Sunflowers* when they displayed the Painting at the Exhibition omitted any reference to Paul von Mendelssohn Bartholdy or that the Painting was sold in Berlin in 1934. (**Exhibit 21.**)

302. Finally, there can be no doubt that Sompo Holdings is responsible for the foregoing, since the August 27, 2001 Loan Agreement by which *Sunflowers* was lent to AIC for the exhibition (attached as **Exhibit 27**) makes clear that Yasuda would be changing its name to Sompo Japan Inc. "as of April 1, 2002," during the course of the loan, and that "the loans will automatically be transferred to the company under the new name."

**In 2017, Sompo Japan Insurance Inc. Proclaims that Many Customers View *Sunflowers* and Sompo as the Same**

303. On July 18, 2017, Sompo Japan Insurance Inc. issued a statement "Celebrating 30 Years of Van Gogh's *Sunflowers*." Sompo Japan Insurance Inc. exclaimed that *Sunflowers* had been on display at its museum for 30 years, and observed: ***"To many customers, Sompo Japan Nipponkoa has become synonymous with Sunflowers.***" (**Exhibit 28**; emphasis supplied.)

**Notwithstanding Long Awareness that *Sunflowers* Is Nazi-Tainted, Yasuda and Sompo Holdings Have Capitalized Upon the Painting with a Sophisticated Branding Strategy Based Upon Psychological Archetypes**

304. Even though Sompo Holdings long has known that *Sunflowers* is a casualty of Nazi policies – and that Mendelssohn-Bartholdy forfeited the Painting as a consequence of Nazi wrongs that violate paradigmatically the modern international law of human rights – Sompo Holdings nonetheless has proactively conjoined its corporate identity with the Painting to such an extent that Sompo Holdings now proclaims that its customers view *Sunflowers* as "synonymous" with Sompo Holdings. Sompo Holdings thereby has made its discrete brand coterminous with *Sunflowers*.

305. Moreover – and through a well-established psychological marketing strategy known as "archetypal branding" – Sompo Holdings has borrowed or "leveraged" discrete characteristics and qualities commonly associated with *Sunflowers* and its iconic, creative artist Vincent van Gogh and invested these traits or "archetypes" in Sompo Holdings. Sompo thereby has employed the Painting to enhance its discrete corporate image as creative and socially caring, and to foster subliminal psychological traction with prospective insurance consumers in New Jersey, throughout the U.S., and internationally.

306. These subliminal traits or archetypes that Sompo Holdings derives from the Painting enable it to perform efficiently and effectively many necessary brand roles, and so add immense value to its corporate operations. These include the following:

a. helping Sompo Holdings create positive associations for the brand in the minds of consumers and stakeholders;

b. enabling Sompo Holdings to invoke the rich potential of art to forge emotional attachments and to differentiate its brand identity;

c. injecting Sompo Holdings' brand with content and meaning borrowed from the paradigmatically creative van Gogh;

d. performing an umbrella function for Sompo Holdings by integrating, cohering, and aligning all of its corporate functions;

e. evoking consumer and stakeholder emotion;

f. enabling Sompo Holdings to appear authentic and to promise consumers a better life;

g. allowing Sompo Holdings to offer consumers a "short-cut" for buying decisions;

h. helping Sompo Holdings both to develop and sustain a positive brand image which is essential to attract and retain valuable employees;

i. enhancing Sompo Holdings' brand value in a market where brands play an increasingly pivotal role;

j. attracting perpetual publicity to Sompo Holdings, the value of which vastly exceeds advertising.

307. The archetypes that Sompo Holdings has derived from *Sunflowers* both to ***create*** its corporate identity and persona and to ***differentiate*** itself from its competitors has helped it to reap immense unjust enrichment since it misappropriated the Painting in 1987, in an amount approximating ten percent (10%) of its net profits.

308. Because Sompo Holdings is a "conscious wrongdoer" within the meaning of the applicable law in that it acquired *Sunflowers* and has commercially exploited it in reckless disregard of the fact that the Painting was a casualty of Nazi policies, and in derogation of the superior ownership and possessory interests of the Heirs, the law allows the Heirs to recover the

consequential gains that Sompo Holdings has realized from misappropriating and commercially exploiting the Painting. The law defines "conscious wrongdoer" as one who is enriched by misconduct and who either acts with knowledge of the underlying wrong, or despite a known risk that the conduct in question violates another's rights. Sompo Holdings is a "conscious wrongdoer" because its predecessor (Yasuda) bought *Sunflowers* in reckless disregard of the high probability that Nazi policies deprived Mendelssohn Bartholdy of the Painting, and that the Heirs therefore were its rightful owners. Sompo Holdings also is a "conscious wrongdoer" because after Yasuda expressing its "deep concern" that *Sunflowers* was afflicted with a Nazi taint, Yasuda and Sompo Holdings continued to neglect to research the Painting's suspicious provenance, and instead commercially exploited it, employing a sophisticated archetypal branding strategy to "leverage" the attributes of *Sunflowers* and van Gogh and to transfer and invest these qualities in Sompo Holdings.

309. Sompo Holdings additionally is a "conscious wrongdoer" because Sompo Holdings consistently has maintained that it is committed to international human rights, follows a human rights due diligence investigative protocol, and that in 2021 it surveyed its corporate operations extensively to ensure that none of its assets or activities exploit human rights violations. Knowingly commercially exploiting a Nazi-tainted painting and proactively concealing this misconduct makes Sompo Holdings – at a minimum – a "conscious wrongdoer."

310. Moreover – and because quantifying unjust enrichment in this context is speculative – the law requires only that the Heirs establish a reasonable basis for computing Sompo Holdings' wrongful gains. The law additionally allocates to Sompo Holdings both the burden of disproving the amount of unjust enrichment that the Heirs demand, as well as the residual risk that Sompo Holdings' unlawful profits cannot be computed with certainty.

311. Because these leveraged traits – the warmth and reassurance of *Sunflowers* and the visionary, creative genius of van Gogh – ***define*** Sompo Holdings' core identity and brand, they necessarily play a commensurate role in enabling Sompo Holdings to generate profits and net income. There can be no doubt, then, that *Sunflowers* has contributed immensely to Sompo Holdings' earnings, and Sompo Holdings so has admitted.

312. Many reported judicial decisions confirm that courts consistently have awarded far greater than ten percent (10%) of a company's net profits when that company realized less benefit from converted or misappropriated property than Sompo Holdings has reaped from misappropriating and exploiting *Sunflowers*. *See, e.g., Blackman v. Hustler Magazine*[14] (affirming an award of 60% and 35% of the profits that a magazine earned from separate issues that published certain photographs in violation plaintiff's copyright privileges); *National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*[15] (awarding plaintiff one third (1/3) of the profits that a bar review course earned from pirating copyrighted bar exam questions); *Sigma Photo News v. High Society Magazine*[16] (awarding plaintiff fifty percent (50%) of the profits earned on a particular magazine from publishing a copyrighted photo of the famous celebrity Raquel Welch); *Williams v. Gaye*[17] (awarding song writer Marvin Gaye 50% of the publishing revenues for a particular song); *Aerospace Services International v. The LPA Group, Inc.*[18] (characterizing an award of approximately 28 percent (28 %) of profits earned from exploiting copyrighted material as "only a small percentage"); *Lawn Managers, Inc. v.*

---

[14] 800 F.2d 1160, 1164-65 (D.C. Cir. 1986)
[15] 484 F. Supp.2d 252, 261 (E.D. Pa. 2006).
[16] 778 F.2d 89 (2d Cir. 1985).
[17] 885 F.3d 1150.
[18] 57 F.3d 1002, 1004 (11th Cir. 1995).

*Progressive Lawn Managers, Inc*.[19] (awarding a lawn service company that infringed the trademark of a competitor 25 percent (25%) of the competitor's profits for a particular period notwithstanding apparent questions about whether the infringed trademark induced those profits); *Universal Pictures v. Harold Lloyd Corporation*[20] (awarding plaintiff 20 percent (20%) of the profits that a movie earned from using a copyrighted photoplay when the copyrighted material played "an integral and essential part in carrying along the role of the star in the story").[21] The *Universal Pictures* court reaffirmed that "uncertainty as to the amount and extent of damage will not deprive" a plaintiff of recovery, and "it will be enough if the evidence shows the extent of the damage as a matter of just and reasonable inference, although the result be only approximate."[22]

313. Courts also have not hesitated to award large compensatory recoveries when necessary to deprive wrongdoers of illicit profits. *See, e.g., Motorola Solutions, Inc. v. Hytera Communications Corp, Ltd.*[23] (sustaining a verdict in the amount of $764,561,156 for copyright infringement and trade secrets misappropriation). Sompo has wrested far more commercial benefit and value from exploiting *Sunflowers.*

314. Moreover, the signal role that the archetypes described above have played both in defining Sompo Holdings' unique brand and enabling it to discharge multiple brand functions preclude any possibility that Sompo Holdings can demonstrate that these archetypes have contributed ***less*** than ten percent (10%) to its net earnings.

---

[19] 959 F.3d 903, 914 (8th Cir. 2020).
[20] 162 F.2d 354 (9th Cir. 1947).
[21] *Id.* at 360.
[22] *Id*. at 369.
[23] 495 F. Supp. 3d 687 (N.D. Ill. 2020).

**Because Sompo Holdings' Commercial Exploitation of What it Knows to Be a Nazi-Tainted Painting Is Contrary to Signal Federal Policies and Impairs the Public Interest in Many Ways, the Federal Unclean Hands Doctrine Precludes Sompo Holdings from Equitable Relief**.

315. The Supreme Court has reaffirmed that whenever the misconduct of a party impairs a federal interest, the federal equitable doctrine of Unclean Hands precludes that party from invoking equitable relief. The Court also has made clear that artworks lost as a consequence of Nazi policies and coercion – such as *Sunflowers* – implicate uniquely federal interests and affect the foreign policy of the U.S. Because the Heirs' claim to recover *Sunflowers* invokes uniquely federal interests, the federal equitable doctrine of Unclean Hands governs Sompo Holdings' misconduct concerning the Painting.

316. By commercially exploiting *Sunflowers* while knowing that the Painting is a casualty of Nazi policies and affirmatively misrepresenting that the Painting bears no human rights stigma, Sompo Holdings has violated multiple signal U.S. public policies and impaired the public interest in several ways. Moreover, the central, paramount roles that *Sunflowers* plays both in informing Sompo Holdings' corporate identity as well as in its archetypal branding strategy amplify the magnitude of Sompo Holdings' wrongdoing and exacerbate the injury to public policies and interests that taint it with Unclean Hands.

317. First, Sompo Holdings' wrongful commercial exploitation of *Sunflowers:*

a. undermines signal U.S. foreign policies prescribing how claims to recover Nazi era artworks such as *Sunflowers* properly should be handled. As related, these policies seek initially to identify Nazi- era artworks and to resolve claims for these materials openly, honestly, transparently, fairly, with access to all relevant documents and other evidence, and without litigation, if

possible. Sompo Holdings' refusal to entertain the Heirs' claim repudiates these policies;

b. perpetrates commercial fraud upon the entire U.S. and international insurance markets;

c. violates the federal law of unfair competition and unfair or deceptive acts or practices in or affecting commerce, as proscribed by 15 U.S.C. § 45;

d. violates the federal statutes proscribing mail fraud, 18 U.S.C. § 1341. This provision prohibits generally using the U.S. mail to obtain money "by means of false or fraudulent pretenses, representations, or promises." Upon information and belief, Sompo Holdings' uses the mail for its integral utilization of *Sunflowers* in its U.S. and international marketing – both overtly as well as covertly through its archetypal branding strategy – while affirmatively misrepresenting that the Painting is not afflicted with any violations of the international law of human rights violates this proscription;

e. violates the federal statute proscribing wire fraud, 18 U.S.C. § 1343. This provision prohibits generally using the U.S. wires to obtain money "by means of false or fraudulent pretenses, representations, or promises." Sompo Holdings' integral use of *Sunflowers* in its U.S. and international marketing – both overtly on its website as well as covertly through its archetypal branding strategy – while affirmatively misrepresenting that the Painting is not tainted

with any violations of the international law of human rights, breaches this proscription.[24]

**Defendants' Fraudulent and Willful Misconduct Concerning the Painting Entitles the Heirs to an Award of Punitive Damages**

318. At all times relevant hereto, the law of New Jersey has permitted plaintiffs to recover punitive damages whenever the tortious conduct of a defendant was actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed. *See, e.g.*, N.J.S.A. 2A:15-5.10 to 5.14; *Jewish Ctr. of Sussex County v. Whale*, 165 N.J. Super. 96, 104 (App. Div. 1979)(punitive damages available where fraud is "wanton and willful or evincing a reckless indifference").

319. Moreover, to determine whether punitive damages are appropriate the trier of fact properly may consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that defendant has caused, as well as the wealth of the defendant.

320. The Heirs are entitled to an award of punitive damages against Defendants because Defendants – with reckless indifference and willful disregard of persons who foreseeably might be harmed – misappropriated *Sunflowers* in derogation of the superior ownership and possessory rights of the Heirs. Defendants since have commercially exploited the Painting while knowing that it is casualty of Nazi policies. Moreover, Defendants have capitalized upon the Painting while affirmatively misrepresenting that the Painting is not affected with human rights violations or bears any human rights stigma. These misrepresentations – which are essential to the capability of Defendants to exploit *Sunflowers* commercially – are both

[24] Even where plaintiffs do not seek to bring a claim for mail fraud, wire fraud, or similar violations, such misconduct reflects a defendant's state of mind and the gravity of the misconduct, warranting equitable relief such as that sought here.

fraudulent and morally unconscionable. Defendants' misconduct regarding *Sunflowers* therefore satisfies the legal standard that New Jersey courts have established for awarding punitive damages. In addition, by fraudulently exploiting *Sunflowers* in this manner Defendants and their predecessor have wrongfully reaped many billions of dollars of unjust enrichment while flouting signal U.S. policies seeking to identify Nazi tainted artworks and resolve claims for these materials fairly.

321. Based upon these considerations and Defendants' great wealth – as well as the extensive unjust enrichment that Defendants have reaped from fraudulently commercially exploiting a Nazi-tainted artwork for many years – the Heirs are entitled to an award of punitive damages in the amount of seven hundred and fifty million dollars ($750 Million), representing three times the current fair value of *Sunflowers*.

**Plaintiffs' claims are timely under the HEAR Act**

322. In or around 1934, Paul sold *Sunflowers* to the Rosenberg Galerie due to Nazi persecution and duress. Paul and Elsa knew at that time that paradigmatically wrongful Nazi persecution and policies compelled Paul to relinquish the Painting to Rosenberg. As a result, their claim to recover the Painting accrued when Paul transferred it – in 1934 – and so was extinguished six years later in or around 1940 under New Jersey law. *See* N.J.S.A. 2A:14-1 (six-year limit applies to both conversion and replevin in New Jersey). Under Illinois law – where the Heirs filed suit originally – their claim was extinguished five years after Paul's transfer of the Painting, that is, in or around 1939. Ill. Comp. Stat. 5/13 205.

323. After Paul's death in or around May 10, 1935, Elsa compiled a list of paintings that remained in Paul's collection at the time of his death. Elsa did not include *Sunflowers* on this list, establishing her knowledge that the Painting had been sold before Paul died.

324. Up until the time Elsa died in 1986, she did not investigate or seek to recover the Painting or any other artwork that Paul sold under Nazi duress before he died in or around May 10, 1935.

325. In 2008, the Heirs subpoenaed the 1930's Paris records of Galerie Rosenberg (hereinafter "Galerie") – which were located in New York City in 2008 – in the case of *Schoeps v. MoMA*, 594 F.Supp.2d 461 (S.D.N.Y. 2009) (*see* copy of this decision, attached as Exhibit 2, hereinafter referred to as "*Schoeps v. MoMA"*). At this point – 2008 – Plaintiffs could finally determine that Paul sold the work in or around 1934 after reviewing the relevant Galerie Rosenberg records. Accordingly, in 2008, the Heirs first learned that Paul had sold the work under Nazi duress and that they were the true owners.

326. In 2008, the Heirs determined that their claim was time-barred by the relevant Illinois statute of limitations, Ill. Comp. Stat. 5/13 205, as well as any other jurisdiction in the United States. *See, e.g.*, N.J.S.A. 2A:14-1.

327. Before 2016, the general absence of a timely judicial remedy for claimants such as the Heirs to recover Nazi-confiscated artworks like the Painting expressly induced both political branches of the U.S. government responsible for conducting U.S. foreign policy – the President and Congress – to enact the HEAR Act. *See* HEAR Act, Section 2, paragraph 6

328. The passage of the HEAR Act in 2016 made timely claims that had previously been time-barred by statutes of limitations throughout the U.S., including the Heirs' claims in this case.

329. The passage of the amendments to the HEAR Act, signed into law in April 2026, provide for nationwide service of process, which transforms the specific jurisdiction analysis from a state-by-state inquiry into a nationwide contacts aggregation. For Japanese, Bermuda, and United Kingdom defendants with substantial U.S. art-market participation this dramatically expands the plaintiff's ability to sue in any federal district where venue is proper, including the District of New Jersey.

## IX. CLAIMS FOR RELIEF

### COUNT ONE
### (Replevin)

330. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

331. At all times relevant hereto, New Jersey law such as N.J.S.A. 2B: 50-1, has permitted the absolute owner or person rightfully entitled to the exclusive possession of a unique chattel to bring an action in replevin to recover such chattel once the person in wrongful possession of it refuses the demand of the rightful owner or person entitled to possession to return it.

332. *Sunflowers* is unique, and as a casualty of Nazi policies is impressed with a discrete federal and U.S. foreign policy identity. The Heirs are the rightful owners of *Sunflowers* and so are entitled to its immediate possession, and Defendants have refused their demand to return it.

333. Defendants' detention of the Painting is wrongful for the reasons alleged herein.

334. Before this action was commenced, that is, on or about October 12, 2022, the Heirs, through their attorneys, demanded that Defendants return the Painting. Defendants, through their agents, refused their demand on or about November 21, 2022.

335. N.J.S.A. 2B: 50-1 permits the Heirs to bring an action in replevin to recover the Painting.

**COUNT TWO**
**(Conversion)**

315. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

316. At all times relevant hereto, the New Jersey law of conversion has prohibited any person from wrongfully detaining property that belongs to another or in which another person has a superior legal possessory interest and a right of immediate possession. When the possessor of such property refuses the demand of a person with a superior possessory interest in such property to return it, the law makes the wrongful possessor of such property liable to the other for conversion.

317. At all times relevant hereto, and for the reasons stated herein, the Heirs have been the rightful owners of *Sunflowers*, have had a legal possessory interest in the Painting that is superior to that of Defendants, and have been entitled to the immediate possession of the Painting.

318. *Sunflowers* is unique, and as a casualty of Nazi policies is impressed with a discrete U.S. foreign policy identity.

319. Before this action was commenced, that is, on or about October 12, 2022, the Heirs, through their attorneys, demanded that Defendants return the Painting. Defendants, through their agents, refused their demand on or about November 21, 2022.

320. Defendants have wrongfully detained and withheld the Painting in violation of the Heirs' superior legal interest and immediate possessory rights. Defendants' wrongful conversion

of the Painting has caused Plaintiffs damages in an amount exceeding two hundred and fifty million dollars ($250 million).

**COUNT THREE**
**(Trover)**

321. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

322. At all times relevant hereto, New Jersey law has allowed the rightful and lawful owner of converted property to recover from the defendant a monetary award in an amount reflecting the full and fair value of such property if the owner cannot obtain the return of the property.

323. *Sunflowers* is unique, and as a casualty of Nazi policies is impressed with a discrete U.S. foreign policy identity.

324. In the event that the Heirs are not able to obtain the return of *Sunflowers* from Defendants, Plaintiffs are entitled to a monetary award in an amount reflecting the full and fair value of the Painting and not less than two hundred and fifty million dollars ($250 million).

**COUNT FOUR**
**(Imposition of a Constructive Trust Under New Jersey Law for the Recovery of *Sunflowers*)**

325. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

326. At all times relevant to this proceeding, the equitable remedy of constructive trust has permitted the rightful and lawful owners of property in the wrongful possession of others to recover such property to prevent such others from being unjustly enriched by receiving and holding property that lawfully belongs to another, and which in good conscience they cannot

retain. At all times relevant to this proceeding, the law has required persons in possession of such property to return it to the rightful owner.

327. Inherently wrongful Nazi policies and concomitant coercion and duress that violated the modern international law of human rights and inflicted massive economic and financial losses upon Mendelssohn-Bartholdy were the exclusive reasons that he transferred *Sunflowers* to art dealer Rosenberg in 1934. Rosenberg and all subsequent possessors of *Sunflowers* – including Sompo Holdings and its corporate predecessor Yasuda, as well as all Defendants – have known that wrongful Nazi duress compelled Mendelssohn-Bartholdy to surrender the Painting and so were not *bona fide* or "good faith purchasers for value" of the Painting within the meaning of the applicable law

328. *Sunflowers* is unique, and as a casualty of Nazi policies is impressed with a discrete federal and U.S. foreign policy identity.

329. The Heirs have asked Defendants to return the Painting and Defendants have refused their demand.

330. The Plaintiffs are entitled to recover the Painting by imposing a constructive trust upon it.

**COUNT FIVE**
**(Unjust Enrichment under New Jersey Law Seeking to Recover Monies that Defendants Wrongfully have Reaped from Commercially Exploiting *Sunflowers*)**

331. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

332. At all times relevant hereto, applicable New Jersey and federal law have permitted owners of property that "conscious wrongdoers" have wrongfully misappropriated or converted to recover the unjust enrichment that they have reaped from using or commercially exploiting the converted property. The law regards a "conscious wrongdoer" as anyone who

either knows that the subject property was taken from a third person under duress, or who is recklessly indifferent to this possibility.

333. At all times relevant hereto, the law has recognized the difficulty inherent in apportioning gains realized from exploiting converted property when defendants commingle that property with other property or assets to generate revenues. For this reason the law requires plaintiffs in this context to propose a theory of recovery that merely reasonably approximates the gain that the wrongdoer reaped from using or exploiting the converted property, and then shifts the burden to the defendant to rebut or disprove this measure of recovery.

334. *Sunflowers* is unique, and as a casualty of Nazi policies is impressed with a discrete federal and U.S. foreign policy identity.

335. Defendants are "conscious wrongdoers" within the meaning of the applicable law because they acquired *Sunflowers* in reckless disregard of the fact that the Painting was a casualty of Nazi policies, and have commercially exploited the Painting for many years while knowing this fact. The Heirs have demonstrated that by purposefully making *Sunflowers* coextensive with its corporate identity and further exploiting the Painting with a sophisticated and effective branding strategy based upon psychological archetypes, Defendants have, upon information and belief, reaped more than seven billion dollars ($7 billion) in profits over the past five years, and increased the market value of their discrete brand by more than two hundred and thirty million dollars ($230 million). Plaintiffs are entitled to an award in an amount reflecting not less than ten percent (10%) of these sums.

**COUNT SIX**
**(Breach of Duty Under New Jersey Law to Assist the Heirs in Recovering *Sunflowers*)**

336. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

337. At all times relevant hereto, the law of New Jersey has imposed a duty upon tortfeasors such as Defendants who convert or unlawfully possess the property of others both to assist their victims and rightful owners to recover their property, and to refrain from commercially benefitting or exploiting such property. As stated in comment c to Section 322 of the Restatement (Second) of Torts (1965), "[t]he initial injury creates a duty of aid and the breach of the duty is an independent tort."

338. By acquiring *Sunflowers* in reckless disregard of the superior possessory and ownership rights of the Heirs and commercially exploiting the Painting in knowing derogation of their superior rights, Defendants and their corporate predecessor Yasuda breached this duty.

339. Plaintiffs are entitled to recover damages from Defendants resulting from this breach of duty in an amount exceeding two hundred and fifty million dollars ($250 million) and an order that Defendants return the Painting.

**COUNT SEVEN**
**(Breach of Duty under New Jersey Law to Refrain from Commercially Exploiting *Sunflowers*)**

340. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

341. At all times relevant hereto, the law of New Jersey has imposed a duty upon persons who are in wrongful possession of the property of others to refrain from commercially exploiting or benefitting from such property.

342. Sompo Holdings, its corporate predecessor Yasuda, and all Defendants herein breached this duty by capitalizing upon *Sunflowers* after knowing that the Painting was a casualty of Nazi policies, making *Sunflowers* an integral element of their discrete corporate identities, and employing a sophisticated branding strategy based upon psychological archetypes to derive commercial and public relations value from the Painting.

343. Plaintiffs are entitled to recover appropriate damages from Defendants for their breach of this duty.

**COUNT EIGHT**
**(Slander of Title under New Jersey Law)**

344. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

345. On or about March 24, 2022, Defendants Sompo Holdings, Sompo Japan Insurance Inc., and the Foundation, issued a public statement that the Painting is "owned by Sompo Japan Insurance Inc." In addition, this statement of ownership was issued on behalf of the "Sompo Group," which specifically includes defendant Sompo International on the Sompo Holdings website, and is part of the "One Sompo" directive. Since this time, Defendants have continued to maintain that they are the owners of the Painting.

346. In light of the foregoing, Defendants have caused to be published in the State of New Jersey and elsewhere that the Mendelssohn heirs are not the owners of *Sunflowers*. In this manner, Defendants work in concert to commercially exploit an image of the Painting on the Sompo Holdings website for advertising and branding, and to attract customers to its subsidiaries throughout the world, including but not limited to Sompo International's Chicago, New Jersey office.

347. Defendants' claims of ownership are malicious and disparaging statements, because Defendants know that such claims are false and misleading since Defendants know that the Heirs are the proper owners of the Painting. In the alternative, Defendants make such malicious and disparaging statements in reckless disregard of whether they are true or false.

348. The false and misleading statements made by Defendants in derogation of the ownership rights of the Heirs have caused the Heirs damages, including but not limited to special damages, because the Heirs are unable to lend the Painting to third parties for exhibition and payment, sell the Painting, or otherwise monetarily profit from their ownership of the Painting.

349. Plaintiffs are entitled to recover appropriate damages from Defendants in an amount to be determined by this Court.

**COUNT NINE**
**(Restitution for the Return of *Sunflowers* under Federal Common Law)**

350. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

351. At all times relevant hereto, the federal common law of restitution has enabled claimants to recover property wrongfully withheld in violation of important federal laws and policies whenever state law does not afford an adequate judicial remedy. Federal common law is essential on matters affecting foreign affairs when discrete state laws threaten to undermine exclusively national objectives upon which U.S. foreign policy necessarily depends.

352. The Defendants wrongfully have refused to return *Sunflowers* to the Heirs in violation of the signal U.S. foreign policy to restitute Nazi-era artworks to rightful owners based upon equitable principles of justness and fairness that both political branches of the U.S. Government that the Constitution entrust with formulating and conducting U.S. foreign policy – Congress and the Executive – have implemented. In the event that New Jersey state law does not

afford the Heirs an adequate judicial remedy to recover *Sunflowers*, the federal common law of restitution provides the Heirs an appropriate judicial remedy to recover the Painting.

**COUNT TEN**
**(Unjust Enrichment for Conscious Wrongdoing Under Federal Common Law)**

353. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

354. At all times relevant hereto, the federal common law has empowered claimants to recover unjust enrichment reaped from violating important federal laws and policies whenever state law does not afford an adequate remedy.

355. Federal common law is essential on matters affecting foreign affairs when discrete state laws threaten to undermine exclusively national objectives upon which U.S. foreign policy necessarily depends

356. The defendants wrongfully have refused to return to the Heirs the unjust enrichment that they have reaped as conscious wrongdoers by commercially exploiting for many years what they have known to be a Nazi-tainted artwork in which the Mendelssohn heirs have enjoyed superior ownership and possessory rights. The Defendants thereby have been enriched unjustly and as conscious wrongdoers in violation of the signal U.S. foreign policy to return Nazi-era artworks to rightful owners based upon equitable principles seeking to resolve claims concerning Nazi-era artworks in a just and fair manner. Moreover, and because both political branches of the U.S. Government that the Constitution entrusts with formulating and conducting U.S. foreign policy – Congress and the Executive – expressly have approved these policies, these policies necessarily preempt any New Jersey law that frustrates or obstructs their objectives. Accordingly – and if New Jersey state law does not afford the Heirs an adequate judicial remedy

to recover this unjust enrichment – the federal common law of unjust enrichment, accounting, or disgorgement provides them with such remedy.

**COUNT ELEVEN**
**(Restitution for the Return of *Sunflowers* Based Upon the Plenary Equitable Authority of the Court under Article III, Section 2 of the U.S. Constitution )**

357. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

358. At all times relevant hereto, when signal federal laws and policies are at stake – such as the imperative foreign policy that both Congress and the Executive have adopted to restitute Nazi- era artworks to rightful owners in a just and fair manner - Article III, Section 2 of the U.S. Constitution has conferred upon federal courts adjudicating such claims the broadest range of plenary equitable authority to accomplish the intended federal objective.

359. This authority includes the power to return to rightful owners specific property or chattels to which they lawfully are entitled under federal law and policy, or to impose constructive trusts upon such property for the benefit of rightful owners.

360. Because the Defendants have wrongfully retained *Sunflowers* in violation of relevant and signal U.S. foreign policies to return Nazi-era artworks to rightful owners in a just and fair manner – and have repudiated the request of the Heirs to return it - the Heirs are entitled to an award of a constructive trust to recover the Painting on their behalf from this Court in the exercise of its plenary equitable authority under Article III, Section 2.

**COUNT TWELVE**
**(Unjust Enrichment for Conscious Wrongdoing Based Upon the Plenary Equitable Authority of the Court under Article III, Section 2 of the U.S. Constitution)**

361. Plaintiffs reassert and reallege the allegations in the preceding paragraphs as if fully set forth herein.

362. At all times relevant hereto, when signal federal laws and policies are at stake – such as the imperative foreign policy that both Congress and the Executive have adopted to restitute Nazi- era artworks to rightful owners in a just and fair manner - Article III, Section 2 of the U.S. Constitution has conferred upon federal courts adjudicating such claims the broadest range of plenary equitable authority to accomplish the prescribed federal objective.

363. This authority includes the power to compel conscious wrongdoers such as the Defendants to relinquish or disgorge all unjust enrichment that they wrongfully have reaped in knowing or intentional violation of the discrete federal law and policy at issue, and to award such unjust enrichment to those rightfully entitled to it such as the Heirs.

364. For these reasons the Heirs are entitled to an award from this Court - in the exercise of its plenary equitable authority under Article III, Section 2 of the U.S. Constitution - of unjust enrichment in the full amount that the Defendants and their corporate predecessors have reaped from knowingly and intentionally commercially exploiting *Sunflowers* as conscious wrongdoers since they recklessly acquired the Painting at Christies' auction in London in 1987, with this amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby demand the following:

a. An order declaring that the Heirs are the sole lawful and rightful owners of *Sunflowers* in accordance with both applicable U.S. and New Jersey law and that Plaintiffs are entitled to the immediate and exclusive possession of the Painting, and declaring further that Defendants' possession of the Painting is wrongful and inequitable and results in unjust enrichment to Defendants;

b. An order imposing a constructive trust upon the Painting for the benefit of the Plaintiffs, and to prevent the unjust enrichment of Defendants, in accordance with applicable New Jersey and U.S. law, and requiring that Defendants return the Painting to Plaintiffs, or – if the Plaintiffs cannot have Painting returned to them – a constructive trust upon monies equivalent in amount to the current fair value of *Sunflowers*;

c. An injunction compelling Defendants to return *Sunflowers* to the Plaintiffs at a time and location within the Northern District of New Jersey to be agreed upon, and in the event possession thereof cannot be given to Plaintiffs, that Plaintiff have judgment against Defendants for the sum of not less than two hundred and fifty million (US) dollars ($250 million), reflecting the current fair value of the Painting with interest thereon;

d. An injunction prohibiting Defendants from continuing to use *Sunflowers* in any manner to represent or promote their business or businesses and from commercially exploiting *Sunflowers*;

e. An order imposing a constructive trust upon the unjust enrichment that Defendants wrongfully have reaped from commercially exploiting *Sunflowers* in violation of relevant New Jersey law in an amount to be determined by this Court;

f. An order requiring the restitution of monies based upon the unjust enrichment that Defendants have obtained from displaying *Sunflowers* publicly since March 30, 1987 when Defendants obtained the Painting in reckless disregard of the superior ownership rights of the Heirs, until the date of the final judgment in this proceeding;

g. An order imposing a constructive trust under New Jersey law on the amount by which over the past five years Defendants have increased their brand value based upon commercially exploiting the Painting in an amount not less than twenty-four million dollars ($24 million);

h. An order imposing a constructive trust under relevant federal common law and pursuant to the plenary equitable authority of the Court under Article III, Section 2 of the U.S. Constitution on the amount by which Defendants have increased their brand value based by commercially exploiting since they tortiously acquired it in March 1987;

i. An order declaring that Defendants' fraudulent misconduct regarding the Painting, and their failure to alert the Heirs that the Painting was a casualty of Nazi policies and that the Heirs were entitled to the exclusive possession and ownership, breached Defendants' legal obligation to aid the Heirs as Defendants' tort victims, in violation of applicable New Jersey law;

j. An award of damages in an appropriate amount on the claim of the Plaintiffs that Defendants failed to aid them in identifying and returning *Sunflowers* as Defendants' tort victims;

k. An order declaring that each Defendants are "conscious wrongdoers" within the meaning of relevant legal and equitable authority that enables the Heirs to recover the full unjust enrichment that the Defendants have reaped by recklessly misappropriating and

commercially exploiting *Sunflowers* while knowing that the Painting is a casualty of Nazi policies;

l. An order declaring that the fraudulent misconduct of Defendants' regarding the Painting and their commercial exploitation of *Sunflowers* while knowing that the Painting was a casualty of Nazi policies breached Defendants' legal obligation to refrain from commercially exploiting the Painting;

m. An award of not less than seven hundred and fifty million dollars ($750) million on Plaintiffs' claim for punitive damages, reflecting three times the current fair value of *Sunflowers*;

n. An order declaring that both the New Jersey and federal equitable doctrines of Unclean Hands precludes Defendants from asserting any equitable defenses to the Plaintiffs' claims in this proceeding to recover the Painting, for unjust enrichment, and for punitive damages;

o. An order declaring that the doctrine of comity – which requires consummate good faith – precludes the Court from recognizing any Japanese judgment that awards Defendants title to the Painting based upon the doctrine of prescription;

p. An injunction precluding Defendants from filing an action in Japan seeking to assert title to *Sunflowers* based upon the Japanese law of prescription;

q. An order piercing the corporate veil of each of the Defendant corporate entities and negating the separate corporate existence of each Defendant, and holding each Defendant liable for the legal wrongdoing, misconduct, and liabilities of the others on grounds that each is an alter ego of the other;

r. An order piercing the veil of each of the Defendant corporate entities and negating the separate corporate existence of each Defendant, and holding each Defendant liable for the legal wrongdoing, misconduct and liabilities of the others on grounds that each Defendant has commingled discrete corporate assets to commit fraud and perpetrate wrongdoing as set forth herein;

s. An order piercing the veil of each of the Defendant corporate entities and negating the separate corporate existence of each Defendant, and holding each Defendant liable for the legal wrongdoing, misconduct and liabilities of the others on grounds that each Defendant has been employed in an attempt to frustrate and impair signal U.S. foreign policies to restitute Nazi- era artworks in a prescribed manner, as well as to violate federal proscriptions against deceptive trade and unfair business practices, as well mail fraud and wire fraud;

t. An order declaring that by doing its business in New Jersey through Endurance Services, Defendants Sompo Holdings, Sompo International and (Sompo Japan) are subject to the specific jurisdiction of this Court and are liable as well for the unjust enrichment that Endurance Services has garnered from the Defendants' collective scheme to commercially exploit *Sunflowers*;

u. An order declaring that Defendants' fraudulent financial reporting concealing the identity of *Sunflowers* as a Nazi-confiscated artwork violates Rule 10b-5 (17 CFR 240.10b-5) of the SEC;

v. A preliminary injunction prohibiting Defendants from continuing to file fraudulent financial statements in violation of applicable IFRS and PCAOB financial accounting and auditing prescriptions and Rule 10b-5 (17 CFR 240.10b-5) of the SEC;

w. Pre-judgment and post-judgment interest on any award;

x. An award of the Plaintiffs' attorneys' fees, costs, expenses and interest;

w. Such further and other relief as the Court may deem appropriate and just.

**JURY DEMAND**

Plaintiffs hereby demand a jury on all counts so triable.

Dated: June 9, 2026

ARCHER & GREINER,
A Professional Corporation
Attorneys for Plaintiffs
Julius H. Schoeps, Britt-Marie Enhoerning,
and Florence von Kesselstatt

By: ______________________
KERRI E. CHEWNING

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I, KERRI E. CHEWNING, ESQUIRE, hereby certify that I am a partner at the law firm of Archer & Greiner, P.C., attorneys for the Plaintiffs Julius H. Schoeps, Britt-Marie Enhoerning and Florence von Kesselstatt, and that the matter in controversy in this case is not currently the subject of any other action pending in any court or of any pending arbitration or administrative proceeding. I further certify that any administrative appeal of sanctions that may be filed in the future would be incapable of providing the relief sought by way of this action as the administrative body is without authority to provide such relief.

DATED: June 9, 2026

______________________
KERRI E. CHEWNING

232296451 v2